1

2

3

4

5

6

7

8

9

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

10

11

12

13

14

15

16

| KONG MENG XIONG, and LUH XIONG, | Case No.  1:13-cv-00083-SKO |
|---|---|

KONG MENG XIONG, and LUH XIONG,

             Plaintiffs,

   v.

CITY OF MERCED, et al.,

           Defendants.

Case No.  1:13-cv-00083-SKO
Consolidated with No. 1:13-cv-00111-SKO

**ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

(Doc. No. 45)

17

## I.    INTRODUCTION

18    This action, *Kong Xiong v. City of Merced, et al.,* 1:13-cv-00083-SKO, was filed by Kong

19 Meng Xiong ("Kong") on January 17, 2013.  (Doc. 1.)  The case was deemed related to a second

20 civil action filed by Luh Xiong ("Luh") on January 23, 2013, captioned *Luh Xiong v. City of*

21 *Merced*, *et al.*("*Luh Xiong*"), 1:13-cv-00111-SKO, and the two cases were consolidated under the

22 lead case No. 1:13-cv-00083-SKO (collectively Kong and Luh are referred to as "Plaintiffs").[1]

23 Defendants City of Merced, Officer Chavez ("Chavez"), Officer Lodwick ("Lodwick"), Sergeant

24 Court ("Court"), and Detective Deliman ("Deliman") (collectively, "Defendants") filed a motion

25 for summary judgment, Plaintiffs each filed an opposition brief, and Defendants filed reply briefs

26 to each of the opposition briefs filed by Plaintiffs.

27

28

---

[1] References to documents filed in the *Luh Xiong* case No. 1:13-cv-00111-SKO will denote the case number along
with the docket number.  References to filings in the *Kong Xiong* case No. 1:13-cv-00083 will denote only a docket
number.

1   On July 17, 2015, Defendants filed a letter brief indicating they discovered an incident-

2   related Force Review Board report, which was being transmitted to Kong and Luh's counsel.  The

3   Court continued the July 22, 2015, hearing to July 29, 2015, to provide Plaintiffs time to review

4   the document and respond.  Plaintiffs filed a response indicating they had reviewed the document

5   and determined it was not relevant to their opposition to Defendants' motion.  Upon review of the

6   parties' papers and supporting documents and material, the matter was deemed suitable for

7   decision without oral argument, and the hearing set for July 29, 2015, was vacated.

8   For the reasons set forth below, Defendants' motion for summary judgment is GRANTED

9   in part and DENIED in part.

10   ## II.   FACTUAL BACKGROUND[2]

11   **A.   Report of Incident and Officers Dispatched to 1594 Buckingham Court**[3]

12   In the evening of December 3, 2011, Merced Police Officer Chavez and Merced Police

13   Officer Lodwick were each separately on patrol.  (Docs. 63, 64 DUMF 1, 5.)  Each was dispatched

14   to a call:  Chavez was told there was an Asian adult male displaying a gun at a residence at 1594

15   Buckingham Court and to respond to a call for Penal Code § 417; Lodwick was told there was an

16   Asian adult male exhibiting a firearm at a party.  (Docs. 63, 64, DUMF 2, 3, 6.)[4]  According to

17   Lodwick, the Asian male was yelling at everyone at the party while exhibiting a firearm.  (Docs.

18   63, 64, DUMF 7.)[5]  There is a recording of the radio traffic between dispatch and the officers.

---

19
20   [2] Citation to undisputed facts will reference the corresponding number in Defendants' Separate Statement of Undisputed Material Facts ("DUMF"); Defendants statement, Plaintiffs' responses, and Defendants replies are found at Docket Nos. 63 and 64.  The disputed facts will be noted as such.

21   [3] The parties each made objections, which the Court has carefully reviewed.  To the extent the Court necessarily relied on evidence that has been objected to, the Court relied only on admissible evidence and, therefore, the objection is
22   OVERRULED.  It is not the practice of the Court to rule on evidentiary matters individually in the context of summary judgment, unless otherwise noted.  This is particularly true when the evidentiary objections consist of
23   general objections such as "irrelevant" or "vague."  *See Capital Records, LLC v. BlueBeat, Inc.*, 765 F. Supp. 2d 1198, 1200 n.1 (C.D. Cal. 2010).
24

25   [4] Kong disputes the characterization that anyone was "brandishing" a weapon as that is not supported by the dispatch recording.  The dispatcher stated that someone had "pulled out a gun."  Defendants contend Kong's dispute over the words "brandishing" and a "disturbance" are overly technical.  However, DUMF No. 6 relates to what dispatch told
26   Lodwick.  The radio recording of the dispatcher's instructions to the officers is the best evidence of what the dispatcher reported.  The dispatcher did not use the words "brandishing" or "disturbance," and Defendants do not cite
27   the radio recording.  DUMF No. 6 is disputed.

28   [5] Kong disputes that the Asian male was reportedly "yelling" with the gun, that he was "brandishing" the gun, or that the person described by the dispatcher was Kong.  Defendants cite only to Lodwick's testimony for this disputed fact,

1   The parties dispute Defendants' characterization of the dispatcher's statement that the adult male

2   was "pointing a gun," which is discussed below.

3       Both officers responded to the call, and did not speak to each other as they responded.

4   (Docs. 63, 64, DUMF 8.)   Upon arriving at the location, Chavez parked his patrol car on

5   Nottingham Lane and Lodwick parked behind him.  (Docs. 63, 64, DUMF 9, 10.)  Both officers

6   exited their vehicles, approached 1594 Buckingham Court,[6] and had a conversation to confirm the

7   house address. (Docs. 63, 64, DUMF 11, 12.)

8   **B.      Officers' Approach to 1594 Buckingham Court**

9       As the officers approached 1594 Buckingham Court, Chavez heard voices coming from the

10  house, and an argument had been going on.[7]  (DUMF 13.)  Chavez took cover behind a pickup

11  truck located at the house next door (DUMF 14), and Lodwick was on Chavez' right and walked

12  alongside the house when a motion light came on.[8]  Lodwick then joined Chavez behind the truck.

13  (DUMF 15.) Lodwick also heard an argument.[9]

14  **C.      Officers Confront Kong**

15        **1.      Officers' Version**

16      While looking at the house, Chavez heard a gun slide – i.e., the racking of a handgun.

17  (Doc. 46-1, Chavez Depo., 64:20, 65:7, 67:24-68:4.)  He thought a bullet was being chambered in

18  a gun, and determined the sound had come from the vicinity of the house.  (Doc. 46-1, Chavez

19  Depo., 66:22-24, 153:5-8.)  To Chavez, the sound was like a semi-automatic gun.  (Doc. 46-1,

20

---

21  which is not the best evidence of what the dispatcher told the officers.  While it is not disputed this is what Lodwick

22  believes the dispatcher reported, the dispatcher did not use the words "brandishing" or "yelling"; thus, this fact is disputed.  (Docs 62, 63 DUMF 7.)

23  [6] Kong disputes that the officers knew where 1594 Buckingham Court was located and were looking for the wrong

24  address initially.  To the extent this is disputed, it is not material.

25  [7] Kong disputes Defendants' characterization of what Chavez heard as an "argument" (*see* Doc. 56-3), although Luh does not dispute this characterization (*see* Doc. 59).   Chavez testified at his deposition that he heard a loud

26  conversation that sounded like an argument, but he did not know what the individuals were saying.  (*Compare* Doc. 46-1, Chavez Depo., 58:11-21, 136:8-34 *with* Doc. 57-1, Chavez Depo., 61:25, 62:23-24.)

27  [8] Kong disputes which house Lodwick was walking next to when the motion light came on.  To the extent this is disputed, it is not material.

28  [9] Kong disputes Defendants' characterization that what Lodwick heard was an argument.

Chavez Depo., 66:10.) Lodwick also heard the sound – he heard a gun slide and believed a bullet was being chambered.  (Doc. 46-3, Lodwick Depo., 66:6-13.)  Lodwick then pulled out his handgun, in the "low-ready" position and asked Chavez if he'd heard that; Chavez said yes. (Doc. 46-1, Chavez Depo., 66:25-67:11, Doc. 46-3, Lodwick Depo., 66:14-25.)  Chavez pulled out his handgun.  (Doc. 46-1, Chavez Depo., 81:3-15.)

Chavez attempted to call dispatch about the gun-racking sound, when Kong opened the gate from the backyard and walked to the front of the house, toward the street/sidewalk.  (Doc. 46-1, Chavez Depo., 70:5-71:2, 71:13-72:4; Doc. 46, Ex. D, Incident Related Video ("Video"), 3:11-3:30.) Lodwick testified Kong appeared within 3 to 5 seconds of the "gun-slide" sound, and Kong emerged from the area where Chavez and Lodwick had heard the argument. (Doc. 46-3, Lodwick Depo., 59:7-12, 67:1-8; Doc. 46-1, Chavez Depo., 137:16-138:1.)  Kong was wearing dark pants with a flannel jacket, either light gray-and-white or white-and-black.  (Doc. 46-3, Lodwick Depo., 67:9-14.)  Kong then stopped in front of the house, at which point a light was shone on Kong, and Chavez and Lodwick issued him verbal commands.   (Doc. 46-1, Chavez Depo., 79:23-80:9, 84:21-85:2, 88:17-89:8; Doc. 46-3, Lodwick Depo., 70:7-11; Doc. 46, Exh. D, Video, 3:27-3:30.) Lodwick initially saw Kong's right-hand inside the waistband area of his jacket, but he could not actually see Kong's right hand.  (Doc. 46-3, Lodwick Depo., 70:2-6.)  Lodwick also observed Kong holding a gun in his right hand (Doc. 46-3, Lodwick Depo., 75:24-77:12), and Kong later corroborated the gun's existence by admitting to having a gun at the time the officers fired at him. (Doc. 46-5, Kong Depo. 69:2-7, 69:13-20, 69:24-70:3, 82:2-7.)

Kong's gun was pointed in the officers' direction, and the officers fired.   (Doc. 46-1, Chavez Depo., 92:3-21, 129:9-12, 129:17-22; Doc. 46-3, Lodwick Depo., 77:13-15.)  Kong fell to the ground, at which time Chavez knew Kong had been shot. (Doc. 46-1, Chavez Depo., 97:16-21, 142:11-14.)  Chavez shot to incapacitate Kong and to stop the threat, but he was not shooting to kill. (Doc. 46-1, Chavez Depo., 153:24-154:5.)  Both officers stopped firing when Kong fell to the ground.  (Doc. 46-3, Lodwick Depo., 81:10-13; Doc. 46-1, Chavez Depo., 97:16-98:20.)

At the moment they fired at Kong, neither officer could see people behind the fence to the backyard.   (Doc. 46-1, Chavez Depo., 121:17-20; Doc. 46-3, Lodwick Depo., 89:24-90:16.)

1    While Chavez had reason to believe there were others on the property, he had no knowledge as to
2    whether these people were inside or outside when he fired his weapon at Kong.  (Doc. 46-1,
3    Chavez Depo., 145:20-23.)  When Lodwick fired his weapon, he was also not aware that people in
4    the backyard were at risk of being hit by a bullet.  (Doc. 46-3, Lodwick Depo., 82:24-83:3.)

5         After the shooting, Kong lay on the ground and continued to move, including his hands
6    towards his waist.   (Doc. 46-1, Chavez Depo., 98:12-20; 101:6-12.)   The officers gave him
7    commands, including putting his hands up.  When Sergeant Court arrived on scene, he saw a gun
8    lying next to Kong.  (Doc. 46-10, Court Depo., 19:8-20:3; 22:7-20.)  Court asked Chavez if he and
9    Lodwick were okay, inquired as to who fired, and told them to keep giving Kong commands; the
10   officers told Court that Kong had a gun, which Court observed.  (Doc. 46-10, Court Depo., 19:8-
11   20:3.)  At that moment, however, Court did not believe the scene was secure as the gun was still
12   on the ground by Kong, at least a dozen people were streaming out of the house, and only three
13   officers were on the scene.  (Doc. 46-10, Court Depo., 22:21-23:15, 24:1-18; 25:16-20.)  First aid
14   was rendered to Kong when it was safe to do so.  (Doc. 46-10, Court Depo., 23:21-24:18.)

15        Court and the other officers moved Kong to a safe area near paramedics.  (Doc. 46-10,
16   Court Depo., 31:6-21; 58:8-17; Doc. 46-3, Lodwick Depo., 91:10-22.)   Kong obtained first aid
17   within 10 to 15 minutes of the incident.  (Doc. 46-10, Court Depo., 27:13-20.)  The officers acted
18   to ensure Kong's medical care, despite that they were not operating in a secure area.  (Doc. 46-10,
19   Court Depo., 31:6-32:3.)  In doing so, the officers exceeded Merced policy, which only states that
20   first aid is to be rendered "to injured parties if it can be done safely."  (Doc. 50, Trindad Decl.,
21   Exh. M.)  Lieutenant McIntyre arrived on-scene when Kong was moved.  (Doc. 46-10, Court
22   Depo., 59:2-25.)  Once Kong was moved, Chavez and Lodwick entered the backyard of 1594
23   Buckingham Court.  (Doc. 46-1, Chavez Depo., 104:16-105:14.)  The officers never entered the
24   house.  (Doc. 46-1, Chavez Depo., 104:16-105:14.)  Upon exiting the backyard, Chavez walked to
25   the street and back to Nottingham Street with Merced Police Officer Gonzalez.   (Doc. 46-1,
26   Chavez Depo., 105:18-106:12.)  Lieutenant McIntyre asked both Chavez and Lodwick questions
27   which constituted a public safety statement.  (Doc. 46-1, Chavez Depo., 108:11-109:8, Doc. 46-3,
28   Lodwick Depo., 30:3-20.)

Once most of the people had left the house, the SWAT team from Merced County Sheriff's Department took over searching and clearing the rest of the property.  (Doc. 46-10, Court Depo., 45:3-13, 48:13-19, 50:7-22.)[10]

**2.     Plaintiffs' Version**[11]

While standing in front of 1594 Buckingham Court, Lodwick and Chavez both testified they heard a noise which they believed to be the racking of a semi-automatic handgun from the general area of the house.  (Doc. 60-2, Chavez Depo., 70:5-15, 71:13-72:18; Doc. 60-3, Lodwick Depo., 65:10-66:13; Doc. 57-1, Chavez Depo.,[12] 66:22-68:22) (testifying sound came from the general area of the house).  However, neither Luh nor Kong heard the noise or observed anyone racking a gun in the backyard, and the sound cannot be heard on the video of the incident.  (Doc. 60, Exh. E, Video 23:03:08; Doc. 60-6, Kong Depo., 70:12-23; Doc. 60-15, Luh Decl., ¶ 5.) Lodwick asked Chavez: "You hear that?" and Chavez responded, "yes."  (Doc. 60-3, Lodwick Depo., 14-25; Doc. 60-6, Kong Depo., 55:19-25, Doc. 60, Exh. E, Video, 23:08:18.)  As Chavez attempted to contact dispatch, Kong exited the side gate area of 1594 Buckingham Court and walked toward the public sidewalk in the front of the homes.  (Doc. 57-1, Chavez Depo., 70:5-14; 71:13-72:18.)  The officers immediately drew their firearms, and illuminated Kong with their gun-mounted flashlights.  (Doc. 57-1, Chavez Depo., 86:7-23, Doc. 57-1, Lodwick Depo., 73:2-7, Doc. 60-2, Chavez Depo., 70:5-71:12, 79:23-81:15.)  Kong maintains Chavez had his gun pointed at Kong even before he had illuminated Kong with his flashlight.  (Doc. 57-1, Chavez Depo., 80:6-21.)[13]  Kong was wearing a black and white checkered jacket and did not fit the description of the

---

[10]  Plaintiff Luh disputes this and contends the Merced County Sheriff's SWAT team is interdepartmental and contains officers from MPD who participated in the search.

[11] Plaintiffs' factual version is drawn from Kong and Luh's opposition briefs in combination, as well as their responses to Defendants' separate statement of undisputed material facts and Plaintiffs' separate statement of disputed material facts.

[12] All references to the Chavez Deposition at Document 57-1 refer to Chavez' 2015 deposition at Exhibit E.  Any reference to the 2012 Deposition at Exhibit C is denoted as the 2012 Deposition.

[13] Chavez was specifically asked at his deposition whether he pulled his gun at the same time as turning on the light or whether the gun was already pointed at Kong and *then* Chavez turned on the light; Chavez responded that he didn't "remember exactly how it was done."  (Doc. 57-1, 82:18-25.)

1  person who reportedly had exhibited a weapon at the party.  (Doc. 60-3, Lodwick Depo., 67:1-

2  69:2; Doc. 46, Exhibit B, Incident Related Radio Traffic ("Radio Traffic"), 4:00-4:34.)[14]

3        Rather than announcing their presence, the officers yelled for Kong to raise his hands, but

4  they failed to identify themselves as the police and did not warn him they would shoot if he did

5  not follow commands.  (Doc. 60-2, Chavez Depo., 72:22-74:14, Doc. 60-3, Lodwick Depo.,

6  70:15-71:5.)  The officers did not know who Kong was, as he did not fit the description of the

7  suspect provided by dispatch, and they had no information that Kong had violated any laws.  (Doc.

8  57-1, Chavez Depo., Doc. 60-3, Lodwick Depo., 71:11-72:2.)  When Kong saw the light, he was

9  unsure who they were and did not know they were police officers; he became scared and turned in

10  the opposite direction of the officers to run away.  (Doc. 60-6, Kong Depo., 67:4-21.)  Kong had a

11  firearm tucked in the waistband of his pants, but he made no motion to reach down into his

12  waistband, rack the gun, or point it at the officers.  (Doc. 60-6, Kong Depo., 67:4-21, 69:5-18,

13  70:12-13, 71:18-20.)

14        The officers opened fire on Kong, shooting several bullets in the direction of Kong and the

15  backyard as he was running away from the officers toward the backyard gate.  (Doc. 60-3,

16  Lodwick Depo., 81:18-82:5; Doc. 60-2, Chavez Depo., 92:19-95:11, 140:6-141:5; Doc. 60-6,

17  Kong Depo., 70:24-71:3.)  The officers fired in a manner meant to incapacitate Kong.  (Doc. 57-1,

18  Chavez 153:24-154:20; Doc. 57-1, Lodwick Depo., 83:4-8.)  One of the bullets struck Kong in the

19  leg.  (Doc. 60-6, Kong Depo., 28:9-29:15.)  When Kong exhibited signs of being shot, the officers

20  stopped firing.  (Doc. 57-1, Chavez Depo., 97:16-98:20.)

21        The officers knew a party was being held in the home, and they heard a group of people

22  talking loudly behind Kong as they fired on him.  (Doc. 60-3, Lodwick Depo., 82:17-83:12, Doc.

23  60-2, Chavez Depo., 61:23-62:13.)  The officers were fully aware that shooting at Kong put other

24  people in the backyard in danger of being shot as well.  (Doc. 60-3, Lodwick Depo., 108:18-

25  109:10, 120:18-24.)  A partygoer standing behind the gate was shot in the foot and chest and died

26  as a result of his injuries (Doc. 60-2, Chavez Depo., 143:17-144:2, 148:3-5; Doc. 60-3, Lodwick

27  Depo., 115:19-116:2), and Luh was also standing in the backyard just behind the gate when he

28

[14] Each of the parties lodged copies of the incident video and dispatch recordings.

1  was shot in the leg (Doc. 60-3, Lodwick Depo., 116:8-11; Doc. 60-15, Luh Decl., ¶ 6).

2  After being shot in the leg, because Luh did not know who was shooting and, fleeing for

3  his life and feeling faint from the trauma, he ran into the house and hid in a bathtub.  (Doc. 60-15,

4  Luh Decl., ¶ 7.)

5  Chavez and Lodwick's supervisor, Court, came onto the scene within minutes of the

6  shooting and began giving orders, including an order to remain in place and wait for additional

7  units to secure the location and Kong.  (Doc. 57-1, Chavez Depo., 100:3-23, 101:25-103:8.)  Kong

8  maintains that Chavez, Lodwick, and Court rendered him no aid.   (Doc. 57-1, Chavez Depo.,

9  104:7-13, Doc. 57-1, Lodwick Depo., 81:18-82:17.)[15]  Partygoers exiting the home informed the

10  officers that another shooting victim was inside the home.  (Doc. 60-4, Court Depo., 48:21-50:6.)

11  **D.      SWAT Team and Post-Arrest Interview of Kong**

12  Court turned the task of controlling the scene over to the Merced County Sheriff's SWAT

13  team which Luh maintains was comprised of Merced City police officers who participated in the

14  incident.  (Doc. 60-4, Court Depo., 45:3-46:11, 50:7-51:6.)[16]  Luh also contends that based on the

15  Merced police officers on the scene reporting that Kong pulled a gun and pointed it at Chavez and

16  Lodwick, the SWAT team deployed a police dog that went into the house and bit Luh until the

17  officers went in and pulled him out of the home.[17]  The parties do not dispute that once the Merced

18  ---

[15] Although he cited it, Kong did not include page 81 of Lodwick's deposition.  Moreover, this portion of the deposition transcript does not discuss the aid Lodwick did or did not render to Kong.  The only testimony supporting this fact is that of Chavez, who was asked whether he rendered Kong aid in any way, to which Chavez responded, "no." (Doc. 57-1, Chavez Depo., 104:12-13.)

[16] Sergeant Court testified that, once all the people were drawn out, Lieutenant McIntyre "kind of took over in terms of initiating the rest of the search of the residence and the location," and "we called the SWAT out." (Doc. 60-4, Court Depo., 45:7-19, 46:7-8.)  He also testified that SWAT "kind of take over the scene in terms of the security of the perimeter and a lot of the stuff that – you know, they – we pull our officers out . . . Once they get there, they kind of take over."  (Doc. 60-4, Court Depo., 48:6-12.)  Sergeant Court testified that it was the Merced County Sheriff's SWAT team that was utilized, and Court identified two of the members of the SWAT team, but did not identify them as officers with the Merced Police Department.  (Doc. 60-4, Court Depo., 50:9-19.)

[17] Luh cites Sergeant Court's deposition as evidence that the police officers on scene reported to the SWAT team that Kong pulled out a gun and pointed it at them.  However, Court's testimony is not that specific.  He states that, "I didn't have – you know, other than information I provided to them.  I mean, by this time, the two people had been – the— Mr. Xiong or Xiong and the other subject inside the gate, I think it's Xiong as well, they had been transported by Riggs, which is a paramedic company, so other than providing information as to what we knew, in terms of what we saw before their arrival, provided them with that information."  (Doc. 60-4, 52:12-20.)  There is no testimony as to what specific information was relayed to the SWAT team or the basis of the SWAT team's decision to deploy the police dog.

8

1  County Sheriff's SWAT team arrived, the Merced Police pulled back to the outer perimeter, and

2  the SWAT team controlled the inner perimeter.  (*See* Docs. 62, 63, DUMF 91-93.)

3

4  Merced Police Detective Deliman prepared a search warrant for 1594 Buckingham Court

5  and interviewed Kong.  Kong made several admissions during the course of his post-arrest

6  interview including that the incident was his fault, that he had a gun in his possession when

7  officers stopped him, and that he had pointed his gun towards the officers.  (Doc. 46, Exhibit L,

8  Post-Arrest Interview Video ("Interview Video")).[18]

9  **E.     Merced Police Department ("MPD") Policies and Training**

10  The parties do not dispute any of the following facts regarding MPD's polices.  At the time

11  of the incident, MPD used policies developed by Lexipol.  (*See* Docs. 62, 63, DUMF 125.)

12  Lexipol is a commercial company that provides policies and procedures for police departments in

13  California and was MPD's provider of policies and procedures at the time of the incident. (*See*

14  Docs. 62, 63, DUMF 126-27.)  These policies included:  (1) Law Enforcement Authority (Police

15  100); (2) Training Policy (Policy 208); (3) Use of Force (Policy 300); (4) Deadly Force Review

16  (Policy 302); (5) Shooting Policy) (Policy 304); (6) Officer-Involved Shooting (Policy 310); (7)

17  Firearms (Policy 312); (8) Search and Seizure (Policy 332); (9) Disciplinary Policy (Policy 340);

18  (10) Report Preparation (Policy 344); (11) Racial Profiling (Policy 402); (12) Briefing Training

19  (Policy 404); (13) Crime and Disaster Scene Integrity (Policy 406); (14) Field Training Officer

20  (Policy 436); and (15) Detentions and Photographing Detainees (Policy 440).  (Doc. 50, Trindad

21  Decl., ¶ 8.)

22  The Commission on Police Officer Standards & Training ("POST") is a state-wide quasi-

23  governmental organization composed of law enforcement executives and advisors.  POST sets

24  forth standards for the basic and continued training of peace officers, and certifies that local law-

25  enforcement agencies and their officers are in compliance with those standards.  In addition, POST

26  reviews and certifies training courses developed by local law-enforcement agencies as in

27
28  [18] Kong and Luh make several evidentiary objections to Kong's post-arrest interview statements, although Kong does not deny that he made these statements.  These objections are considered in the Court's discussion of the interview statements in the analysis section below.

1  compliance with POST standards and expectations.  POST conducts regular audits of local

2  agencies and officers to determine compliance, and certifies that those agencies and officers are in

3  compliance.  (Doc. 50, Trindad Decl., ¶ 9.)

4       Court successfully completed a POST-certified police academy with 680 hours of training.

5  Chavez successfully completed a POST-certified police academy with 1,200 hours of training.

6  Lodwick successfully completed a POST-certified police academy with 1,007 hours of training.

7  Deliman successfully completed a POST-certified police academy with 1,332 hours of training.

8  (Doc. 50, Trindad Decl., ¶ 11.)   Officers in the MPD may also choose to obtain additional

9  certificates which are based on an officer's further education and experience.  At the time of the

10  incident, Court possessed his Basic, Intermediate, Advanced, and Supervisory certificates;

11  Deliman possessed his Advanced certificate; and Chavez and Lodwick possessed a Basic

12  certificate.  (Doc. 50, Trindad Decl., ¶ 12.)[19]

13       MPD requires firearms requalification as well as mandatory monthly firearms training.

14  (Doc. 46-15, Williams Depo., 16:10-19; 55:25-58:3.)  The monthly training reflects an officers'

15  real-world environment:  day shift officers shoot during the day-time, night-shift officers shoot at

16  night.  (Doc. 46-15, Williams Depo., 36:17-25.)[20]  Additionally, every officer in the Department is

17  required to attend an annual nighttime shoot, regardless of their shift.  (Doc. 46-15, Williams

18  Depo., 37:1-9.)  The subject matter of monthly training depends on the lesson plan prepared by the

19  range instructor.  (Doc. 46-15, Williams Depo., 16:20-17:15, 18:8-20.)  MPD utilizes scenario-

[19] Kong objects to Trindad's declaration (Doc. 50), paragraphs 10, 14, and 15 because Trindad offers testimony about various training MPD performs, as well as the number of hours of biannual update training Lodwick, Chavez, Deliman, and Court had completed as of the date of the incident because these documents were not produced under Rule 26 to Plaintiffs.  (Doc. 56-3, DUMF 136-38.)  Although Trindad references training and the number of hours of training Chavez, Lodwick, Court, and Deliman had completed at the time of the incident, Defendants are not offering the actual training documents as evidence.  The documents may not have been disclosed by Defendant pursuant to the initial disclosure requirements under Federal Rule of Civil Procedure 26(a), but this does not preclude Trindad from offering testimony within his personal knowledge about the training completed by the officers or within the department, particularly as there is no argument that Trindad was not disclosed as a witness and because Trindad was deposed, in part, on these matters.

[20] Although Kong objects that this testimony from Matthew Williams is irrelevant, this testimony is relevant to Kong's *Monell* claim for inadequate training.  Kong also objects that no documents were produced by Defendants pursuant to Rule 26 initial disclosure requirements regarding this training.  However, Williams was deposed by Kong on March 16, 2015.  Defendants are not precluded from relying on the deposition testimony solicited by Kong from Williams.  Moreover, Defendants are not offering the underlying training documents to support their defense to Kong's *Monell* claim; thus they are not offering documents in violation of their initial disclosure requirements under Federal Rule of Civil Procedure 26(a).  Kong's objections are OVERRULED.

based training (also known as laser-shot system), which officers are required to undergo at least once a year.  (Doc. 46-15, Williams Depo., 25:24-26:19, 43:21-44:15.)  This is a pass-fail system, and officers are not allowed to leave if they fail the scenario-based training.  (Doc. 46-15, Williams Depo., 26:20-29:8.)  Officers who initially fail undergo additional training before undergoing the scenario shooting again.  (Doc. 46-15, Williams Depo., 28:20-29:8.)  The same rule applies to live-fire training:  all officers must take until they pass (and get additional training if they initially fail).  (Doc. 46-15, Williams Depo., 28-20-29:8.)

**F.      MPD Investigation into the Shooting Incident**

The MPD adheres to the California Penal Code § 832.5, which requires that the Department have a procedure for investigating complaints made by the public and make a written description of the procedure available to the public.  An Internal Affairs investigation conducted by the MPD results in one of the following findings for each allegation, which have the following meanings:  (a) Exonerated:  Action complained about did occur, but was lawful, justified, and proper; (b) Not sustained:  There is insufficient information/evidence to prove or disprove the allegation; (c) Sustained:  The allegation is supported by sufficient information and/or evidence; (d) Unfounded:  The allegation is false; alleged act did not occur, employee or MPD was not involved.  (Doc. 50, Trinidad Decl., ¶ 5.)

The MPD conducted an officer-involved shooting investigation after the subject incident in this case.  Internal Affairs conducted an administrative investigation pursuant to Policy 310, and Trinidad and Lieutenant Jim Gurden were the investigating lieutenants.  The investigation included (1) interviewing the reporting party who called 911 the night of the incident; (2) interviewing Chavez, Lodwick, and Court; (3) interviewing Luh Xiong; (4) canvassing the neighborhood of 1594 Buckingham Court for witnesses; (4) visiting the scene and inspecting the incident-related residence; (5) reviewing the incident-related video from Chavez' glasses; (6) reviewing the incident-related radio traffic; and (7) reviewing the incident-related photographs taken by the Crime Scene Response Team.  The neighborhood canvass uncovered three civilians who were interviewed.  The investigators also interviewed a guest at the party that evening.  The investigators attempted to interview another person, but were unsuccessful.  The investigators

1   attempted to interview Kong, but he declined.  Internal affairs found no violation of MPD policy

2   regarding the use of deadly force.  (Doc. 50, Trinidad Decl., 15.)[21]

3   **G.     Video Evidence**

4         The parties each submitted a video of the incident that was obtained from a camera

5   embedded in Chavez' glasses.  Both sides assert it supports their respective accounts of the

6   incident and, in turn, contradicts the opposing party's account.  The Court has reviewed the video,

7   which is incorporated by reference herein.  The Court will not provide a summary of the video,

8   except in a general way as it would give rise to subjective interpretation.

9                          **III.   PROCEDURAL BACKGROUND**

10        It is undisputed that, due to the events on December 3, 2011, Kong was charged and found

11   guilty by jury of violation of penal Code § 12021(d), possession of a gun while on probation.  He

12   was released from custody on June 25, 2012.

13        Kong filed a complaint in this Court on January 17, 2013.  He alleges claims for violation

14   of the California Civil Code §§ 51.71 and 52.1, battery, assault, negligence, excessive force in

15   violation of the Fourth Amendment, conspiracy pursuant to 42 U.S.C. § 1985, a *Monell* claim

16   pursuant to Section 1983 (*see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)), a claim for

17   injunctive relief, and seeks punitive damages.

18        Luh filed a complaint against Officers Chavez and Lodwick as well as the City of Merced

19   on January 23, 2013.  Luh alleges claims against Officers Chavez and Lodwick under Section

20   1983 for unreasonable search and seizure and excessive force in violation of the Fourth

21   Amendment (*Luh Xiong*, 1:13-cv-00111-SKO, Doc. 2, ¶¶ 24-25), violation of Luh's due process

22   rights under the Fourteenth Amendment (*Luh Xiong*, 1:13-cv-00111-SKO, Doc. 2, ¶¶ 24-25), and

23   state-law claims for assault, battery, and negligence (*Luh Xiong*, 1:13-cv-00111-SKO, Doc. 2, ¶¶

24   40-46).  Against the City of Merced, Luh Xiong alleges a *Monell* claim under two separate

---

[21] Kong does not dispute these actions occurred, but disputes they were sufficient to properly investigate the incident. (Doc. 57-1, T.T. Williams Depo., 10:16-11:6.) Kong also asserts that no administrative shooting investigation report was ever provided in discovery, and objects to Trindad's declaration regarding the administrative investigation. Defendants do not offer the administrative report as evidence to support their defenses; instead, they offer Trindad's declaration regarding his personal knowledge about the administrative shooting investigation.  Also, Trindad was deposed by Plaintiffs on June 4, 2015, and he gave testimony about the Internal Affairs investigation.  Kong's objection is OVERRULED.

1   theories: (1) custom, policy, and practice; and (2) ratification.  (*Luh Xiong*, 1:13-cv-00111-SKO,

2   Doc. 2, ¶¶ 26-39.)

3       On September 6, 2013, Defendants filed a motion to consolidate the two cases, which was

4   granted.  (Doc. 25, 27.)   On June 3, 2015, Defendants moved for summary judgment on all

5   Plaintiffs' claims.  (Doc. 45.)  Luh and Kong filed briefs in opposition and separate responses to

6   Defendants' undisputed statement of material facts.  Defendant filed a reply brief in response to

7   both Plaintiffs' opposition briefs.  Plaintiffs assert there are multiple issues of material fact that

8   preclude summary judgment including whether Defendants used excessive force in shooting Kong

9   and Luh.

10                          **IV.   JUDICIAL NOTICE**

11      In support of their motion for summary judgment, Defendants request that the Court take

12   judicial notice of the following documents:   (1) the jury verdict from Kong's incident-related

13   criminal prosecution; (2) minutes regarding the jury's verdict in Kong's incident-related criminal

14   prosecution; (3) the probation order from Kong's incident-related criminal prosecution; (4) the jail

15   record regarding Kong's release from custody on June 25, 2012; (5) a copy of Kong's tort claim to

16   the City of Merced, presented on June 1, 2012; and (6) a copy of the City of Merced's amended

17   notice of rejection of Kong's tort claim, served on July 16, 2012.  (Doc. 52.)  Neither Plaintiff

18   objects to Defendants' request for judicial notice of these documents.

19      Federal Rule of Evidence 201 provides that a "court may judicially notice a fact that is not

20   subject to reasonable dispute because it: (1) is generally known within the trial court's territorial

21   jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot

22   reasonably be questioned."  Fed. R. Evid. 201(b)(1)-(2).  Judicially noticed facts often consist of

23   matters of public record.  *See, e.g., Barron v. Reich*, 13 F.3d 1370, 1377 (9th Cir. 1994) (records

24   and reports of administrative bodies subject to judicial notice); *Toney v. Burris*, 829 F.2d 622,

25   626-27 (7th Cir. 1987) (city charters and city ordinances subject to judicial notice); and *Rothman*

26   *v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) (taking judicial notice of a filed complaint as a public

27   record).  The records to be judicially noticed include court and other public documents which are

28   subject to accurate and ready determination.  Defendants request for judicial notice is granted.

## V.   SUMMARY JUDGMENT LEGAL STANDARD

Summary judgment is appropriate when the pleadings, disclosure materials, discovery, and any affidavits provided establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A material fact is one that may affect the outcome of the case under the applicable law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party." *Id.* (internal quotation marks and citation omitted)

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  The exact nature of this responsibility, however, varies depending on whether the issue on which summary judgment is sought is one in which the movant or the nonmoving party carries the ultimate burden of proof. *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007); *Cecala v. Newman*, 532 F. Supp. 2d 1118, 1132 (D. Ariz. 2007).  If the movant will have the burden of proof at trial, it must demonstrate, with affirmative evidence, that "no reasonable trier of fact could find other than for the moving party." *Soremekun*, 509 F.3d at 984.  In contrast, if the nonmoving party will have the burden of proof at trial, "the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." *Id.* (citing *Celotex*, 477 U.S. at 323).

If the movant satisfies its initial burden, the nonmoving party must go beyond the allegations in its pleadings to "show a genuine issue of material fact by presenting *affirmative evidence* from which a jury could find in [its] favor." *FTC v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009).  "[B]ald assertions or a mere scintilla of evidence" will not suffice in this respect. *Id.* at 929; *see also Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.").  "Where

1  the record taken as a whole could not lead a rational trier of fact to find for the non-moving party,
2  there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

3      In resolving a summary judgment motion, "the court does not make credibility
4  determinations or weigh conflicting evidence." *Soremekun*, 509 F.3d at 984.  That remains the
5  province of the jury or fact finder.  *See Anderson*, 477 U.S. at 255.  Instead, "[t]he evidence of the
6  [nonmoving party] is to be believed, and all justifiable inferences are to be drawn in [its] favor."
7  *Id.*  Inferences, however, are not drawn out of the air; the nonmoving party must produce a factual
8  predicate from which the inference may reasonably be drawn.  *See Richards v. Nielsen Freight*
9  *Lines*, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898 (9th Cir. 1987).

10                              **VI.   DISCUSSION**

11  **A.    Plaintiffs' Fourth Amendment Claims Against Officers Chavez and Lodwick**

12      Luh and Kong allege excessive force claims under the Fourth Amendment pursuant to 42
13  U.S.C. § 1983.  Defendants claim they are entitled to summary judgment as to both Luh and
14  Kong's claims of excessive force under the Fourth Amendment.

15      Section 1983 of Title 42 of the U.S. Code provides a cause of action for the deprivation of
16  "rights, privileges, or immunities secured by the Constitution or laws of the United States" by any
17  person acting "under color of any statute, ordinance, regulation, custom, or usage."  *Gomez v.*
18  *Toledo*, 446 U.S. 635, 639 (1980).  Section 1983 is not itself a source of substantive rights, but
19  instead is a method for vindicating federal rights conferred elsewhere.  *Graham v. Connor*, 490
20  U.S. 386, 393-94 (1989).  A claim under Section 1983 requires an allegation that (1) the conduct
21  complained of was committed by a person acting under color of state law; and (2) the conduct
22  violated a right secured by the Constitution or laws of the United States.  *West v. Atkins*, 487 U.S.
23  42, 48 (1988).

24          **1.    Plaintiff Luh's Claims Under the Fourth Amendment for Excessive Force**

25              **a.    Luh's Shooting Was Not A Constitutionally Cognizable Seizure**

26      The Fourth Amendment only protects against unreasonable "searches" and "seizures."
27  *County of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998).  "[I]t is not a general prohibition of all
28  conduct that may be deemed unreasonable, unjustified, or outrageous."  *Medeiros v. O'Connell*,

1   150 F.3d 164, 167 (2d Cir. 1998) (citing *Carter v. Buscher*, 973 F.2d 1328, 1332 (9th Cir. 1992)).

2   Thus, the first step in analyzing a Fourth Amendment claim under Section 1983 is to determine

3   whether there has been a constitutionally cognizable seizure.  *See Michigan v. Summers*, 452 U.S.

4   692, 696 (1981).  "[A]pprehension by the use of deadly force is a "seizure."  *Tennessee v. Garner*,

5   471 U.S. 1, 7 (1985).

6          The parties dispute whether Chavez and Lodwick's shooting of Luh constituted a "seizure"

7   since he was not the person Chavez and Lodwick were attempting to seize.  Defendants assert that

8   a bystander, such as Luh, injured incidental to a police officer's use of force is not seized within

9   the meaning of the Fourth Amendment.  Pursuant to the Supreme Court's decision in *Brower v.*

10  *County of Inyo*, 489 U.S. 593, 596-97 (1989), a person can only be seized for Fourth Amendment

11  purposes if the person was the deliberate object of the exertion of force intended to terminate the

12  freedom of movement.  Defendants also cite *Rodriquez v. City of Fresno*, 819 F. Supp. 2d 937,

13  946 (E.D. Cal. 2011) where police were investigating a domestic disturbance at an apartment

14  reportedly involving an armed gang member.  When officers approached the apartment, they

15  observed a man (Hernandez) walking away from the apartment and identified themselves as police

16  officers.  *Id.* at 943-44.  The officers alleged that Hernandez ran into the apartment and as he was

17  running, his hands shifted to the area around his front waistband where officers had reason to

18  believe a handgun was located.  *Id.*  The officers followed him into the apartment, and Hernandez

19  was seen moving toward an open doorway.  *Id.*  Fearing that Hernandez posed a deadly threat, one

20  of the officers fired two shots, one of which hit Hernandez and the other hit a bystander.  *Id.*  The

21  court determined that the shooting of the bystander was not a seizure within the meaning of the

22  Fourth Amendment.  *Id.*  The officer who fired the shots was focused on Hernandez and had no

23  reason, expressed or conjectural, to seek to restrain the bystander. *Id.*  Defendants contend this

24  case is similar to *Rodriquez* in that Chavez and Lodwick unintentionally injured Luh, who was

25  only a bystander.  Luh was never the deliberate object of the exertion of force, and they never

26  intentionally desired to terminate his freedom of movement.  (Doc. 46, 30:19-31:21.)

27          Luh argues the Ninth Circuit rejected a similar argument in *Nelson v. City of Davis*,

28  685 F.3d 867, 876-77 (9th Cir. 2012), and that, under *Brower*, the intentionality requirement is

satisfied when the termination of freedom of movement occurs through means intentionally applied.  Luh contends that Chavez and Lodwick intentionally drew their guns and fired multiple times in the direction of a crowd of people, effectively seizing the entire crowd and hitting Luh, Xiong, and another bystander.  The fact that Defendants did not intend to shoot *Luh* misstates the requisite standard.  (Doc. 58, 15:9-17:12.)[22]

Defendants respond that *Nelson* is distinguishable in that the officers in *Nelson* intended to fire their pepperball guns at the plaintiffs to disperse a crowd.  Here, there is no evidence the officers fired upon Kong to seize any group that Luh was with, and there is no evidence the officers intended to seize anyone except Kong.  To the extent Luh claims the officers observed a group of people on the other side of the fence, the statement is a mischaracterization of the officers' testimony.  Defendants contend this case is more factually similar to *Logan v. City of Pullman*, 392 F. Supp. 2d 1246 (E.D. Wash. 2005) where the police deployed OC (oleoresin capsicum) spray during a fight taking place on the first floor of a two-story building.  The cloud of OC affected partygoers on the second floor, causing injury.  The court found that none of the plaintiffs who suffered secondary exposure to the OC were seized under the Fourth Amendment because these plaintiffs were not among those the officers intended to seize, despite that they intended to deploy the OC.  *Id.* at 1260.  Here, Luh offers no evidence he was intentionally targeted by the officers; rather, the undisputed facts show that he was a bystander and not the deliberate object of the officers' use of force.

To be a constitutionally cognizable seizure, there must be purposeful conduct:

Violation of the Fourth Amendment requires an intentional acquisition of physical control.  A seizure occurs even when an unintended person or thing is the object of the detention or taking, but the detention or taking itself must be willful.  This is implicit in the word "seizure," which can hardly be applied to an unknowing act.

*Brower*, 489 U.S. at 596.

The distinction Defendants draw between those whom officers intended to seize and those unintentionally injured in the attempt to seize another is persuasive.  In *Nelson*, approximately

---

[22] All citations to pages of the parties' briefs refer to the CM/ECF pagination at the top of the filed document.

1   1,000 people had gathered at an apartment building for a party. 685 F.3d at 872-73. When

2   officers were initially unsuccessful in dispersing the crowd, they returned armed with pepperball

3   guns. *Id.* at 873. A group of students had congregated on the breezeway of the first floor of the

4   complex, which included one of the plaintiffs – Nelson. *Id.* at 873-74. The plaintiffs testified they

5   stood in the breezeway awaiting instructions from the police, but the officers failed to inform them

6   what they wanted the plaintiffs to do. *Id.* at 874. The officers claimed they warned the

7   congregants to disburse, and when the partygoers failed to disburse, the officers shot pepperballs

8   towards Nelson's group. One of the pepperballs struck Nelson's eye, and he immediately

9   collapsed on the ground. *Id.* The officers argued that Nelson was not individually targeted by the

10  officers and therefore his shooting was unintentional and incapable of causing a Fourth

11  Amendment violation. *Id.* The Ninth Circuit rejected this argument reasoning that the absence of

12  concern regarding the ultimate recipient of the government's use of force does not negate volition:

13
14          Regardless of whether Nelson was the specific object of governmental force, he
            and his fellow students were the undifferentiated objects of shots intentionally fired
15          by the officers in the direction of that group. Although the officers may have
            intended that the projectiles explode over the students' heads or against a wall, the
16          officers' conduct resulted in Nelson being hit by a projectile that they intentionally
            fired towards a group of which he was a member. Their conduct was intentional, it
17          was aimed towards Nelson and his group, and it resulted in the application of
            physical force to Nelson's person as well as the termination of his movement.
18          Nelson was therefore intentionally seized under the Fourth Amendment.

19  *Id.* at 877. The officers' intentionality arose from more than simply intending to pull the trigger of

20  the pepperball gun – their intention was to shoot the gun toward a specific group of people, of

21  which Nelson was one, for the purposes of disbursing the entire group collectively.

22          In *Rucker v. Harford County*, 946 F.2d 278 (4th Cir. 1991), *cert. denied*, 502 U.S. 1097

23  (1992), the Fourth Circuit similarly analyzed a claim by the father of a bystander who was killed

24  by police officers attempting to "apprehend[] a madman run amok, threatening the lives of

25  everyone in his way." *Id.* at 281. The court concluded that *Brower* foreclosed the father's Fourth

26  Amendment claim: "[*Brower*] does not mean, as Rucker contends, that a seizure occurs just so

27  long as the act of restraint itself is intended (here the act of shooting) though it restrains one not

28  intended to be restrained." *Id.*

Additionally, in *Medeiros v. O'Connell*, 150 F.3d 164 (2d Cir. 1998), the mother, as administrator of her son's estate, brought a Section 1983 claim against the officers who fired into a school van in an attempt to stop the driver who had commandeered the van and taken her son hostage. The Second Circuit held that no Fourth Amendment seizure occurred because the police did not intend to restrain the hostage – the deflection of the bullet intended for the hostage-taker "did not transform the troopers' rescue efforts on the hostages' behalf into a seizure." *Id.* at 169.

Luh's argument that Chavez' and Lodwick's intent to shoot the gun constitutes a seizure regardless that they did not intend to restrain Luh, is too broad an interpretation of *Brower*. Even to the extent the officers heard people arguing over the fence and knew that there may have been others behind the fence, there is no evidence they intentionally shot at anyone other than Kong. Luh suggests that attempting to distinguish who Chavez and Lodwick intended to shoot is a subjective consideration, which is not relevant. However, the facts and circumstances cast in the light most favorable to Luh do not require inquiry into the officers' subjective intent. Unlike in *Nelson*, there is no evidence that Chavez and Lodwick observed and fired into a crowd of individuals that they observed. Rather, Chavez testified he heard an argument while he was taking cover behind a truck when first arriving at the house, but he never saw any individuals behind the fence leading to the backyard:

Q. And I take it while you were in your position of cover and concealment, you're hearing those voices, four to five people. Appears like they may be arguing. You can't make out exactly what they're saying, you could tell that these people are outside the house, and your attention is focused in the area of this gate, right?
A. Yes.
Q. The very gate that Mr. Xiong wound up coming out of, correct?
A. Yes.
. . .
Q. So as you're hearing this four to five people talk of what you think is an argument taking place, you're focusing on where it's coming from to determine that it's coming somewhere behind the gate, correct?
A. Yes.
Q. So you're looking at the gate. Could you see the people who you heard arguing?
A. No.
Q. Could you see any portion of their body, either the top of their head, their hair, anything?
A. No.

1

|   | Q. | No. But you formed the opinion that the noise – the voices are coming from behind this gate, correct? |
|---|---|---|

2

|   | A. | Yes. |
|---|---|---|
|   | Q. | And this is also where you claim that you heard the noise which you interpreted to be the racking of a gun coming from the same location, correct? |

3

4

|   | A. | Yes. |
|---|---|---|
|   | Q. | And then, you know, within in some short proximity of time, the gate opens up, correct? |

5

6

|   | A. | Yes. |
|---|---|---|
|   | Q. | And when the gate opened up, did you see – you saw a person step from behind that gate.  Is that true? |

7

|   | A. | Yes. |
|---|---|---|

8

|   | Q. | Did you see people behind that person? |
|---|---|---|

9

|   | A. | No. |
|---|---|---|
|   | Q. | You were focused on the person coming through the gate, right? |

10

|   | A. | Right. |
|---|---|---|
|   | Q. | When you saw this person from your standpoint, that person appeared to be alone? |

11

12

|   | A. | Was alone. |
|---|---|---|
|   | Q. | And so there was only one person coming through the gate, right? |

13

|   | A. | Yes. |
|---|---|---|

14

(Chavez Depo., Doc. 46-1, 137:16-139:23.)   Lodwick also testified that he could not see any

15

people behind the gate at the time he fired his weapon at Kong:

16

|   | Q. | Of course, you couldn't see behind the gate, could you? |
|---|---|---|
|   | A. | No. |
|   |   | . . . |

17

|   | Q. | Were you aware that there were people in the yard behind the subject? |
|---|---|---|

18

|   | A. | I was aware that there were people in the backyard. |
|---|---|---|
|   | Q. | Where you aware as you were shooting, that those people were in risk and in danger of being hit by your bullets? |

19

|   | A. | I was focused on the threat in front of me. |
|---|---|---|

20

|   |   | . . . |
|---|---|---|
|   | Q. | Now, from where you were standing, could you see over the top of the fence? |

21

22

|   | A. | No.  Well, I can see over the top of the fence, I mean. |
|---|---|---|
|   | Q. | Bad question, good answer.  Could you see into the backyard over the top of the fence? |

23

|   | A. | To what extent? |
|---|---|---|

24

|   | Q. | So you could see who all was back there? |
|---|---|---|
|   | A. | We could not see anybody who was in the backyard from where we were standing. |

25

26

(Lodwick Depo., Doc. 46-3, 72:20-22; 82:24-83:3; 89:24-90:8)

27

Because there is no evidence that the officers saw and intentionally fired at Luh, this case

28

is distinguishable from *Nelson.*  The Court concludes there is no evidence that Luh was seized

1  within the meaning of the Fourth Amendment, and Defendants are entitled to summary judgment

2  on this claim.

3      **b.    There Was No Integral Participation by Lodwick and Chavez in the
4             SWAT Team's Deployment of a Canine and Luh's Resulting Dog Bite**

5      Luh claims the dog bite he sustained inside the house was the result of excessive and

6  unreasonable force under the Fourth Amendment.  Luh contends Chavez and Lodwick's inaccurate

7  report that Kong pulled out a gun and pointed it at the officers led the Merced County SWAT team

8  to search the house and deploy a canine that bit Luh.

9      Defendants argue that neither Chavez nor Lodwick participated in the SWAT team's

10 deployment of the canine against Luh.  Neither was a canine officer, and the dog and its handler

11 were from the Merced County Sheriff's Office as part of its SWAT team.  Neither Chavez nor

12 Lodwick requested SWAT to respond to the incident, nor ordered that the canine be deployed.  As

13 such, neither Chavez nor Lodwick is liable for the canine bite Luh sustained.  (Doc. 45, 30:3-17.)

14     Luh contends that Chavez and Lodwick falsely represented the circumstances leading up to

15 the shooting and, based on their erroneous and overwrought representations, the Merced County

16 SWAT team took control of the scene and ultimately made the decision to deploy a police dog.

17     Defendants respond that Luh fails to dispute that Chavez and Lodwick were not integral

18 participants in the deployment of the canine, Luh cites no evidence to support his contention that

19 Lodwick and Chavez made false representations that led Merced County to deploy the canine, and

20 fails to state any causal link between the alleged misrepresentation and the dog bite.  Pursuant to

21 the Ninth Circuit's decision in *Hopkins v. Bonvicino*, 573 F.3d 752, 770 (9th Cir. 2009), because

22 Lodwick and Chavez did not participate in the planning or the execution of the SWAT police

23 dog's deployment, they are entitled to summary judgment on Luh's Fourth Amendment excessive

24 force claim arising out of the dog bite.

25     Section 1983 liability requires a showing of personal participation in the alleged rights

26 deprivation – there is no respondeat superior liability under section 1983.  *See Monell v. Dep't of*

27 *Soc. Servs.*, 436 U.S. 658 (1978); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir.1989) (requiring

28 personal participation in the alleged constitutional violations); *May v. Enomoto*, 633 F.2d 164, 167

1 (9th Cir.1980) (holding that section 1983 liability must be based on the personal involvement of

2 the defendant).

3     In *Hopkins*, police responded to a reported hit-and-run car accident that resulted in the

4 search of a house.  573 F.3d at 759-60. Three officers responded to the residence where the alleged

5 hit-and-run driver lived; one officer remained outside in front of the house interviewing the party

6 who reported the incident, while two other officers conducted a welfare check inside the house

7 with guns drawn and ultimately arrested the hit-and-run suspect, Hopkins.  *Id.* 760-61.  Hopkins

8 sued all three officers.  *Id.*  The court found that only two officers were integral participants in the

9 search and the seizure of Hopkins, because the officer who interviewed the reporting party did not

10 participate in or direct the search or participate in a conversation about whether to conduct a

11 search.  *Id.* at 769-70.  Because there was no evidence of any participation in the search and

12 seizure, the third officer was not subject to liability under Section 1983.  *Id.*

13     Here, similar to *Hopkins*, Luh cites no evidence to support his contention that SWAT

14 deployed its canine *because of* reports from Chavez and Lodwick or that Chavez and Lodwick

15 participated in the search or deployment in some way.  Although Court testified SWAT was

16 informed of the situation, he did not testify as to the details given to SWAT or how that

17 information caused SWAT to deploy a canine.  There is no evidence that Chavez or Lodwick

18 requested Merced County SWAT assistance, gave information to SWAT that *led to* the

19 deployment of a canine dog, or that they oversaw, directed, or participated in SWAT's search of

20 the house with a canine.  Although Luh alleges the SWAT team contains officers from the MPD,

21 the portion of Court's deposition cited for this proposition does not establish that MPD officers

22 were part of the Merced County Sheriff's SWAT team.  (*See* Doc. 46-10, Court Depo., 45:3-46:11,

23 50:7-51:6.)   Even to the extent the Merced County SWAT team has an interdepartmental

24 relationship with the MPD as Luh suggests, there is simply no evidence that Lodwick or Chavez

25 bore any causal relationship to the SWAT search or the decision to deploy the canine inside the

26 house.  As such, Luh's Fourth Amendment claim for excessive force related to the dog bite he

27 sustained is not viable against Chavez and Lodwick, and they are entitled to summary judgment

28 on this claim.

1          **2.        Plaintiff Kong's Excessive Force Claim is Not *Heck* Barred**

2          Defendants argue that under *Heck v. Humphrey*, 512 U.S. 477 (1994), Kong's claim of

3   excessive force is barred.  Pursuant to *Heck*, a Section 1983 claim is barred if it "would necessarily

4   imply the invalidity of [the plaintiff's] conviction or sentence."  *Id.* at 487.  Defendants contend

5   that because Kong was found guilty of gun possession while on probation – which stems from his

6   gun possession on the night of the incident – Kong's excessive force claim here and his conviction

7   are mutually exclusive:  If Kong never had a firearm, then there is no basis for the officers firing

8   upon him in self-defense.   Kong's excessive force claim "calls into question the firearms

9   conviction" and thus *Heck* bars the claim.

10         Kong contends Defendants' *Heck* argument conflates possession of a firearm with the

11  dispute as to whether Kong was actively resisting arrest, necessitating self-defense by the officers.

12  However, even if there had been an active resisting-arrest charge against Plaintiff, *Heck* would not

13  bar his claims for excessive force.   Kong is not calling into question the lawfulness of his

14  conviction for possession of a firearm, but the excessive use of force and violation of his Fourth

15  Amendment rights that occurred before his arrest and before the officers had knowledge of his

16  "illegal" action in possessing a firearm.  According to Kong, a finding of excessive force or failure

17  to provide timely medical assistance would not affect his underlying conviction.

18         Where a plaintiff has been convicted of a crime under state law and then seeks damages in

19  a Section 1983 suit, "the district court must consider whether a judgment in favor of the plaintiff

20  would necessarily imply the invalidity of his conviction or sentence." *Heck*, 512 U.S. at 487.

21

22         It is undisputed that, based on the events giving rise to this lawsuit, Kong was convicted of

23  a violation of California Penal Code section 12021(d) which provides as follows:

24         (d)  Any person who has been convicted of a felony under the laws of the United
             States, the State of California, or any other state, government, or country, or of an
25           offense enumerated in subdivision (a), (b), or (d) of Section 23515, or who is

26           addicted to the use of any narcotic drug, and who owns, purchases, receives, or has
             in possession or under custody or control any firearm is guilty of a felony.
27

28  It is also undisputed that Kong was a felon prior to this incident *and* had a firearm in his

                                                23

possession at the time of the incident.  Whether or not the officers in this case exercised reasonable force by discharging their weapons and shooting Kong does not implicate his conviction for being a felon in possession of a firearm.  Moreover, Kong was released from custody on June 25, 2012, before he filed his complaint here.  (Doc. 52, Exh. E.)  Once the Section 1983 plaintiff has served his sentence, the *Heck* bar no longer applies.  *Nonnette v. Small*, 316 F.3d 872, 877 (9th Cir. 2002).  *Heck* does not bar Kong's claim for excessive force.

> **3.** **There Are Disputed Issues of Material Fact Regarding Kong's Claim for Excessive Force**

Kong claims that Chavez' and Lodwick's decision to shoot him was excessive and unreasonable in violation of his Fourth Amendment rights.  (Doc. 1, ¶¶ 120-128.)  Defendants argue there is no dispute that Kong pointed a gun in the officers' direction, and their use of force was in self-defense and undisputedly reasonable.

"Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (internal citations and quotation marks omitted).  To conduct this balancing act, the court must evaluate "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.  The most important factor is whether the suspect poses an immediate threat to the safety of the officers or others. *Id.*

The *Graham* factors, however, are not exhaustive. *George v. Morris*, 736 F.3d 829, 837-38 (9th Cir. 2013).  Rather, courts are to "examine the totality of the circumstances and consider 'whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham.*'" *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (quoting *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994)).  "Other relevant factors include the availability of less intrusive alternatives to the force employed, whether proper warnings were given and whether it should have been apparent to officers that the person they used force against was emotionally

1  disturbed." *Glenn v. Washington Cnty.*, 673 F.3d 864, 872 (9th Cir. 2011) (citations omitted).

2       "The reasonableness of a particular use of force must be judged from the perspective of a

3  reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S.

4  at 396 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)).  "The calculus of reasonableness

5  must embody allowance for the fact that police officers are often forced to make split-second

6  judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of

7  force that is necessary in a particular situation." *Id.*  The factors involved in that inquiry include

8  (1) "the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the

9  safety of the officers or others, and (3) whether [the suspect] is actively resisting arrest or

10 attempting to evade arrest by flight." *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005).

11 Reasonableness of the use of force is usually a question for the finder of fact, rather than a

12 question of law.  *Chew v. Gates*, 27 F.3d 1432, 1443 (9th Cir. 1994).

13      Defendants argue that Chavez' and Lodwick's shooting of Kong was not unreasonable

14 under the circumstances pursuant to the factors in *Graham*.  Although resort to deadly force is the

15 most significant intrusion on Fourth Amendment interests, it was reasonable under the conditions

16 presented to Lodwick and Chavez.  Chavez and Lodwick were facing a life-threatening situation

17 in responding to a report of a firearm being brandished, they heard a round being chambered in a

18 semi-automatic weapon at the residence, and they saw Kong emerge from the backyard

19 immediately after the sound of the gun being racked.  Chavez and Lodwick ordered Kong to show

20 his hands, but he refused and instead removed a firearm from his waist, pointed it in the officers'

21 direction, and the officers fired on him in self-defense.  Defendants maintain none of these facts is

22 disputed.

23      Kong contends that when the officers stopped him he was wearing a white and black or

24 white or gray plaid shirt, but the person reportedly exhibiting a weapon at the party was described

25 as wearing a black hoodie.  As Kong did not match the description of the suspect, the officers had

26 no basis to believe Kong was the individual reportedly exhibited a gun at the party or that he was

27 armed at all.  Although the officers claim to have heard the racking of a gun a few seconds before

28 Kong came through the fence to the front yard, the video of the event does not indicate a racking

1   sound, and Kong testified he never racked the gun or heard anyone else racking a gun.  When the

2   officers confronted Kong by illuminating him with their gun-mounted flashlights and told him to

3   put his hands up, they neither identified themselves as police nor warned him they would shoot if

4   he did not comply, Kong never reached for or removed the gun from his waistband, and Kong

5   turned to run away without his weapon drawn.  Kong argues he did not pose a threat to the officers

6   and ran away from them because he did not know who they were.  As he posed no objective threat

7   to the officers or the public when he began to run away out of fear, the officers had no objective

8   and reasonable basis to fire their weapons at him while he was retreating.

9           There are several critical factual disputes about the situation with which the officers were

10  confronted at Buckingham Court during the incident.  While the parties do not dispute that the

11  officers were dispatched to investigate a report of violation of California Penal Code 417,[23] the

12  reported incident did not involve any threats with the weapon, only that it had been exhibited by

13  the suspect.  Defendants cite the 911 dispatch call indicating an Asian male was brandishing a gun

14  at a party.  Plaintiffs dispute Defendants' characterization of the dispatcher's description that there

15  was an Asian adult male "displaying a gun and/or pointing a gun at people."  The dispatcher's

16  statement cited by Defendants advises Officer Chavez to respond to a call at 1594 Buckingham:

17           . . . going to be for a 417 . . . advises that they are at a party at that location and an
             AMA with a black hooded sweatshirt pulled out a firearm . . . advised that there's a
18           black firearm and advised that the male pulled it out . . . responsible was still on
             scene.
19

20  (Doc. 46, Radio Traffic, Exh. B, 4:00-4:34.)   The officer asked for a description, and the

21  dispatcher repeated it was an "AMA, black hooded sweatshirt."[24]  (Doc. 46, Radio Traffic, Exh. B,

22  4:00-4:34.)  Defendants state it is undisputed the dispatcher stated the Asian male "pulled out a

23  gun and pointed it at people" and specifically used the term "pointed" between 4:01 and 4:12 on

24  _____

[23] California Penal Code § 417(a)(1) provides that "[e]very person who, except in self-defense, in the presence of any
25  other person, draws or exhibits any deadly weapon whatsoever, other than a firearm, in a rude, angry, or threatening
manner, or who in any manner, unlawfully uses a deadly weapon other than a firearm in any fight or quarrel is guilty
26  of a misdemeanor, punishable by imprisonment in a county jail for not less than 30 days."

27  [24] Although each side provided an audio recording of the 911 call and the dispatch calls to Chavez and Lodwick, no
transcript of these calls was provided.  The total radio traffic is over an hour in length, and some of the words are
28  difficult to discern.  The ellipses are inserted where words were inaudible or impossible to definitively determine.

1   the recording.  (Doc. 62, DUMF 2, Defendants' Response.)  However, the word "pointed" is not

2   used – the dispatcher states that the male "pulled out a firearm."  (Doc. 46, Radio Traffic, Exh. B,

3   4:00-4:34.)  The officers were advised there was no report of a threat with the weapon that had

4   been exhibited when dispatch re-contacted the reporting party.  (Doc. 46, Radio Traffic, Exh. B,

5   7:45-8:31.)  Thus, while the severity of the crime was not minimal – such as the violation of a

6   leash law (*see Hesterberg v. United States*, __ F. Supp. 3d __, No. 13-cv-01265-JSC, 2014 WL

7   5073716, at *9 (N.D. Cal., Oct. 9, 2014)), there is no evidence of a report of active shooting or of

8   any threats made with the weapon.

9       As to the immediate threat to the safety of the officers or others, which is the most

10  important factor, there are multiple disputed factual issues.  While the officers were taking cover

11  behind a truck gathering intelligence, they claim to have heard the sound of a loud conversation

12  that seemed to be an argument.[25]  Then, they heard a gun being racked just before Kong came

13  through the gate from the backyard to the front yard.  Chavez and Lodwick both testified to

14  hearing the sound, but Plaintiffs dispute the officers' version and note the video does not reflect the

15  sound the officers reported.  (Doc. 60-5, Exh. E, Video 23:03:08.)  While Kong and Luh do not

16  dispute that the officers *testified* they heard a gun being racked just prior to Kong coming through

17  the gate, they contend the video does not actually capture such a sound.  Plaintiffs also cite the

18  testimony of their expert Greg Stutchman who concluded that the video contains no event before

19  the shooting consistent with a semi-automatic firearm chambering a round.  (Doc. 57-1,

20  Stutchman Depo., 66:19-23.)[26]  Finally, Kong maintains he never racked a gun, and Luh did not

21

22  [25] Kong disputes the characterization of the loud voices as an argument, but there is no dispute that this is what
    Lodwick and Chavez testified it sounded like to them.

23

24  [26] Defendants object to Stutchman's opinion during his deposition that the video does not reflect the sound of a gun
    being racked and that Chavez' camera glasses were capable of picking up the sounds of a gunshot racking in terms of
    quality of the recording file and the microphone sensitivity (Doc. 57-1, Stutchman Depo., 66:25-67:5).  Defendants

25  argue that Stutchman's first opinion is irrelevant and lacks foundation.  The opinion is relevant to corroborate Kong's
    deposition testimony that he did not rack the gun, and Luh's declaration that he did not see a gun being racked.

26  Defendants also object that Stutchman's opinion lacks foundation because it is based on exemplar testing using a
    Glock 9 mm whereas Kong's gun was a Taurus 40 caliber.  (*See* Doc. 65.)  However, Stutchman's deposition

27  testimony was not that no gun racking sound of a particular caliber could be heard on the video – it was that no sound
    consistent with a semi-automatic weapon could be heard.  It is undisputed that Kong's gun was a semi-automatic

28  handgun.  (*See* Doc. 62, DUMF 77.)  Defendants' objections to Stutchman's statement in this regard are
    OVERRULED.  Moreover, although there is no dispute that Chavez and Lodwick testified to hearing a gun racking

1  see anyone racking a gun.[27] ((Doc. 60-6, Kong Depo., 70:12-23; Doc. 60-15, Luh Decl., ¶ 5.)

2  Whether there was the sound of a gun racking prior to Kong walking through the gate is a disputed

3  issue, regardless that it is undisputed the officers testified they heard such a sound.  (*See* Doc. 46-

4  1, Chavez Depo., 66:22-24, 153:5-8; Doc. 46-3, Lodwick Depo., 66:6-13.)  It is for the jury to

5  consider each party's version of events, weighing the officers' testimony, that of Kong and Luh,

6  and drawing inferences from the video. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (jury has

7  responsibility "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable

8  inferences from basic facts to ultimate facts").

9        While it is undisputed that Kong had a gun at the moment Chavez and Lodwick stopped

10  him,[28] there is a dispute whether Kong removed his gun from his waistband and pointed it in the

11  direction of the officers.  Defendants argue that based on Kong's police interview where he

12  admitted he pointed a gun at the officers *and* the officers' testimony that Kong pointed the gun in

13  the officers' direction, as well as Michael Schott's expert testimony about the video, it is

14  undisputed that Kong pointed his gun in the officers direction.  (DUMF 33.)  Defendants cite the

15  following interchanges between Defendant Deliman and Kong during Kong's post-arrest

16  interview:[29]

17  sound, the video itself and the testimony from Kong and Luh is sufficient to dispute the officers' version of events
18  even without Stutchman's testimony in this regard.

19        Defendants also argue Stutchman was not disclosed as an expert who would offer an opinion of the quality
    and capability of the camera-embedded glasses' recording device.  Because there is sufficient evidence to dispute
20  whether there was a racking of a handgun just before Kong came through the gate without Stutchman's opinion as to
    the sound quality of the camera-embedded glasses, the Court does not reach Defendants' objection to Stutchman's
21  opinion in this regard.  Defendants remain free to raise this argument through a motion in limine.

22  [27] To the extent Kong's deposition testimony is inconsistent with his post-arrest interview statements, that issue is
    discussed below.

23  [28] Although Kong disputes DUMF 32 that Kong corroborated the gun's existence and admitted to having a gun at the
    moment in time officers stopped him, Kong's objection is relevant to his post-arrest interview.  The evidence cited to
24  support DUMF 32, however, is Kong's deposition testimony.  Kong conceded during his deposition that he was in
    possession of a gun at the moment the officers stopped him. (Doc. 46-5, Kong Depo., 69:2-7.)  Luh does not dispute
25  this fact.  (*See* Doc. 63, DUMF 32.)

26  [29] Kong objects that his statements during the post-arrest interview are not relevant to what the officers knew at the
    moment they stopped him.  (Doc. 56-3, 102-121, Kong's Responses to DUMFs.)  Kong is correct.  The testimony
27  from Kong's post-incident interview regarding whether he pointed a gun at officers during the course of the incident is
    not relevant to show what the officers knew *at the time* they confronted Kong – that cannot be established by
28  information discovered *after* the fact.  However, these statements are relevant to *corroborate* the officers' testimony
    about what they perceived during the incident, as Kong's interview statements suggest that he pointed his gun at the

Deliman:  "And you're in possession of the gun that was pointed at the officers, and they fired back, protecting themselves.  Don't you think?"

Kong: "Yeah, that's true."  (Interview Video, Doc. 46-13, Exh. M, 21:56-22:12.)

…

Deliman:  "I don't know what you meant to happen today, but something did happen, where officers had to protect themselves, from people pointing guns at them.  Why, why point the gun?"

Kong:  "I was like, I don't know, I was just like, panicking, and I didn't know what to do.  I don't know."  (Doc. 46-13, Interview Video, Exh. M, 27:45-28:14.)

Defendants also cite to Chavez and Lodwick's testimony that Kong had a gun and pointed it in their direction.  Lodwick testified he saw Kong's right hand inside the waistband area of his jacket, but he could not see Kong's right hand itself.  (Doc. 46-3, Lodwick Depo., 70:2-6.)  Chavez observed Kong move his left-hand away from his body, revealing a gun in Kong's right hand, which Kong then pointed in the officers' direction.  (Doc. 46-1, Chavez Depo., 89:9-13, 90:10-19, 92:3-21.)  As Kong turned toward the officers, Lodwick observed Kong holding a gun in his right hand pointed in the officers' direction, and they began to fire.  (Doc. 46-3, Lodwick Depo., 75:24-77:12.)  Kong then fell to the ground.  (DUMF 34.)  Defendants' expert, Michael Schott, reviewed and analyzed the video of the event, focusing on Frames 5,211-5,350.  (Doc. 49.)  Schott indicates that Frame 5,251 shows Kong, with his right hand in proximity to his front waist area, running

---

officers, giving credence to their testimony about the threat they perceived.  The statements about whether Kong reached for the gun in his waistband and pointed it at officers are admissible as party-opponent admissions. Fed. R. Evid. 801(d)(2). Kong also objects under Federal Rule of Evidence 602, which allows a witness to testify only if there is evidence to support a finding the witness has personal knowledge of the matter.  Kong maintains that he was intoxicated and in pain during the course of his interview and disputes that he understood the questions or his response. (Kong Depo., 66:10-19; 73:16-17; 86:8-16.)  Whether Kong was intoxicated and on pain medication affects the credibility of his statements, not the admissibility of such statements as one without personal knowledge about a matter under Rule 602.   On these grounds, Kong's objections to his post-arrest interview statements are OVERRULED.

     Additionally, Defendants object to Kong's contention in his responses to Defendants' undisputed statement of facts that he was interviewed by Detective Deliman within one hour of the shooting. Kong cites to his deposition to support his argument, but the cited portions of his deposition relate to his alleged intoxication at the time of the shooting, his pain at the time he was shot, and his pain medication and not remembering whether he understood Detective Deliman's statement that he was going to ask Kong questions.  Defendants argue none of this evidence concerns the timing of Kong's arrest and interview and note that the shooting occurred at approximately 11:00 p.m. (Radio Traffic, 15:05-15:35 (documenting shooting at approximately 11:13 p.m.).)  The interview began on December 4, 2011, at approximately 3:30 a.m. (Doc. 48, Deliman Decl., ¶ 3, Interview Video, Allen Decl., Ex. L.)  Thus, Kong's evidence does not support the contention that his post-arrest interview began only one hour after the shooting.

1   toward the rear of the residence; Frame 5,264 shows a rectangular or L-shaped object in direct

2   proximity to Kong's right hand; Frame 5,266 shows Kong reversing direction and turning toward

3   the front of the residence; Frame 5,280 shows Kong resuming movement towards the rear of the

4   residence; and Frame 5,303 shows Kong reversing direction and turning toward the front of the

5   residence.  (Doc. 49, Schott Decl., ¶¶ 3-5.)[30]

6       Despite this testimony from the officers, Kong's post-arrest interview statements,[31] and

7   Schott's expert declaration, Plaintiffs have offered sufficient evidence to create a disputed issue of

8   material fact as to whether Kong removed the gun from his waistband and pointed it in the

9   officers' direction.  *Smith*, 661 F.3d at 441 (whether suspect posed immediate threat to the safety

10  of officers or others is the most important *Graham* factor).   Kong's post-arrest interview

11  statements are not clear yes or no responses to single questions, but even if they were, Kong

12  testified at his deposition he never pulled the gun from his waistband when confronted by the

13  officers:

14      Q. Did you ever rack the slide on that gun?
        A. No.
15      Q. Do you know what that means?
        A. Yes.
16      . . .
        Q. So as you turn to run, the first thing – the next thing you hear is gunshots?
17      A. Yes.
        Q. And then what happens?
18      A. I was down.
        Q. What happened to the gun?
19      A. It was right side by me.
        Q. Did you pull it out of your waistband and drop it?
20      A. No.  It just came out.
21

22
    _____

23  [30] Kong objects to Schott's declaration as irrelevant, but it is relevant to corroborate the officers' version of events.
    Kong also argues that the opinion that Frame 5,251 shows Kong with his right hand in proximity to his front waist
24  area is outside the scope of his retention as an expert.  Defendants argue Schott was requested "to examine the video
    images and associated audio track recorded by the apparatus worn by Chavez."  In his rule 26 expert report, two issues
25  were identified for Schott to address.  One included determining "[f]rom the time that the first video images of Mr.
    Xiong appear and continuing until the last shot is fired, establish and document the movements and actions of Mr.
    Xiong [] captured on the video images."  Schott's opinion as to what Frame 5,251 shows is within the scope of his
26  retention as an expert, and Kong's objection is OVERRULED.

27  [31] Kong also objects to his post-arrest interview statements regarding whether he was a gang member, whether he had
    run from police before, and whether he had a tattoo on his right inner forearm as irrelevant.  (*See* Doc. 62, DUMF
28  104-06.)  Kong is correct.  These statements are irrelevant to what the officers' perceived when they confronted Kong.
    Kong's objection to these statements as irrelevant is SUSTAINED and they are not considered.

1

> Q.  And after you fell to the ground, what happened next?
> A.  I was in pain.

2

> Q.  You can remember the light shining on you; is that correct?
> A.  Yes.

3

> Q.  Did you ever reach down to your waistband to pick up the gun?
> A.  No.

4

5   (Doc. 60-6, Kong Depo. 70:12-15, 70:24-71:20.)  To the extent that Kong's deposition testimony

6   contradicts his prior interview statements to Deliman, the interview statements were not sworn

7   testimony and thus do not trump or supplant Kong's deposition testimony.  Unsworn testimony

8   cannot provide a basis for the court, as a matter of law, to disregard contrary sworn testimony.  *See*

9   *Leslie v. Grupo, ICA*, 198 F.3d 1152 (9th Cir. 1999).[32]  Here, Kong's deposition testimony is

10  sworn and must be taken as true; his prior interview statements, even if contradictory, are not

11  sworn.  It is for the jury to decide how to credit Kong's statements during the police interview.  *Id.*

12  at 1159.  Kong's deposition testimony is admissible evidence that Kong never pulled the gun out

13  of his waistband or pointed it in the officers' direction.

14          Additionally, Plaintiffs offer earlier deposition testimony from both officers showing some

15  divergence as to whether they actually perceived Kong pointing a gun in their direction.

16  Specifically, Lodwick gave the following testimony at his 2012 deposition:

17

> Q.  Well, did [Kong] raise the weapon up and point it at you?
> A.  I didn't give him that opportunity.

18

> Q.  Where was the weapon when you shot at him?
> A.  About here.

19

> Q.  You have your hand out in front with the weapon down towards the round or

20  pointing towards you or what's going on?
> A.  At that distance I couldn't tell if it was pointed at the ground or pointed at me.

21

22  (Doc. 57-1, Exh. D, 2012 Lodwick Depo., 33:5-14).  Officer Chavez was asked whether the

23  "suspect actually raise[d] his weapon in a shooting position towards you," and Chavez responded,

24  _____

[32]  In *Leslie*, the district court recognized that the plaintiff's deposition testimony and sworn declaration were

25  sufficient, if believed, to create a material factual dispute and survive summary judgment, but the court concluded that
Leslie had made contradictory statements in prior correspondence with the defendant that were so inconsistent with

26  his subsequent deposition testimony as to render the deposition testimony unbelievable.  *Id.* at 1154.  On appeal, the
court rejected the trial court's determination reasoning that the letters were not sworn testimony sufficient to contradict

27  the subsequent deposition testimony and in the deposition, the plaintiff attempted to explain his statements in the
earlier letters to the defendant.  The court held that disbelief of the sworn statements because of prior, contradictory

28  unsworn statements was not sufficient to support summary judgment.  *Leslie*, 198 F.3d at 1159.

1    "no." (Doc. 57-1, Exh. C, 2012 Chavez Depo., 22:24-23:1.)

2        Finally, Plaintiffs argue the video of the incident contradicts the officers' statements that

3  Kong pointed the gun in their direction.[33]   Interpreting the video in the light most favorable to

4  Plaintiffs and drawing all inference in Plaintiffs' favor, the video can be interpreted to contradict

5  the officers' testimony.   *Blakenhorn v. City of Orange*, 485 F.3d 463, 468 n.1 (9th Cir. 2007).

6  Although the officers testified they heard a racking of a gun just before Kong came through the

7  backyard gate, no racking sound is audible on the video.   At the moment Kong is illuminated in

8  the video, he appears to be facing the officers with his hands down by his waist.   The video is

9  susceptible to Plaintiffs' contention that Kong's gun was never revealed, nor did he remove it from

10  his waistband or point it in the officers' direction.   Defendants argue the video did not necessarily

11  capture everything Chavez and Lodwick saw or heard and cannot therefore dispute the officers'

12  testimony about what they perceived. While it is possible the video did not capture everything the

13  officers testified they heard or saw, the jury must evaluate whether the events as portrayed in the

14  video more accurately reflect what happened or whether the officers' testimony more accurately

15  reflects the events – this is a factual issue for the jury, not one for the court to decide as a matter of

16  law.   *See Castro v. Cnty of L.A.*, 785 F.3d 336, 346 (9th Cir. 2015) (where video footage neither

17  confirmed or refuted testimony, the jury could review the footage and the testimony in context to

18  perform a full assessment of each witness's credibility).

19        If the factual disputes are resolved in Defendants' favor, a reasonable jury could find the

20  officers' conduct was reasonable.   However, Plaintiffs have offered evidence that the officers had

21  no reason to believe Kong had a weapon as he did not match the description of the person

22  reportedly exhibiting the gun.   Kong testified at his deposition that he never reached for the gun in

23  his waistband, and the video is susceptible to the interpretation that Kong did not pull out his gun,

24  point it at officers or in their direction, or threaten them with it.   According to Plaintiffs, the video

25  reflects the officers neither identified themselves as police officers nor gave Kong a verbal

26

---

27  [33] Defendants object to Kong's citation to the video because it does not reference a specific timeframe.  The moment
where officers confront Kong on the video is a very specific portion, so the failure to note a specific time stamp is not

28  problematic.  Moreover, Luh cites the specific portion of the video in disputing whether Kong revealed a gun or held a
gun in his right hand.  (Doc. 59, Luh's Response to DUMF 30, 31.)

warning they would shoot.  As such, Kong attempted to run away from the officers because he did not know it was the police.  His back was to the officers, and he was moving away from them when he was shot.  Under this version of events, Kong posed no threat to the safety of officers, and turning his back on the officers was not a high level of resistance.  Based on the evidence offered by Plaintiffs, a reasonable jury could find that the officers' action in shooting Kong was not reasonable.  *Harris v. Roderick*, 126 F.3d 1189, 1204 (9th Cir. 1997) ("Law enforcement officials may not kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed."); *Curnow v. Ridgecrest Police*, 952 F.2d 321, 323 (9th Cir. 1991) (holding deadly force was unreasonable where, according to plaintiff's version of facts, the decedent possessed a gun but was not pointing it at the officers and was not facing the officers when they shot him).

The parties dispute facts that bear directly on whether a reasonable officer would have viewed Kong as an immediate threat to the officers.  Resolution of disputed material facts about whether a gun was racked just before Kong came through the gate into the front yard and whether Kong reached for the gun and pointed it at the officers when they stopped him involve credibility determinations and interpretation and inferences from the video footage, which are within the province of a jury.  Whether Kong posed a threat to the officers is the most critical fact in assessing the reasonableness of the officers' conduct, and because there are material factual disputes as to the threat that Kong posed, the Court cannot conclude as a matter of law that Chavez and Lodwick acted reasonably in shooting Kong.  Defendants' motion for summary judgment as to Kong's claim of excessive force under the Fourth Amendment is DENIED.

**B.      Luh's Fourteenth Amendment Claims**

> **1.      Shooting Outside the House**

As Luh's Fourth Amendment claim is foreclosed because of the lack of a cognizable seizure, the substantive due process clause of the Fourteenth Amendment is considered.  *Lewis*, 523 U.S. at 843.

The Fourteenth Amendment's substantive due process clause protects against the arbitrary or oppressive exercise of governmental power.  *Lewis*, 523 U.S. at 845-46.  "[T]he Due Process

Clause is violated by executive action only when it can be properly characterized as arbitrary, or conscience shocking, in a constitutional sense." *Id.* The cognizable level of executive abuse of power is that which "shocks the conscience" or "violates the decencies of civilized conduct." *Id.* at 846. Mere negligence or liability grounded in tort does not meet the standard for a substantive due process claim. *Id.* at 849.

To address whether a constitutional violation was committed, a court must first decide the appropriate standard of culpability to determine whether the defendants' conduct "shocks the conscience" under the Fourteenth Amendment's Due Process Clause. *Lewis*, 523 U.S. 833, 846 (1998). The court must then determine whether the defendants' conduct meets that standard of culpability. The degree of culpability required to meet the conscience-shocking level depends on the context. *Id.* at 850 ("[d]eliberate indifference that shocks in one environment may not be so patently egregious in another"). To determine whether "deliberate indifference" is sufficient to shock the conscience, or whether the more demanding standard of "purpose to harm" is required, "the 'critical consideration [is] whether the circumstances are such that actual deliberation is practical.'" *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008) (quoting *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 372 (9th Cir. 1998) (internal quotation marks omitted)). "Where actual deliberation is practical, then an officer's 'deliberate indifference' may suffice to shock the conscience. On the other hand, where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may be found to shock the conscience only if he acts with a purpose to harm unrelated to legitimate law enforcement objectives." *Hayes v. Cnty. of San Diego*, 736 F.3d 1223, 1230 (9th Cir. 2013) (citing *Wilkinson v. Torres*, 610 F.3d at 546, 554 (9th Cir. 2010)).

Defendants contend this situation is analogous to the circumstances presented in *Lewis* and *Moreland* in that Chavez and Lodwick were responding to a call of a gun being exhibited.[34] At the scene, they heard a gun being racked, seconds later Kong emerged, and the officers believed

---

[34] *Lewis* involved a police chase of a motorcycle. 523 U.S. at 837. The motorcycle passenger was thrown from the bike and was hit by the chasing officers. *Id. Moreland* involved police response to a gunfight in a parking lot of a bar. 159 F.3d at 368. In both cases, the purpose-to-harm standard was applied in considering a bystander's claim under the Fourteenth Amendment.

1  he "pulled a gun on them."  Defendants argue the officers only shot for legitimate self-defense

2  purposes, their only intent was to stop the threat, and the incident happened within seconds with

3  no time for deliberative action.  (Doc. 45, 40:16-42:11.)  Moreover, the facts show the officers did

4  not act with any purpose to harm Luh or with any purpose other than attempting to stop Kong.

5        Luh maintains the deliberate indifference standard applies to determine whether Chavez

6  and Lodwick's conduct shocked the conscience, and a reasonable trier of fact could conclude that

7  by indiscriminately firing into a wooden gate knowing partygoers were on the other side, the

8  officers acted with deliberate indifference with regard to Luh.

9        At the summary judgment stage, a court may determine whether the officer had time to

10  deliberate (such that the deliberate indifference standard applies to determine whether the conduct

11  shocks the conscience) or instead had to make a snap judgment because he found himself in a

12  quickly escalating situation (such that the purpose to harm standard applies to determine

13  conscience shocking), "so long as the undisputed facts point to one standard or the other."  *Bui v.*

14  *City & Cnty. of S.F.*, 61 F. Supp. 3d 877, 901 (N.D. Cal. 2014) (quoting *Duenez v. City of*

15  *Manteca*, No. CIV. S-11-1820-LKK-KJN, 2013 WL 6816375, at * 14 (E.D. Cal. Dec. 23, 2013)).

16  "But, '[b]y its nature, the determination of which situation [the officer] actually found himself in is

17  a question of fact for the jury, so long as there is sufficient evidence to support both standards.'"

18  *Id.* (quoting *Duenez*, 2013 WL 6816375, at *14).

19        The parties' dispute about the facts surrounding the officers' use of force precludes

20  summary judgment as to Luh's Fourteenth Amendment claim for excessive force.  Construing the

21  evidence in the light most favorable to Plaintiffs, the officers were responding to a report of an

22  individual exhibiting – but making no threats with – a gun at a house party.  The officers heard

23  people outside the house before they stopped Kong.  Although the officers testified they heard the

24  racking of a gun just before Kong opened the backyard gate to come into the front yard, Kong

25  testified he never racked the gun nor did Luh observe anyone doing so.  Moreover, the video does

26  not necessarily reflect the sound of a gun-racking noise.  Significantly, when the officers stopped

27  Kong, he was not wearing a black hoodie like the person who was described as exhibiting the

28  weapon at the party.  While the officers told Kong to put up/show his hands, they did not identify

themselves as police officers or give any warning they would shoot if he failed to comply with their command to put his hands up.  The video of the event is also susceptible to a finding that Kong's gun was not visible to the officers when they stopped Kong; Kong never reached for his gun, held it in his hand or pointed it in the officers' direction; and Kong had begun to run away from the officers with empty hands when he was fired upon.  Although the officers testified they could not see over the backyard gate to observe any people, they both indicated they heard voices outside when they approached the house.  When Kong turned to flee the officers, he turned toward the gate leading to the backyard.  Officers fired at Kong as he moved away from officers toward the backyard gate, despite the knowledge there were people outside the house.

Under this version of the facts, the officers could be found to have had sufficient time to contemplate their use of force and the deliberate indifference, not the purpose-to-harm, standard would apply.  *See Duenez*, 2013 WL 6816375, at *15 ("Even if it found that decedent had a knife in his hand, that alone would not necessarily bring the situation into a 'purpose to harm' situation since a reasonable jury could find that decedent was not advancing on [the officer], nor threatening him with the knife.").  In *McCloskey v. Courtnier*, No. C 05-4641 MMC, 2012 WL 646219, at *4 (N.D. Cal. Feb. 28, 2012), the court denied officers' motion for summary judgment as to bystanders' claims under the Fourteenth Amendment.  The bystanders were the unintended objects of the officer's use of pepper spray, and the court found that disputed factual issues precluded a determination of whether the officer had time to fully consider his use of pepper spray and thus the court could not determine which culpability standard should apply.  *Id.*

Similarly, in *Bui*, 61 F. Supp. 3d at 901, the court denied officers' motion for summary judgment on Fourteenth Amendment claims against them because there were material factual disputes about whether the officers had adequate time to deliberate and which standard of culpability should apply.  *Id.*  The officers submitted evidence that when they confronted a suspect in a residence, he came down the hall after them and attacked, or at least threatened them, with a knife.  *Id.*  The officers provided evidence showing they responded by raising their guns, instructing the suspect to lower the knife, and retreating until they no longer could do so.  *Id.*  It was only when they and some other teenagers were at risk of being stabbed or injured that the

1   officers shot the suspect.  *Id.*  The plaintiff proffered evidence that, while the suspect had an X-
2   Acto knife in his hand, it was always down at his side, rather than charging at the officers, he
3   assumed a defensive, cringing posture and shuffled down the hall because officers had told him to
4   come out of the bathroom, and the suspect was not directly facing the officers in the erect position
5   when he was shot.  *Id.*  The court concluded there was a factual dispute whether a reasonable
6   officer could have viewed the suspect as an immediate threat to officers or others.  *Id.*  In
7   considering the culpability standard under the Fourteenth Amendment, the court reasoned that it
8   was possible, viewing the evidence in the light most favorable to the plaintiff, that the deliberate
9   indifference and not the purpose to harm standard would apply to determine whether the conduct
10  shocked the conscience.  *Id.* at 901.

11      Because the circumstances under which the officers fired upon Kong are disputed, the
12  standard of culpability under the Fourteenth Amendment cannot be determined at this stage and
13  summary judgment is not appropriate.  *McCloskey,* 2012 WL 646219, at *4; *Bui,* 61 F. Supp. 3d at
14  901-02. Defendants' motion for summary judgment as to Luh's claim of excessive force related to
15  his shooting under the Fourteenth Amendment is DENIED.

16          **2.      Dog Bite Inside the House**

17      As discussed above, because Chavez and Lodwick were not integral participants in Merced
18  County SWAT's search of the house and deployment of the canine that bit Luh, they are not liable
19  to Luh under the Fourteenth Amendment for excessive force.  *See Blakenhorn*, 485 F.3d at 481
20  n.12.  Defendants' motion for summary judgment as to Luh's claim of excessive force related to
21  the dog bite inside the house under the Fourteenth Amendment is GRANTED.

22  **C.      Qualified Immunity**

23      Defendants alternatively argue that Chavez and Lodwick are shielded by qualified
24  immunity as to the constitutional claims against them.

25      "The doctrine of qualified immunity protects government officials 'from liability for civil
26  damages insofar as their conduct does not violate clearly established statutory or constitutional
27  rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231
28  (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "Qualified immunity balances

two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  *Id.*  "The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'"  *Id.* (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting)).

The Supreme Court has "mandated a two-step sequence for resolving government officials' qualified immunity claims."  *Id.* (citing *Saucier v. Katz*, 533 U.S. 194 (2001)).  "First, a court must decide whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right."  *Id.* (citing *Saucier*, 533 U.S. at 201).  This prong of the inquiry "mirrors the substantive summary judgment decision on the merits."  *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002).  "If no constitutional right would have been violated were the allegations established," then the officer is entitled to qualified immunity.  *Saucier*, 533 U.S. at 201.  "Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct."  *Pearson*, 555 U.S. at 232.  "Qualified immunity is applicable unless the officials conduct violated a clearly established constitutional right."  *Id.* (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

"For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable officer would understand that what he is doing violates that right."  *Hope v. Pelzer*, 536 U.S. 730, 739, (2002).  While the reasonableness inquiry may not be undertaken as a broad, general proposition, neither is official action entitled to protection "unless the very action in question has previously been held unlawful."  *Hope*, 536 U. S. at 739.

The existence of material factual disputes does not necessarily preclude a finding of qualified immunity.  *Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1053 (9th Cir. 2002). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions."  *Ashcroft v. al-Kidd*, __ U.S. __, __, 131 S.Ct. 2074, 2085 (2011).

### 1.    Chavez and Lodwick Are Not Entitled to Qualified Immunity As to Kong's Excessive Force Claim At Summary Judgment

Chavez and Lodwick invoke qualified immunity as a defense to Kong's excessive force claim.  However, in "Fourth Amendment unreasonable force cases, unlike in other cases, the qualified immunity inquiry is the same as the inquiry made on the merits."  *Scott v. Henrich*,, 39 F.3d 912, 914-15 (9th Cir. 1994) (quoting *Hopkins v. Andaya*, 958 F.2d 881, 885 n. 3 (9th Cir. 1992)).   At step one, as discussed above, there are disputed issues of fact whether the officers used objectively reasonable force in shooting Kong.  At step two, "the relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Saucier*, 533 U.S. at 202.

Defendants argue that as of December 2011, when the officers shot Kong, case law clearly established that "where a suspect threatens an officer with a weapon such as a gun or a knife, the officer is justified in using deadly force."  *Smith*, 394 F.3d at 703.  As considered above, however, under Plaintiffs' version of the facts, Kong did not attack or threaten Chavez and Lodwick.  While Kong did have a gun in his waistband, there is evidence that he did not remove it from his waistband and never pointed his gun at the officers.   Kong did not match the description of the person reportedly exhibiting the weapon at the party such that officers could have believed he had a gun based solely on his appearance.  The caselaw cited by Defendants does not support a finding that, where a suspect does not threaten the officers and turns to flee, deadly force is reasonable.

While the officers may be entitled to qualified immunity after the disputed material facts are resolved, the Court denies Defendants' motion to the extent it seeks qualified immunity for Chavez and Lodwick's shooting of Kong.  *Wilkins v. City of Oakland*, 350 F.3d 949, 956 (9th Cir. 2003) ("Where the officers' entitlement to qualified immunity depends on the resolution of disputed issues of fact in their favor, and against the non-moving party, summary judgment is not appropriate.");  *Santos v Gates*, 287 F.3d 846, 855 n.12 (9th Cir. 2002) (finding it premature to decide the qualified immunity issue "because whether the officers may be said to have made a 'reasonable mistake' of fact or law may depend on the jury's resolution of disputed facts and the inferences it draws therefrom") (internal citation omitted).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### 2.    Chavez and Lodwick are Not Entitled to Qualified Immunity as to Luh's Fourteenth Amendment Claim Related to His Shooting[35]

Defendants argue that assuming Luh could establish a constitutional violation under the Fourteenth Amendment for excessive force, the law was not clearly established that firing in self-defense at a lethal threat was an illegitimate law enforcement purpose.  However, like Defendants' arguments for qualified immunity regarding Kong's Fourth Amendment claim, this argument must also fail with respect to Luh's Fourteenth Amendment claim.  Based on the evidence presented by both sides, the circumstances presented to Chavez and Lodwick are disputed, and the Court cannot decide as a matter of law whether it would have been "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202.

Defendants' motion for summary judgment on the alternative ground of qualified immunity as to Luh's excessive force claim under the Fourteenth Amendment is DENIED.

### D.    *Monell* Claims Against the City of Merced ("Merced")

Plaintiff Kong's complaint alleges that MPD owed a duty to Plaintiffs to properly train and supervise police officers in the proper use of deadly force.  This duty includes having all officers cognizant as to the criteria for using deadly force and when to cease applying deadly force.  Chavez and Lodwick did not properly investigate the situation, did not announce themselves, and ended up shooting Kong as the result of reckless and negligent discharge of a firearm toward or into an occupied area where the officers knew there was a party.  Kong also alleges that by failing to bring disciplinary action against Chavez and Lodwick, MPD ratified the officers' conduct. (Doc. 1, ¶ 140.)

Merced argues that Kong's inadequate training and supervision claim fails as a matter of law because the MPD's training program met or exceeded standards set forth by POST.  All four officers (Chavez, Lodwick, Deliman, and Court) completed Merced's FTO program, which is 25-

---

[35] Because the Court concludes Luh's Fourth Amendment claim for excessive force is not cognizable, the Court does not reach Defendants' alternative argument that they are entitled to qualified immunity as to Luh's Fourth Amendment excessive force claim.  Similarly, as the Court finds that Luh's excessive force claim under the Fourteenth Amendment for his dog bite injury was not cognizable against Lodwick and Chavez, the Court does not reach Defendants' alternative argument for qualified immunity as to this claim.

weeks long, more than double the 10-weeks mandated by POST.  Merced also has a robust and continuous training program on firearms, and officers are trained only to shoot as allowed under applicable law.  Kong's inadequate discipline claim fails because Merced maintained a system for discipline consistent with California Penal Code § 832.5.  Merced had a policy for receiving citizen complaints and investigating allegations.  It carried out an administrative investigation in this case.  As to Kong's theory of ratification by a final policymaker, there is no evidence that the Chief of Police, who is the final policymaker for Merced, ratified an unconstitutional shooting of Kong or that he ratified any alleged unconstitutional basis for the shooting.  Even assuming excessive force was used against Kong, Defendants also assert there is no causal relationship to Merced's customs, policies, and practices.

To establish a claim against Merced under 42 U.S.C. § 1983, Plaintiffs must show that they were deprived of their constitutional rights and that this deprivation was proximately caused by a Merced policy, custom, or practice that amounts to deliberate indifference.  *Monell*, 436 U.S. at 690-91.  Specifically, municipal liability can be established through (1) conduct pursuant to an expressly adopted official policy or a longstanding custom which constitutes the standard operating procedure of the local government entity; (2) a decision of a decision-making official who was a final policy-making authority whose edicts or acts may fairly be said to represent official policy in the area of the decision; and (3) an official with final policymaking authority either delegating that authority to, or ratifying the decision of the subordinate.  *See Price v. Sery*, 513 F.3d 962, 966 (9th Cir. 2008); *Gillette v. Delmore*, 979 F.2d 1342, 1346-47 (9th Cir. 1992).  A policy is "'a deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.'"  *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139 (9th Cir. 2012).

After proving that one of the circumstances existed, a plaintiff must also show that the municipality's action was the cause of the constitutional deprivation.  *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).

41

1    **1.    Kong's Monell Claims Against Merced Are Not Supported By Sufficient Evidence**

2

3          **a.    Failure to Train – Single Incident**

4          Complete inadequacy of training may constitute a "policy" giving rise to *Monell* liability;

5    however, "adequately trained officers occasionally make mistakes; the fact that they do says little

6    about the training program or the legal basis for holding the [municipality] liable." *City of Canton*

7    *v. Harris*, 489 U.S. 378, 379 (1989) ("*Canton*").  Therefore, a claim of inadequate training is only

8    cognizable under Section 1983 "where that city's failure to train reflects deliberate indifference to

9    the constitutional rights of its inhabitants." *Id.* at 392.

10         A Section 1983 plaintiff alleging a policy of failure to train peace officers must show

11   (1) he/she was deprived of a constitutional right; (2) the local government entity had a training or

12   policy that amounts to deliberate indifference to constitutional rights of persons with whom its

13   peace officers are likely to come into contact; and (3) his/her constitutional injury would have

14   been avoided had the local government unit properly trained those officers.  *Blankenhorn v. City*

15   *of Orange*, 485 F.3d 463, 485 (9th Cir. 2007).  "[A]bsent evidence of a program-wide inadequacy

16   in training, any shortfall in a single officer's training can only be classified as negligence on the

17   part of the municipal defendant – a much lower standard of fault than deliberate indifference." *Id.*

18   at 484-85 (internal citations and quotations omitted).

19         In sum, "the identified deficiency in a city's training program must be closely related to the

20   ultimate injury." *Canton*, 489 U.S. at 391.  The required "deliberate indifference" is established

21   where "the need for more or different training is so obvious, and the inadequacy so likely to result

22   in the violation of constitutional rights, that the policymakers of the city can reasonably be said to

23   have been deliberately indifferent to the need." *Clouthier v. County of Contra Costa*, 591 F.3d

24   1232, 1249 (9th Cir. 2010) (quoting *Canton*, 489 U.S. at 390).  Since *Canton,* although the

25   Supreme Court has recognized the continuing viability of a single-incident theory for failure to

26   train in *Connick v. Thompson*, 131 S.Ct. 1350, 1361-65 (2011), the theory is limited to the

27   complete absence of training the Supreme Court hypothesized in *Canton*, 489 U.S. 378 (1989)).

28   "*Canton's* single incident theory does not allow inquiry into subtleties of training.  *Canton* should

not be read to infer deliberate indifference for failure to train after any violation, for in virtually every instance of a constitutional violation by a city employee a § 1983 plaintiff will be able to point to something the city could have done to prevent the unfortunately incident." *Wereb v. Maui Cnty.*, 830 F. Supp. 2d 1026, 1033 (D. Haw. 2011) (quoting *Connick*, 131 S.Ct. at 1363). Showing that additional training would have been helpful in making difficult decisions does not establish municipal violations. *Id.* Further, proving that an injury or accident could have been avoided if an employee had better or more training, sufficient to equip him to avoid the particular injury-causing conduct will not suffice. *Id.*

In this case, even if Chavez and Lodwick's actions amount to a constitutional violation, Kong has failed to establish a genuine disputed issue of material fact regarding the existence of a policy of inadequate training. Defendants have presented evidence of Merced's training and policies regarding use of excessive force by its officers. The nature and scope of the training of Officers Chavez, Lodwick, Court, and Deliman is undisputed by Kong. Kong argues only that, while the officers' training may be "robust," it "was certainly per se inadequate given the actions taken against [Kong]." (Doc. 56, 28:5-8.) This is precisely the type of single-incident conduct of a non-policy making employee that fails to establish a custom or policy of the municipality. *Davis v. City of Ellensburg*, 869 F.2d 1230, 1233-34 (9th Cir. 1989) (single incident of excessive force by police officers inadequate to establish *Monell* liability). Merced is entitled to summary judgment on Kong's *Monell* claim under a failure-to-train theory of liability.

**b.      Ratification**

Kong alleges a *Monell* claim against Merced based its failure to discipline Chavez and Lodwick for their conduct during the incident or retrain them or their supervisors. By failing to discipline the officers, Merced ratified the conduct and breached its duty to supervise and properly train police officers. (Doc. 1, Kong Cmplt., ¶¶ 139-140.)

Defendants argue that to prevail on a *Monell* claim under a ratification theory, Kong must show that an official with final policy-making authority ratified a subordinate's unconstitutional decision and the basis for it. The parties do not dispute that the Chief of Police is the final policy-maker for the City of Merced as to its Police Department policies. Kong contends the Chief of

1  Police (the "Chief") ratified Chavez and Lodwick's use of force through multiple internal reviews.

2  The Chief was provided a memo outlining the actions taken by the officers and their explanations,

3  and he had the authority and discretion to impose discipline, ask for further investigation, and to

4  approve of their conduct as within policy.  As explained by Trindad in his deposition, the Chief

5  also approved the recommendations made by his subordinates, determined Lodwick and Chavez

6  acted in conformance with the policies and training of the Police Department, and ratified their

7  conduct.  (Doc. 56, 28:10-29:2 (citing Doc. 57-1, Exh. K, Trindad Depo., 21:9-23:23, 50:13-16,

8  57:21-59:22, 69:11-72:16, 98:8-10, 105:22-106:18).)   Kong contends that because the Chief

9  exonerated the officers involved, this reflects ratification by a final policymaker.

10  Defendants respond that because the Chief declined to discipline the officers does not

11  mean that he ratified unconstitutional conduct and the basis for it.  Defendants cite *Cloutheir*, 591

12  F.3d at 1253-54, which requires that the policymaker "made a conscious, affirmative choice to

13  approve" the subordinate's unconstitutional conduct and adopted it as official policy.  Further,

14  *Monell* liability requires a causal link between the ratification and the unconstitutional act, and

15  Kong has not shown how the failure to discipline the officers caused Kong's constitutional

16  deprivation.

17  A municipality may be held liable for a constitutional violation under the theory of

18  ratification if an authorized policymaker approves a subordinate's decision and the basis for it.

19  *Lytle v. Carl*, 382 F.3d 978, 987 (9th Cir. 2004).   However, "mere failure to overrule a

20  subordinate's actions, without more, is insufficient to support a § 1983 claim."  *Id.* at 393.  For

21  there to be ratification, there must be "something more" than a single failure to discipline or the

22  fact that a policymaker concluded that the defendant officer's actions were in keeping with the

23  applicable policies and procedures.  *Kanae v. Hodson*, 294 F. Supp. 2d 1179, 1191 (D. Haw.

24  2003).  As discussed by the court in *Kanae*,

25  The law does not say that every failure to discipline an officer who has shot
   someone is evidence of a "whitewash" policy or some other policy of "sham"
26  investigations.  The law does not say that, whenever an investigative group accepts
   an officer's version over a victim's differing version, this acceptance establishes a
27  policy for which a municipality may be held liable under § 1983.  If that were the

28

44

law, counties might as well never conduct internal investigations and might as well always admit liability. But that is not the law. The law clearly requires "something more."

*See also Peterson v. City of Forth Worth Texas*, 588 F.3d 838, 848 (5th Cir. 2009) (no ratification of use of excessive force where the Chief of Police determined after investigation that the officers complied with department policies); *Santiago v. Fenton*, 891 F.2d 373, 382 (1st Cir. 1989) ("As we have indicated before, we cannot hold the failure of a police department to discipline in a specific instance is an adequate basis for municipal liability under *Monell*.").

According to Trindad's declaration, MPD adheres to California Penal Code § 832.5, which requires MPD to have a procedure for investigating complaints made by the public. (Doc. 50, Trindad Decl., ¶ 4.) Under MPD policy, Internal Affairs conducts an investigation that results in a finding of exonerated (action complained of did occur, but was lawful, justified, and proper), not sustained (insufficient information/evidence to prove or disprove the allegation), sustained (allegation is supported by sufficient information or evidence), and unfounded (allegation is false; alleged act did not occur, employee or MPD was not involved). (Doc. 50, Trindad Decl., ¶ 5.) Specifically, the investigation team gathers information, conducts interviews, prepares a memo outlining the investigation, and creates a recommendation. The completed package of information is then given to the Chief who reviews it. The Chief then either concurs with the recommendation, sends it back for further investigation, or modifies the recommendation. (Doc. 57-1, Trindad Depo., 22:1-18.) The Chief is the person with the final say as to the form of discipline imposed as a result of the investigation. (Doc. 57-1, Trindad Depo., 23:19-23.)

After the shooting of Kong, MPD conducted an administrative investigation, and Internal Affairs found no violation. (Doc. 50, Trindad Decl., ¶ 15.) Chavez and Lodwick were found exonerated by Internal Affairs after the investigation into the event, and those findings were forwarded to the Chief. (Doc. 57-1, Trindad Depo., 105:22-106:17.)

The fact that the Chief reviewed the Internal Affairs investigation, accepted its recommendation that Chavez and Lodwick be exonerated for the shooting incident, and did not impose any discipline or modify the recommendation is insufficient in-and-of-itself to establish the Chief made a conscious, affirmative choice to approve the officers' actions and adopt them as

official policies.  There must be something more, as noted in *Kanae*, 294 F. Supp. 2d at 1191.  For example, in *Larez v. City of L.A.*, 946 F.2d 630 (9th Cir. 1991), the court held there was sufficient evidence to support a jury finding that the Chief of Police ratified the excessive use of force against the plaintiffs.  The "something more" necessary to show ratification present in *Larez* included an obviously flawed investigation of the plaintiff's excessive force complaint.  The investigation was conducted by the unit responsible for the constitutional violation and contained gaps and inconsistencies "that should have been visible to any reasonable police administrator." *Id.* at 647.  The Chief did not question the investigation and accepted the results.  *Id.* at 635.  The LAPD investigations were also found to be unreliable by a two-year study of LAPD complaints which showed that it was "almost impossible for a police officer to suffer discipline as a result of a complaint lodged by a citizen."  *Id.* at 647.  The evidence supported the plaintiff's theory that LAPD's disciplinary and complaint process contributed to the police excesses complained of because the procedures made clear to officers that they "could get away with anything."  *Id.*

Unlike *Larez*, Kong cites no evidence other than that the Chief reviewed the Internal Affairs investigation and recommendation and did not impose discipline.   This alone is insufficient to establish ratification.  *Peterson*, 588 F.3d at 848; *Santiago*, 891 F.2d at 382; *Kanae*, 294 F. Supp. 2d at 1191.  There is also no evidence showing a causal connection between the Chief's acceptance of the Internal Affairs' investigation recommendation regarding the officers' conduct and the alleged violation of Kong's constitutional rights.  In *Larez*, there was evidence that the refusal to discipline officers for complained-of conduct was a widespread practice giving officers the impression that they could "get away with anything," which supported a causal connection between the approval of officer conduct and the constitutional violation the plaintiff suffered.  There is no such evidence of how a one-time refusal to discipline is evidence of a causal connection between the alleged ratification and the excessive force Kong complains of here.

In sum, Defendants are entitled to summary judgment as to Kong's claims against the City of Merced under *Monell* pursuant to a theory of ratification.

### 2. Luh's *Monell* Claims Against Merced Are Not Supported by Sufficient Evidence

Luh also states claims against the Merced under *Monell*.  (Doc. 2, 1:13-cv-00111-SKO, Luh's Cmplt., ¶¶ 32-39.)  Luh's claims are predicated on a repeated course of conduct tantamount to a custom or policy of condoning or tacitly encouraging abuse of police authority and the disregard of citizens' constitutional rights; he also alleges a *Monell* claim under a theory of ratification.  (Doc. 2, 1:13-cv-00111-SKO, Luh's Cmplt., ¶ 33.)

Defendants argue Luh's ratification theory fails for the same reasons as Kong's:  (1) there is no evidence the Chief of Police ratified unconstitutional conduct and the basis for it; and (2) there is no causal link between any supposed ratification and Luh's shooting.[36]   As to the custom, policy, and practice theory, Luh's claim fails for the same reason as Kong's:  it is a single-incident theory which is insufficient to show deliberate indifference.

Luh contends it is undisputed that the officers violated several Deadly Force and Officer Involved Shooting policies that the City requires.  Luh notes that Chavez and Lodwick rode to the hospital together in disregard of policies that they remain sequestered and not discuss the shooting.  None of the officers were reprimanded or disciplined for this policy violation.  Luh contends there are material issues of fact under the ratification theory whether the officers exercised reasonable force during the incident.  Luh cites *Estate of Villarreal v. Cooper*, 929 F. Supp. 2d 1063 (E.D. Wash. 2013), where the district court denied summary judgment on the plaintiff's ratification theory because there were disputed issues of facts as to the reasonableness of the force used and the Police Chief had *expressly* stated that the officers' actions complied with department policies and that he supported all of the officer's actions.

Unlike *Cooper*, however, here there is no express statement from the Chief supporting and approving Chavez' and Lodwick's conduct as comporting with policy and supporting the officers' actions.  As discussed above, there is also no evidence of a causal link between any ratification of excessive force and the officers' conduct in this case.  Even to the extent the officers violated

---

[36] Defendants also argue Luh's claim should be dismissed as to DOE Defendants.  Luh clarifies that his *Monell* claim is against the City of Merced.  (Doc. 58, 25, n. 5.)

1  policy in this instance by not being sequestered and by riding together to the hospital, there is no

2  evidence how a one-time policy violation bears a *causal* nexus to the shooting of Kong and Luh.

3  As to Luh's theory that the City is liable under *Monell* based on a custom, policy, and practice

4  theory, the evidence of a single incident in this case is not sufficient to maintain the claim for the

5  reasons discussed as to Kong's *Monell* claim for a failure-to-train.  *See Trevino*, 99 F.3d at 918

6  ("Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be

7  founded upon practices of sufficient duration, frequency and consistency that the conduct has

8  become a traditional method of carrying out policy").   Defendants are entitled to summary

9  judgment on Luh's *Monell* claims.

10  **E.**      **Official Capacity Suits**

11        Defendants contend that Plaintiffs Luh and Kong sued Chavez and Lodwick in both their

12  individual and their official capacities.   Additionally, Kong sued Deliman and Court in their

13  individual and official capacities.  Defendants correctly maintain that the official capacity suits

14  against these individual defendants are superfluous because Merced is the real party in interest.

15  Neither Luh nor Kong addresses this argument.   As such, the official capacity suits against

16  Deliman, Court, Chavez, and Lodwick are dismissed and Defendants are entitled to summary

17  judgment as to such claims.

18  **F.**      **MPD is an Improperly Named Defendant**

19        Section 1983 provides a cause of action against any "person" who, under color of law,

20  deprives an individual of federal constitutional or statutory rights.  42 U.S.C. § 1983.  The term

21  "person" includes local governmental entities, *Cortez v. County of Los Angeles*, 294 F.3d 1186,

22  1188 (9th Cir. 2002), but does not encompass municipal or county departments. *See United States*

23  *v. Kama*, 394 F.3d 1236, 1239 (9th Cir.2005) (Ferguson, J., concurring) (municipal police

24  departments and bureaus are generally not considered "persons" within the meaning of section

25  1983); *Vance v. County of Santa Clara*, 928 F. Supp.  993, 995-96 (N.D. Cal. 1996) (dismissing

26  sua sponte Santa Clara Department of Corrections as improper defendant); *Garcia v. City of*

27  *Merced*, 637 F. Supp. 2d 731, 760 (E.D. Cal. 2008) (dismissing Sheriff's Department as improper

28  defendant).   It is clear that as a department of the City of Merced, the MPD is not a proper

defendant in Plaintiffs' section 1983 actions.   As such, the MPD is not a proper party and is DISMISSED from this action.

**G.      State Law Claims**

**1.       Kong's Claims Are Not Barred by the Statute of Limitations**

Defendants assert that all seven of Kong's state-law claims are barred by the statute of limitations found in California Government Code § 945.6 which requires that a lawsuit against a public entity be filed within 6 months of the entity's Notice of Rejection of Claim.   Kong filed his tort claim with the City of Merced on June 1, 2012, and it was rejected on July 16, 2012.   Kong's last day to file suit against the City or its officers was January 16, 2013.   Kong filed his claim on January 17, 2013 – one day late.

Kong argues that California Government Code § 6800 computes time calculations under statute by excluding the first day and including the last day, unless it is a holiday, which is also excluded.   Defendants' calculation counts the first day.   When the first day is excluded, the calculation of time begins on July 17, 2012.   Using the 184-day rule along with California Code § 6800, the complaint was due on January 17, 2013 – the date it was filed.

In their reply, Defendants do not dispute Kong's timeliness argument. California Government Code Section 945.6 requires complaints to be filed within 6 months of the notice of rejection of the claim.  *Gonzalez v. County of Los Angeles*, 199 Cal. App. 3d 601, 604-06, (1988) explains that under Section 945.6, a claimant has 184 days to file suit if the rejection notice is mailed between March and August, as a 6-month period on a calendar ranges in days from 181 to 184.   Applying California Government Code Section 6800, the first day of the 184 days is the day after the rejection notice was mailed.   Here, the claim rejection notice was mailed on July 16, 2012, and the 184-day time period began running on July 17, 2012.   The complaint was filed on January 17, 2013, exactly 184 days from July 17, 2012.    Thus, Kong's complaint is timely and none of his state law claims are barred.

**2.       Merced is Not Liable for State Law Torts**

Defendants argue that Merced is not liable for any of the common-law torts alleged by Kong.   In his opposition, Kong concedes his claims for civil conspiracy and aiding and abetting,

1   but Kong's opposition brief does not address whether his negligence claim against Merced is

2   barred.   In their reply, Defendants argue Kong's failure to address this issue is an implicit

3   concession and the issue has been waived.

4       The California Tort Claims Act governs the liability of state and local governmental

5   entities for tort claims. *See* Cal. Gov. Code § 810 *et seq*; *see also Eastburn v. Regional Fire*

6   *Protection Auth.*, 31 Cal. 4th 1175, 1183 (2003) ("[D]irect tort liability of public entities must be

7   based on a specific statute declaring them to be liable, or at least creating some specific duty of

8   care . . . .").   Section 815 of the California Government Code provides that a public entity is not

9   liable for injury arising out of an act or omission except as provided by statute.   Kong has not

10  alleged an independent statutory basis for imposing on Merced liability for his common law

11  negligence claim, as required by California law, and he does not identify any statutory basis in his

12  opposition.   Therefore, the Court finds that Merced is entitled to summary judgment on Kong's

13  state-law negligence claim against it.

14      **3.      Kong's Bane Act Claim Is Not Supported by Sufficient Evidence**

15      Kong alleges a violation of the Bane Act under California Civil Code Section 52.1 against

16  Defendants Chavez and Lodwick for allegedly interfering with Kong's constitutional rights

17  through threats, intimidation, or coercion.   (Doc. 1, ¶¶ 66-78.)

18      Defendants argue that in *Rodriguez*, 819 F. Supp. 2d at 937, the court held that to maintain

19  a claim under the Bane Act, the coercive force applied against a plaintiff must result in an

20  interference with a separate constitutional or statutory right – it is not sufficient that the right

21  interfered with is the right to be free of the force that was applied.   Here, Kong's Bane Act claim is

22  predicated upon violation of his Fourth Amendment right against excessive force.   Defendants

23  argue the coercion alleged under the Bane Act cannot be the same conduct as alleged under the

24  Fourth Amendment violation.   Thus, Defendants argue they are entitled to judgment on Kong's

25  Bane Act claim.

26      Kong argues that Defendants' argument hinges on *Rodriguez*, but this case is "outdated"

27  and other courts have refused to follow the reasoning offered by Defendants.   Kong argues that

28  Defendants acted intentionally in firing upon him, and their ambush tactics were meant to

intimidate him.  "Hiding behind a vehicle and ambushing [Kong], and threatening/intimidating him with gunfire as a means of effectuating arrest is precisely the aim of the legislature in enacting the Bane Act."

The Bane Act prohibits any person from interfering "by threats, intimidation, or coercion . . . with the exercise or enjoyment by an individual . . . of rights secured by the Constitution or laws of the United States."  Cal. Civ. Code § 52.1.  "The essence of a Bane Act claim is that the defendant, by the specified improper means (i.e., 'threats, intimidation or coercion'), tried to or did prevent the plaintiff from doing something he or she had the right to do under the law or to force the plaintiff to do something that he or she was not required to do under the law."  *Austin B. v. Escondido Union School Dist.*, 149 Cal. App. 4th 860, 883 (2007) (citing *Jones v. Kmart Corp.,* 17 Cal. 4th 329, 334 (1998)).

District courts in California were split on the issue of whether a Fourth Amendment excessive force or false arrest violation *alone* satisfies the element of interference with a legal right under the Bane Act.  In *Justin v. City and County of San Francisco*, the court held that "Section 52.1 is only applicable when a defendant intends by his or her conduct to interfere with a separate, affirmative right enjoyed by a plaintiff; it does not apply to a plaintiff's allegation of use of excessive force absent a showing that the act was done to interfere with a separate state or federal constitutional right."  No. C05-4812-MEJ, 2008 WL 1990819, at *9 (N.D. Cal. May 5, 2008).  The court concluded a false arrest claim alone was insufficient for establishing violation of a separate right.  However, in *Cole v. Doe 1 thru 2 Officers of City of Emeryville Police Department*, 387 F. Supp. 2d 1084, 1102 (N.D. Cal. 2005), the court held that the use "of law enforcement authority to effectuate a stop, [and] detention (including use of handcuffs) . . . can constitute interference by 'threat, intimidation, or coercion under [§ 52.1].'" (quoting *Venegas v. Cnty of L.A.*, 32 Cal. 4th 820, 843 (2004) (holding allegations and evidence of unreasonable search and seizure, accompanied by threats, intimidation, or coercion, are sufficient to withstand a demurrer under § 52.1)).

1   *Rodriquez* was decided while district courts were split on this issue.[37]   Like the court in

2   *Justin*, the court determined a cause of action under the Bane Act requires a predicate – the

3   application of threat, intimidation or coercion, and an object – interference with a constitutional or

4   statutory right.   The court concluded, based on case authority and the language of the statute, that

5   to maintain a claim under the Bane Act, the coercive force applied against a plaintiff "must result

6   in an interference with a separate constitutional or statutory right.   It is not sufficient that the right

7   interfered with is the right to be free of the force or threat of force that was applied."   *Rodriquez*,

8   819 F. Supp. 2d at 954.

9   One year later, a California Court of Appeal decided *Shoyoye v. County of Los Angeles*,

10  32 Cal. App. 4th 947 (2012).   Shoyoye was lawfully arrested on August 19, 2007, because, in the

11  act of reporting an unrelated incident to the police, officers discovered he had two outstanding

12  warrants.   The first warrant was related to his failure to address a citation he receiving for riding

13  the subway without a ticket, and the second related to a former roommate who stole his identity

14  and was convicted of grand theft under Shoyoye's name.   Shoyoye was incarcerated, appeared in

15  court, and was ordered released on the first warrant.   A few days later, he appeared on the second

16  warrant, and that matter was resolved in his favor.   On August 22, 2007, he was ordered released,

17  subject to any other holds.   He was transported back to the jail, expecting to be released at any

18  time.   Due to a processing error, a Department of Corrections hold intended for another parolee

19  was placed in the computer under Shoyoye's name.

20  When Shoyoye was transferred to the Detention Center in Castaic, he continued to ask why

21  he was not being released, he received no assistance, and he was transferred again to the Pitchess

22  Detention Center.    Finally, he was able to contact his roommate and his boss who in turn

23  contacted a state assemblyman's office, and the error was discovered.   Shoyoye was ultimately

24  released on September 7, 2007.   During his wrongful incarceration, he was subjected to strip

25  searches, anal cavity searches, required to wait naked in line to shower, and shackled.   He also

26  witnessed criminal activity, fights, and was housed in a dormitory with hundreds of inmates –

27  many of whom were gang members.

28

---

[37] The facts of *Rodriquez* were summarized above.

1    Shoyoye filed suit, including a claim under the Bane Act.  The court found there was no
2    coercion independent from the inherent coercion in his wrongful detention.  While county
3    employees had been rude to him at times, they did not threaten or intimidate him for voicing his
4    opinion that he should be released.  They coerced him to remain incarcerated, but they did not
5    coerce him to stop inquiring about his release, threaten him for doing so, or punish him in any
6    way.  "No one ignored him deliberately, knowing that he should in fact be released, let alone
7    purposefully threaten or intimidate him."  Moreover, while there was "[n]o doubt the experience
8    was traumatic and frightening, [] there was no evidence of any coercion independent of that
9    inherent in a wrongful detention itself."  *Id.* at 961-62.

10   Federal district courts deciding Bane Act claims since *Shoyoye* have disagreed about the
11   significance of that court's holding that there must be evidence of "coercion independent of that
12   inherent in the wrongful detention itself."  *Compare Hunter v. City & Cnty. of S.F.*, No. 11-4911-
13   JSC, 2012 WL 4831634, at *5-6 (N.D. Cal. Oct. 10, 2012) *with Quinn v. Fresno Cnty. Sheriff*, No.
14   10-cv-1617, 2012 WL 6561562, at *5 (E.D. Cal. Dec. 14, 2012).

15   In *Bender v. County of Los Angeles*, 217 Cal. App. 4th 968 (2013), a California court of
16   appeals reviewed a number of district court decisions prior to *Shoyoye* and determined that, to the
17   extent those cases held that an unlawful seizure or arrest committed with unlawful use of force did
18   not constitute a violation of the Bane Act, those cases did not reflect the current state of California
19   law.  *Bender*, however, sidestepped the issue because there was both an unlawful arrest claim *and*
20   an excessive force claim.  The court held that where "an arrest is unlawful *and* excessive force is
21   applied in making the arrest, there has been coercion 'independent from the coercion inherent in
22   the wrongful detention itself.'"  *Id.* at 978 (quoting *Shoyoye*, 203 Cal. App. 4th at 959).  *Bender* did
23   not address the question whether an excessive force claim alone could suffice under the Bane Act.

24   As recognized by judges in this district, "the landscape has evolved since *Rodriquez*,
25   including the more recent decision in *Shoyoye v. County of Los Angeles,* 32 Cal. App. 4th 947
26   (2012)."  *Youngblood v. City of Bakersfield*, No. 1:12-cv-1150-AWI-JLT, 2014 WL 1386392, at
27   *12-13 (E.D. Cal. Apr. 14, 2009); *see also Rodriquez v. City of Modesto*, No. 1:10-cv-1370-LJO-
28   MJS, 2013 WL 6415620, at *10-11 (E.D. Cal. Dec. 9, 2013).  However, courts continue to

1  disagree about whether there must be coercion independent from the coercion inherent in the

2  claimed excessive force or unlawful search.

3       In considering the case authority on this issue, the Court finds most persuasive and

4  consistent the interpretation of *Shoyoye* and the other authority noted in *Youngblood*. *Youngblood*

5  involved the search of a residence of a disabled individual who was bitten by a police canine

6  during the course of the search.  In considering a Bane Act claim, the court adopted the

7  interpretation of *Shoyoye* applied in *N.H. v. City of Alameda*, No. 11-cv-02868-JST, 2013 WL

8  1701591 (N.D. Cal. Apr. 18, 2013) such that "where Fourth Amendment unreasonable seizure or

9  excessive force claims are raised and intentional [police] conduct is at issue, there is no need for a

10 plaintiff to allege a showing of coercion independent from the coercion inherent in the seizure or

11 use of force *at the pleading stage*."  *Youngblood*, 2014 WL 1386392 at *13 (emphasis added).

12 The *Youngblood* court explained that such an interpretation aligns with the decision in *Bender* by

13 leaving open the chance that a plaintiff who alleges an improper seizure or arrest may, upon

14 development of facts, be able to show that excessive force was employed and thereby prevail in a

15 claim under the Bane Act."  *Id.*  The *Youngblood* court reasoned that there were facts proffered

16 that, if proven, could show that there was no justification for the plaintiff's seizure *and* that

17 excessive force was applied.  As such, the court concluded that it would *not* grant summary

18 judgment as to the plaintiff's Bane Act claims.  *Id.*

19      Kong's Bane Act claim is distinguishable from *Youngblood*.  While it may be sufficient for

20 pleading purposes, there is no evidence proffered showing there was any coercion outside the

21 alleged use of excessive force.  As such, Defendants are entitled to summary judgment as to

22 Kong's claim under the Bane Act.

23      **4.      Luh and Kong's Assault and Battery Claims**

24      Kong and Luh each allege claims for assault and battery against Chavez and Lodwick.

25 Defendants claim they are entitled to summary judgment as to both Plaintiffs' claims.

26      "A police officer in California may use reasonable force to make an arrest, prevent escape

27 or overcome resistance, and need not desist in the face of resistance."  *Johnson v. Bay Area Rapid*

28 *Transit*, 290 F. Supp. 2d 1034, 1073-74 (N.D. Cal. 2011) (quoting *Edison v. City of Anaheim*,

63 Cal. App. 4th 1269, 1272 (1988)).  "The standard jury instruction in police battery actions recognizes this:  'A peace officer who uses unreasonable or excessive force in making a lawful arrest or detention commits a battery upon the person being arrested or detained as to such excessive force.'"  *Id.*  In an assault and battery claim against a police officer under California law, a plaintiff must show that the officer used reasonable force.  *Id.*

A claim for assault under California Law must allege that (1) defendants intended to cause harmful or offensive contact, or the imminent apprehension of such contact, and (2) Plaintiff was put in imminent apprehension of such contact.  *Brooks v. United States*, 29 F. Supp. 2d 613, 617 (N.D.Cal.1998) (citing Restatement (Second) of Torts § 21 (1965)). "The tort of assault is complete when the anticipation of harm occurs."  *Kisesky v. Carpenters' Trust for So. Cal.*, 144 Cal.App.3d 222, 232 (1983).  Physical injury need not be present for either a claim of assault or battery. *Id.* "A civil action for assault is based upon an invasion of the right of a person to live without being in fear of personal harm." *Lowry v. Standard Oil Co.*, 63 Cal. App. 2d 1, 7 (1944).

### a.   Disputed Factual Issues Preclude Summary Judgment of Kong's Assault and Battery Claims

Defendants contend that Kong's state law claims for battery and assault are barred by *Heck* and because the Officers used reasonable force.  For the reasons discussed above, there are issues of material fact as to whether the officers used reasonable force against Kong, and Defendants argument under *Heck* is not persuasive.  Accordingly, the motion to Kong's assault and battery claim against Chavez and Lodwick is DENIED.

### b.   Disputed Factual Issues Preclude Summary Judgment of Luh's Assault and Battery Claims

Defendants contend that Luh was never placed in apprehension for purposes of his assault claim:  "He had no prior knowledge he was about to be struck, and thus could not have reasonably believed he was about to be hit."  (Doc. 45, 57:6-10.)  While there is no evidence that Luh observed the officers' interaction with Kong such that he was placed in apprehension before he was shot, *after* Luh was shot he states in his declaration he did not know who shot him and he was "in fear for [his] life."  (Doc. 60-15, Luh Decl., ¶ 7.)  While fearing for his life, he went into the

55

house and "crawled into a bathtub for safety." (Doc. 60-15, Luh Decl., ¶ 7.) This is sufficient evidence of imminent apprehension of contact following the alleged battery.

Defendants also contend the requisite intent is not met with respect to Luh's assault and battery claims because the officers never intended to make harmful contact with Luh. Under the doctrine of transferred intent, the viability of a claim of assault and battery by a bystander against a police officer turns on the reasonability of the application of force by the police officer against the intended suspect. *See Brown v. Ransweiler*, 171 Cal. App. 4th 516, 527 n.10 (2009) (under transferred intent doctrine, if police officer's actions are reasonable as to the suspect, then they are necessarily reasonable as to the third-party plaintiff). As noted above, in the presence of conflicting evidence, the court cannot find that Chavez and Lodwick's decision to employ deadly force against Kong was reasonable as a matter of law. Although Defendants contend Luh cannot show that the officers intended to shoot him as a bystander who they could not see behind the fence, the doctrine of transferred intent will apply to an innocent bystander. Because the officers intended to fire upon Kong, that intent transfers to Luh.

In sum, neither Kong's nor Luh's assault and battery claims are subject to summary judgment, and Defendants' motion with respect to these claims is DENIED.

### 5. Luh and Kong's Negligence Claims

Luh and Kong each allege negligence claims against Defendants. Defendants assert they are entitled to summary judgment as to both Plaintiffs' claims.

To prevail on a common law claim of negligence against a police officer, Plaintiffs must show that (1) the officer owed plaintiff a duty of care; (2) the officer breached the duty by failing "to use such skill, prudence, and diligence as other members of profession commonly possess and exercise," (3) there was a "proximate causal connection between the [officer's] negligent conduct and the resulting injury" to the plaintiff; and (4) the officer's negligence resulted in "actual loss or damage" to the plaintiff. *Harris v. Smith*, 157 Cal. App. 3d 100, 104 (1984). Therefore, "to prevail on the negligence claim, Plaintiffs must show that the Defendant officers acted unreasonably and that the unreasonable behavior harmed Plaintiffs." *Robinson v. City of San Diego*, 954 F. Supp. 2d 1010 (S.D. Cal. 2013) (internal quotation marks and citation omitted).

a. **Kong's Negligence Claims**

Defendants identify three separate theories pled in Kong's complaint regarding negligence of the officers:  (1) excessive force against Chavez and Lodwick; (2) inadequate medical care against Court; and (3) inadequate investigation by Deliman.   Kong does not dispute this characterization of his claims or the Defendants identified under each theory.

(i) **Factual Issues Preclude Summary Judgment as to Kong's Negligence Claim Based on Excessive Force of Chavez and Lodwick**

Defendants contend because there is no material dispute that Chavez and Lodwick's use of force was reasonable, there is no issue of fact with regard to Kong's negligence claim.  (Doc. 45, 57:24-27.)

Kong contends there are disputed issues of fact as to the reasonableness of the officers' use of force, and even if the officers' use of force were reasonable, their conduct before the shooting could still be found to be negligent.   Kong cites *Hayes v. County of San Mateo*, 12 Cal. 4th 913, 917 (1996) for the proposition that California negligence law is broader than federal Fourth Amendment law, and the officer's tactical conduct and decisions preceding the use of deadly force are relevant considerations as to whether the officers were negligent.

"Law enforcement officers do have a duty to refrain from unreasonable use of deadly force."  *Munoz v. City of Union City*, 120 Cal. App. 4th 1077, 1094 (2004), *as modified on denial of rehearing*.  The Fourth Amendment reasonableness standard applies to claims that officers were negligent in using excessive force.  *See Young v. Cnty. of L.A.*, 655 F.3d 1156, 1170 (9th Cir. 2011) (citing *Munoz v. City of Union City*, 120 Cal. App. 4th 1077, 1108-09 (2004)).

Kong's claim of negligence against Chavez and Lodwick involves disputed issue of fact regarding the reasonableness of the force used.  Making a determination regarding negligence would require the same determinations of credibility, weighing evidence, and drawing inferences from the facts – none of which are the Court's function at the summary judgment stage. *Anderson*, 477 U.S. at 355.  To the extent Kong's negligence claim is premised on the officers' pre-shooting tactics, those facts are also considered in the totality of circumstances surrounding the officers' ultimate use of force.  The officer's duty to act reasonably when using deadly force extends to pre-

shooting conduct.  *Hayes v. City of San Diego*, 57 Cal. 4th 622, 689 (2013) ("[T]he totality of the circumstances, including the preshooting conduct of the officers, might persuade a jury to find the shooting negligent.  [Citations omitted].   In other words, preshooting circumstances might show that an otherwise reasonable use of deadly force was in fact unreasonable.")   It is for the jury to determine whether the preshooting tactics, in light of the officers' ultimate use of force, amounted to reasonable or negligent conduct.   Therefore, Kong's negligence claim cannot be resolved on summary judgment for the same reasons as Kong's constitutional excessive force claim.

<center>(ii)      **Summary Judgment is Warranted as to Kong's Negligence Claim Based on Inadequate Medical Care**</center>

Defendants contend there is no evidence that, even if they had a duty to render medical care, Chavez, Lodwick, or Court breached the duty to provide Kong medical care following the shooting.  Defendants argued that Kong received care within 10 to 15 minutes after police moved Kong to a safe area to be treated by paramedics.  In fact, the officers moved Kong even before the scene was secure and went "above and beyond Department police" to render such aid.   Their conduct was reasonable.

Kong contends that Defendants are required to provide medical care pursuant to their own policies.  The video shows that officers refused to provide medical care for over 15 minutes based on the theory that other possible threats could exist in the home.  Although Defendants state they have no duty to provide medical care in a particular period of time after an incident, they cite no authority other than their own duty manual.  As such, Kong contends Defendants have not met their burden on summary judgment.

Determining whether officers owed Kong a duty of care requires consideration of the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant, and the consequences to the community of imposing a duty of care, the availability, cost, and prevalence of insurance for the risk involved.  *Davidson v. City of Westminster*, 32 Cal. 3d 197, 203 (1982).

Merced Policy 310 (officer involved shooting) provides guidelines used in the investigation of an officer-involved shooting.  (Doc. 50, Trindad Decl., Exh. F.)   The policy describes the duties of any initial on-scene supervisor at an officer-involved shooting.  Pursuant to Policy 310.4.1, the first uninvolved supervisor should "[t]ake all reasonable steps to obtain emergency medical attention for all apparently injured individuals." (Doc. 50, Trindad Decl., Exh. F.)    Policy 406 also requires officers to use reasonable efforts to render medical aid to any obviously injured parties at a crime scene.  (Doc. 50, Trindad Decl., Exh. M.) Assuming the officers owed Kong a duty of care to provide timely medical care pursuant to these policies, the court considers the remaining elements of Kong's negligence claim.

A police officer breaches a duty of care when he fails to use the skill, prudence, and diligence that other members of the profession commonly possess and exercise.  *Harris*, 157 Cal. App. 3d at 104.  As there is no dispute that medical care was summoned, Kong claims the officers were negligent in not providing more timely medical care.  Kong offers the testimony of expert Timothy Williams who stated that it took officers seven minutes to pull Kong out so that he could receive treatment from paramedics which was too long in his opinion, and the scene could have been secured much more quickly than it was. (Doc. 57-1, T.T. Williams Decl., 85:12-86:25.) Kong also asserts the video confirms the scene could have been secured more quickly and aid could have been rendered sooner.  Officer Court testified that first aid was rendered to Kong when it was safe to do so.  (Doc. 46-10, Court Depo., 23:21-25.)  Kong offers evidence sufficient to create a factual dispute about whether the scene could have been secured more quickly and care rendered in a more timely manner (in less than the seven minutes Williams observed it took to pull Kong out so he could be treated by the paramedics).  *See Hernandez v. KWPH Enterprises*, 116 Cal. App. 4th 170, 175 (2004) (whether a duty of care has been breached is normally a question of fact).

As to causation and damages, however, Kong neither cites to any evidence or argument as to how any breach of the duty caused him additional injury nor identifies any injury as a result of any delay in medical care.   All Defendants are entitled to summary judgment on Kong's

1  negligence claim for failure to render timely medical care. [38]

2              **(iii)    Summary Judgment is Warranted as to Kong's Negligence
3                        Claim Based on Post-Shooting Investigation**

4          Kong alleges that Defendants breached their duty of care by engaging in an incomplete and

5  negligent investigation, failing to question the officers, or to use well-established legal principles

6  to determine whether or not there were any questionable activities on the part of Chavez and

7  Lodwick.  (Doc. 1, Kong's Cmpt., ¶ 116.)

8          Defendants contend that, even assuming there is a duty to investigate, there is no evidence

9  that Deliman breached any duty.  After obtaining a search warrant, Deliman was instructed to

10  interview Kong – which he did.  (Doc. 45, 58:16-28.)  Kong contends Defendants have an inherent

11  duty to investigate criminal wrongdoing, which includes that of their own officers.  Kong asserts

12  that Deliman did not separate the officers and did not interview the officers on the night in

13  question.  Deliman's entire investigation centered on Kong's criminal liability, which is unrelated

14  to his duty to investigate whether the shooting was proper.[39]

15          Kong has not established that Deliman had a duty to conduct a post-shooting investigation

16  into the shooting incident, or that he was charged with separating the officers and interviewing

17  them on the night of the incident.  Although Merced and the MPD may have had a duty to

18  investigate the officer-involved shootings, the City is not liable for common law negligence.

19  Moreover, Kong has not established how any failure to investigate the shooting was the proximate

20  cause of any additional injury to Kong.  Defendants are entitled to summary judgment on Kong's

21  theory of negligence arising out of an inadequate post-shooting investigation.

22

---

23  [38] Kong's complaint for negligence is against all Defendants, but Merced is not liable for negligence absent a statutory
    duty, which was discussed above.  *See Cardinal Buchnoff*, No. 06-cv-72-MMA (BLM), 2010 WL 3609489, at * 2
24  (S.D. Cal. Sept. 14, 2010) (citing *Universal By-Prods, Inc. v. City of Modesto*, 43 Cal. App. 3d 145, 153 (1975)
    (stating there is "no common law liability of a public entity; liability is wholly statutory)).

25
26  [39] In his responses to the DUMFs (*see* Doc. 56-3, DUMF 122), Kong disputes that Deliman was not involved in the
    disciplinary decision for Chavez and Lodwick because his report was part of the investigation file used to clear
    Chavez and Lodwick.  Kong cites no particular portion of Deliman's deposition to support his dispute.  Deliman was
27  asked during the course of his deposition whether he was involved in the investigation of the officers, and he said he
    did "some canvassing of the neighborhood after the fact, but, no, I don't believe so."  (Doc. 46-11, Deliman Decl.,
28  17:22-18:2.)  He also indicated he did not participate in the decision-making process as it related to recommending
    discipline for either of the officers.  (Doc. 46-11, Deliman Decl., 17:22-18:2.)

1

        **b.**     **Factual Issues Preclude Summary Judgment as to Luh's Negligence Claim Against Chavez and Lodwick**

2

3        Luh claims the officers' use of excessive force against Kong negligently caused Luh injury.

4  (Case No. 1:13-cv-00111-SKO, Luh's Cmplt., ¶ 44-46.)

5        Chavez and Lodwick contend they are entitled to summary judgment because their use of

6  force against Kong, which led to the shooting of Luh, was reasonable.  Luh contends there are

7  disputed issues of fact whether Chavez and Lodwick's use of force was reasonable, precluding

8  summary judgment of Luh's negligence claim based on the same conduct.  As with Kong's claim

9  of negligence due to the officers' use of excessive force, Luh's claim is subject to the same factual

10  disputes which require the jury to make credibility determinations, weigh evidence, and draw

11  inferences about totality of the circumstances the officers faced and the use of force employed.  As

12  such, Defendants' motion with respect to Luh's negligence claim is DENIED.

13  **H.**     **Punitive Damage Claims**

14        Kong has conceded his punitive damage claim as to the City of Merced, but maintains

15  Defendants are not entitled to summary judgment on his punitive damages claims against the

16  individual officers.

17        Pursuant to federal law, a jury may award punitive damages in a Section 1983 case

18  alleging excessive force either "when a defendant's conduct was driven by evil motive or intent, or

19  when it involves a reckless or callous indifference to the constitutional rights of others." *Dang v.*

20  *Cross*, 422 F.3d 800, 807 (9th Cir. 2005); *Smith v. Wade*, 461 U.S. 30, 33 (1983) (punitive

21  damages may be awarded "if the conduct of one or more of the defendants is shown to be a

22  reckless or callous disregard of, or indifference to, the rights or safety of others").  A Section 1983

23  punitive damage claim is subject to summary adjudication "where plaintiff fails to produce

24  evidence raising a material question of fact regarding aggravating circumstances or the reckless or

25  callous nature of defendant's actions." *Megargee v. Wittman*, 550 F. Supp. 2d 1190, 1214 (E.D.

26  Cal. 2008) (internal quotation marks and citations omitted).

27        As discussed with respect to Kong's excessive force claim and state law claims for

28  negligence, battery, and assault, the parties have provided differing versions of events regarding

1    the officers' use of force against Kong.  These disputes raise factual issues whether Chavez and

2    Lodwick engaged in malicious, wanton, or oppressive conduct under federal law as well as

3    whether the officers acted with malice, oppression, or fraud under California law.  Cal. Civ. Code

4    § 3294(a).  As discussed by the Ninth Circuit in *Castro*, 785 F.3d at 349-50, even where the

5    standard on the underlying merits of the claim is one of recklessness, punitive damages may still

6    be awarded by a jury without any additional culpable conduct.  Because there is evidence from

7    which a reasonable jury could conclude the officers' conduct was unreasonable, there is sufficient

8    evidence to support an award of punitive damages.

9         Similarly, issues of fact as to the reasonableness of the officers' conduct preclude summary

10   judgment as to Luh's Fourteenth Amendment excessive force claim and his state law claims for

11   negligence, assault and battery.  These factual issues similarly preclude summary judgment as to

12   Luh's claim for punitive damages.

13   **I.    Kong's Conceded Claims**

14        In his opposition, Kong conceded his claims for violation of the California Civil Code

15   § 51.7, conspiracy, aiding and abetting, injunctive relief, and punitive damages – as to Merced

16   only.  (Doc. 56, 30:18-22.)  Defendants' summary judgment motion is granted as to these claims,

17   and they are dismissed.

18                            **VI.    CONCLUSION**

19        For the reasons set forth above, IT IS HEREBY ORDERED that

20        1.    Defendants' motion for summary judgment as to Kong's claims is DENIED as

21              follows:

22              a.    Fourth Amendment claim for excessive force (Doc. 1, Cmplt., Sixth Cause

23                    of Action);

24              b.    Qualified Immunity for Fourth Amendment claim for excessive

25                    force; and

26              c.    State law claims for negligence, assault, and battery (Doc. 1., Cmplt.,

27                    Second, Third, and Fourth Causes of Action).

28        2.    Defendants' motion for summary judgment as to Kong's claims is GRANTED as

follows:

      a.     California Civil Code §§ 51.7 and 52.1 (Doc. 1, First Cause of Action, Count 1);

      b.     Common law conspiracy (Doc. 1, Cmplt., First Cause of Action, Count 2);

      c.     Aiding and Abetting (Doc. 1, Cmplt., First Cause of Action, Count 3);

      d.     Negligence on theories of (1) untimely medical care; and (2) inadequate investigation (Doc. 1, Cmplt., Fourth Cause of Action);

      e.     Conspiracy under 42 U.S.C. § 1985 (Doc. 1, Cmplt., Seventh Cause of Action)

      f.     *Monell* (Doc. 1, Cmplt., Eighth Cause of Action);

      g.     Injunctive Relief Request (Doc. 1, Cmplt., Ninth Cause of Action); and

      h.     Punitive Damage claim against the City of Merced.

3.     Defendants' motion for summary judgment as to Luh's claims is DENIED as follows:

      a.     Excessive force under the Fourteenth Amendment as to shooting (1:13-cv-00111-SKO, Doc. 2, Cmplt., First Cause of Action);

      b.     Alternative request for qualified immunity as to the Fourteenth Amendment excessive force claim as to the shooting; and

      c.     State law claims for assault, battery, and negligence 1:13-cv-00111-SKO, Doc. 2, Cmplt., Fourth And Fifth Causes of Action).

4.     Defendants' motion for summary judgment as to Luh's claims is GRANTED as follows:

      a.     Fourth Amendment Claim for excessive force as to shooting and dog bite;

      b.     Fourteenth Amendment Claim for excessive force as to dog bite; and

      c.     *Monell*.

5.     In sum, this case proceeds against Chavez and Lodwick only as to the following claims:

      a.     Kong's claims for (1) excessive force under the Fourth Amendment;

1          (2) negligence; and (3) assault and battery; and

2          b.      Luh's claims for (1) excessive force under the Fourteenth Amendment;

3                  (2) negligence; and (3) assault and battery.

4

5

IT IS SO ORDERED.

6

7      Dated:   **July 29, 2015**                    _____ **/s/ Sheila K. Oberto**
                                                      UNITED STATES MAGISTRATE JUDGE
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28