# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

KONG MENG XIONG,

           Plaintiff,

    v.

OFFICER CHAVEZ, et al.,

           Defendants.

_____

Case No.  1:13-cv-00083-SKO

**ORDER RE PLAINTIFF'S MOTION FOR JUDGMENT AS A MATTER OF LAW AND MOTION FOR A NEW TRIAL**

(Doc. Nos. 156, 174)

## I.  INTRODUCTION

On January 17, 2013, Plaintiff filed a complaint alleging, among other claims, that Defendant Police Officers Eduardo Chavez ("Chavez") and James Lodwick ("Lodwick") (collectively, "Defendants") used excessive force when seizing him on December 3, 2011, in violation of Plaintiff's Fourth Amendment rights.  (Doc. 1.)  A 7-day jury trial was held in September 2015 and resulted in a defense verdict.  (Doc. 153.)

On October 21, 2015, Plaintiff timely filed a renewed motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b), and alternatively, for a new trial under Federal Rule of Civil Procedure 59.  (Doc. 156.)  Due to the need for a formal trial transcript, Plaintiff was required to file an amended motion on December 9, 2015.  (Doc. 174.)  Defendants filed an opposition on December 23, 2015, and Plaintiff filed a reply brief on January 4, 2016.  A hearing was deemed unwarranted pursuant to Local Rule 230(g), and the matter was submitted on the

1  parties' papers and supporting materials.  For the reasons set forth below, Plaintiff's motion for

2  judgment as a matter of law under Rule 50(b) and, alternatively, for a new trial under Rule 59 is

3  DENIED.

4  ## II.  BACKGROUND

5      On December 3, 2011, Plaintiff drove to a party at a residence (the "Residence") in

6  Merced, California.  (Doc. 1, ¶¶ 24, 26.)  The Merced Police Department ("MPD") received a 911

7  call that a man at the Residence, wearing a black hoodie, had displayed a gun.  Officers Chavez

8  and Lodwick were dispatched to the scene where they approached the front of Residence.  A

9  camera attached to Chavez' glasses video-recorded the events.  According to Defendants, as they

10  approached the Residence, they heard a semi-automatic pistol being "racked" and what sounded

11  like an argument.  (Doc. 177-2, Chavez Trial Testimony ("Tr. Test."), 38:21-39:14, 99:20-100:12;

12  Doc. 177-3, Lodwick Tr. Test., 7:9-13, 9:8-23.)  From their positions at the front of the Residence,

13  Defendants heard Plaintiff come through the gate from the backyard of the Residence to the front

14  of the Residence where Defendants were located.  Defendants shined gun-mounted flashlights on

15  Plaintiff which illuminated him.  When Plaintiff was illuminated by Defendants' flashlights, he

16  was turning towards the officers and had his hands at the waistband of his pants.  (Doc. 177-3,

17  Lodwick Tr. Test., 26:14-18.)  Lodwick testified that as Plaintiff turned, Plaintiff withdrew a gun

18  from his waistband, pointed it in the officers' direction, and then started running away.  (Doc. 177-

19  3, Lodwick Tr. Test. 27:4:23.)  Defendants testified that when they saw Plaintiff had a gun in his

20  hand and was pointing it in their direction, they fired their weapons at him.  (Doc. 177-2, Chavez

21  Tr. Test., 58:24-59:1; Doc. 177-3, Lodwick Tr. Test., 27:10-28:13.)  Plaintiff was shot in the leg,

22  fell to the sidewalk, and was later taken to the hospital.

23      Plaintiff is suing Defendants, alleging their use of force was unreasonable and excessive.

24  The jury trial commenced on September 15, 2015.   At the close of all evidence and before the

25  case was submitted to the jury, Plaintiff and Defendants made oral motions for judgment as a

26  matter of law pursuant to Federal Rule of Civil Procedure 50(a), respectively, which were denied,

27  and the case was submitted to the jury on the question of 42 U.S.C. §1983 liability for excessive

28  force in violation of the Fourth Amendment.  The jury returned a verdict on September 23, 2015,

1  finding that Defendants did not use excessive force in seizing Plaintiff by means of deadly force.

2  (Doc. 153.)

3       Plaintiff has now filed a renewed Rule 50(b) motion for judgment as a matter of law and,

4  alternatively, for a new trial pursuant to Rule 59.  (Doc. 174.)  Defendants oppose the motion.

5  (Doc. 176.)  It is Plaintiff's motion that is currently pending before the Court.

6  **III.    LEGAL STANDARDS**

7  **A.    Judgment As A Matter of Law – Federal Rule of Civil Procedure 50(b)**

8       Motions for judgment as a matter of law are governed by Federal Rule of Civil Procedure

9  50.  Rule 50(a) governs pre-verdict motions while Rule 50(b) applies to post-verdict motions.  A

10  motion for a judgment as a matter of law under Rule 50(b) is not a freestanding motion, but is a

11  renewed Rule 50(a) motion.  If the trial judge denies or defers ruling on a Rule 50(a) motion

12  during trial, and if the jury then returns a verdict against the moving party, that party may renew

13  its motion under Rule 50(b).

14       A Rule 50(b) motion is limited to the grounds asserted in the pre-deliberation Rule 50(a)

15  motion.  *EEOC v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009).  "Thus, a party

16  cannot properly 'raise arguments in its post-trial motion for judgment as a matter of law under

17  Rule 50(b) that it did not raise in its preverdict Rule 50(a) motion.'"  *Id.* (quoting *Freund v.*

18  *Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003) (citing Fed. R. Civ. P. 50 advisory

19  committee's notes to the 1991 amendments ("A post trial motion for judgment can be granted only

20  on grounds advanced in the pre-verdict motion.")))  Rule 50(b) motions, however, "may be

21  satisfied by an ambiguous or inartfully made motion" under Rule 50(a).  *Reeves v. Teuscher*,

22  881 F.2d 1495, 1498 (9th Cir. 1989).  Without a liberal interpretation of a motion under Rule

23  50(a), "the rule is a harsh one."  *Nat'l Indus., Inc. v. Sharon Steel Corp.*, 781 F.2d 1545, 1549

24  (11th Cir. 1986).

25       A motion for judgment as a matter of law under Rule 50(b) is appropriate when the

26  evidence permits only one reasonable conclusion, and that conclusion is contrary to that of the

27  jury.  *Martin v. Cal. Dep't of Veterans Affairs*, 560 F.3d 1042, 1046 (9th Cir. 2009); *Josephs v.*

28  *Pacific Bell*, 443 F.3d 1050, 1062 (9th Cir. 2006).  All evidence must be viewed in the light most

1   favorable to the non-moving party, and the court must draw all reasonable inferences in that

2   party's favor.  *Go Daddy Software, Inc.*, 581 F.3d at 961.  "[I]n entertaining a motion for judgment

3   as a matter of law, the court . . . may not make credibility determinations or weigh the evidence."

4   *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  A jury verdict "must be

5   upheld if it is supported by substantial evidence . . . even if it is also possible to draw a contrary

6   conclusion."  *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002).

7   **B.**     **Motion for A New Trial – Federal Rule of Civil Procedure**

8              Under Federal Rule of Civil Procedure 59, a district court has the discretion to grant a new

9   trial "for any reason for which a new trial has heretofore been granted in an action at law in federal

10  court."  Fed. R. Civ. P. 59(a)(1)(A).  As "Rule 59 does not specify the grounds on which a motion

11  for a new trial may be granted," courts are "bound by those grounds that have been historically

12  recognized."  *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1035 (9th Cir. 2003).  Grounds

13  recognized as permitting a new trial include (1) a verdict that is contrary to the weight of the

14  evidence, (2) a verdict that is based on false or perjurious evidence, or (3) to prevent a miscarriage

15  of justice.  *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007).  The decision whether to

16  grant a motion for a new trial lies within the discretion of the trial judge.  *See Merrick v. Paul*

17  *Revere Life Ins. Co.*, 500 F.3d 1007, 1013 (9th Cir. 2007).  The Ninth Circuit has provided the

18  following guidance for ruling on such motions:

19          A decent respect for the collective wisdom of the jury, and for the function
            entrusted to it in our system, certainly suggests that in most cases the judge should
20          accept the findings of the jury, regardless of his owns doubts in the matter . . . . If,
            having given full respect to the jury's findings, the judge on the entire evidence is
21          left with the definite and firm conviction that mistake has been committed, it is to
            be expected that he will grant a new trial.
22

23  *Landes Const. Co., Inc. v. Royal Bank of Canada*, 833 F.2d 1365, 1371-72 (9th Cir. 1987) (citing

24  C. Wright & A. Miller, Federal Practice & Procedure § 2806 at 48-49 (1973)).  "The judge can

25  weigh evidence and assess the credibility of witnesses, and need not view the evidence from the

26  perspective most favorable to the prevailing party."  *Id.*

27          While the court has discretion to assess the evidence under the three grounds identified in

28  *Molski,* 481 F.3d at 729 (clear weight of the evidence, seriously erroneous result, and miscarriage

of justice), the standard for finding insufficient evidence warranting a new trial remains high. *Roy v. Volkswagen of Am.*, 896 F.2d 1174, 1176 (9th Cir. 1990) ("While the trial court may weigh the evidence and credibility of the witnesses, the court is not justified in granting a new trial 'merely because it might have come to a different result from that reached by the jury.'") (quoting *Wilhelm v. Associated Container Transp. (Australia) Ltd*., 648 F.2d 1197, 1198 (9th Cir. 1981)).

## IV.   DISCUSSION

### A.   Plaintiff's Motion for Judgment As a Matter of Law is DENIED

Plaintiff asserts that, given the evidence presented at trial, no reasonable jury could conclude Defendants' use of force was reasonable under the Fourth Amendment, and Plaintiff is entitled to judgment as a matter of law under Rule 50(b).

### 1.   Legal Standard:  Excessive Force Standard

In considering the question of constitutional violation,

> [a]llegations of excessive force are examined under the Fourth Amendment's prohibition on unreasonable seizures.  We ask whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them. We must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interest at stake. Stated another way, we must balance the amount of force applied against the need for that force.

*Bryan v. Macpherson*, 630 F.3d 805, 823-24 (9th Cir. 2010) (citations omitted).

"[T]wo Supreme Court decisions chart the general terrain. *Graham v. Connor*, 490 U.S. 386 (1989), defines the excessive force inquiry, while *Tennessee v. Garner*, [471 U.S. (1985)], offers some guidance tailored to the application of deadly force." *Graham* provides a non-exhaustive list of factors for evaluating reasonableness: (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect actively resisted arrest or attempted to escape. *George v. Morris*, 736 F.3d 829, 837-38 (9th Cir. 2013) (citations omitted).   In *Garner*, the Supreme Court considered (1) the immediacy of the threat, (2) whether force was necessary to safeguard officers or the public, and (3) whether officers administered a warning, assuming it was practicable. *Id.*

5

"The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.

The predominant consideration in the context of deadly force is whether the suspect posed an immediate threat to the safety of the officers:  "Case law has clearly established that an officer may not use deadly force to apprehend a suspect where the suspect poses no immediate threat to the officers or others.  On the other hand, it is not constitutionally unreasonable to prevent escape by using deadly force where the officer has probable cause to believe that the suspect poses a serious threat of harm."  *Wilkinson v. Torres*, 610 F.3d 546, 550 (9th Cir. 2010) (citing *Garner*, 471 U.S. at 11).  "Law enforcement officials may not kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed."  *Harris v. Roderick*, 126 F.3d 1189, 1204 (9th Cir. 1997).  "[W]here a suspect threatens an officer with a weapon such as a gun or a knife, the officer is justified in using deadly force."  *Smith v. City of Hemet*, 394 F.3d 689, 704 (9th Cir. 2005).  "[A] simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern.  In short, an officer's use of force must be objectively reasonable based on his contemporaneous knowledge of the facts."  *Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001).  "If the person is armed—or reasonably suspected of being armed—a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat."  *George*, 736 F.3d at 838.  "This balance must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Boyd v. Benton Cty.*, 374 F.3d 773, 779 (9th Cir. 2004) (citing *Graham*, 490 U.S. at 396).

       **2.**       **Plaintiff Sufficiently Set Forth the Rule 50(b) Arguments in the Rule 50(a) Motion at Trial**

Defendants contend Plaintiff raises four grounds supporting his Rule 50(b) motion that were not included in his Rule 50(a) motion:  (1) Chavez and Lodwick could not have heard an argument; (2) Chavez and Lodwick did not identify themselves; (3) Chavez and Lodwick did not

1    give a warning; and (4) Chavez and Lodwick were required to give Plaintiff an opportunity to drop

2    the gun.  Defendants maintain that, to the extent these arguments are considered at all, they must

3    be considered under the plain error standard applicable to arguments not made in a Rule 50(a)

4    motion.  Under this standard, the jury's verdict must be upheld if there is "evidence adequate to

5    support the jury's conclusion, even if it is also possible to draw a contrary conclusion." *Pavao*,

6    307 F.3d at 918.  Defendants also note that even to the extent Plaintiff referenced his closing

7    arguments in his Rule 50(a) motion, such inclusion by reference is not supported by any case

8    authority allowing it to be recognized as a specific stated ground supporting the Rule 50(a)

9    motion.

10        Plaintiff asserts his position can be stated simply:  even if Plaintiff's entire testimony lacks

11   credibility, the undisputed videotape evidence proves that Defendants' version of the events is

12   false.  The video shows that Plaintiff never pointed a weapon at the officers, when Defendants

13   fired on Plaintiff, he had already turned his back and was running away, and the video shows that

14   when Plaintiff first turned toward Defendants, both his empty hands were in front of his body and

15   the video does not show his right hand tucked under his jacket as if he were holding a weapon.

16   Plaintiff maintains this was sufficiently articulated in his oral Rule 50(a) motion at the close of the

17   evidence.

18        On September 23, 2015, Plaintiff made an oral Rule 50(a) motion for judgment as a matter

19   of law:

20          . . . Plaintiff moves under Rule 50(a) of the Federal Rules of Civil Procedure for
21          judgment as a matter of law as to Officers Chavez and Officer Lodwick.

22          . . .

             In this case, the evidence that we have presented through the course of this
23          trial shows that Officers Chavez and Lodwick did not have a gun pointed at them.
            And even if you – even if the Court assumes that Mr. Xiong did have a gun, for
24          purposes of this motion, the gun was never pointed in their direction.  They didn't
            fire until Mr. Xiong was back towards the back gate.  Mr. Xiong never posed an
25          immediate threat.

26
             The evidence of the expert witnesses, including Mr. Stutchman and the
27          others, showed that there was never a racking sound that was made and no
            reasonable jury would believe that a racking sound was actually heard by these
28          officers.

7

No reasonable jury would believe that, based on the 911 call, that there was some kind of threat that posed great bodily injury to these officers before they showed up, despite their testimony to the contrary.

The evidence also showed that Mr. Xiong – from the portion of the videotape that they say they saw a gun, there is no evidence on the videotape that shows Mr. Xiong with a gun in his hand at the point they say they made a decision to use deadly force.

The jury instructions, the case law – and the case law I'm referring to is Gonzales versus City of Anaheim, Cruz versus City of Anaheim, all those cases state that it must be an immediate threat.  That the officers cannot foresee a threat in the future and use force for that reason.

And specifically the testimony of the expert witnesses that describe that it needs to be an actual immediate threat, the testimony of Mr. Xiong saying that he did not pull a gun, the evidence of the video and the audio tapes that demonstrate that and the testimony that – and I don't want to go through all of it, but the testimony that was all cited in my closing argument yesterday before the jury.

For all those reasons, the plaintiff moves for judgment for Mr. Xiong against Officer Chavez and Officer Lodwick under Rule 50(a).

(Doc. 177-1, Trial Trans., Sept. 23, 2015, 3:9-5:8.)

The ground for Plaintiff's renewed Rule 50(b) motion is that the evidence shows Defendants' conduct was unreasonable as a matter of law considering the totality of the circumstances.  The reasonableness calculus under the Fourth Amendment includes the entire set of circumstances faced by the officers – individual factors and/or evidence are not considered separately or in a vacuum.  In other words, assessing reasonableness through consideration of separate and distinct grounds, theories, or facts is proscribed.  Due to the fundamental nature of the reasonableness inquiry under the Fourth Amendment, the grounds supporting Plaintiff's Rule 50(b) motion were sufficiently articulated in Plaintiff's Rule 50(a) motion for judgment as a matter of law at the close of the evidence; the Rule 50(a) motion requested the Court grant judgment for Plaintiff under the totality of the circumstances and all the evidence offered to establish those circumstances.  The evidence discussed in Plaintiff's Rule 50(b) motion does not represent a new theory or ground for judgment as matter of law, only a more complete discussion of the evidence supporting Plaintiff's Rule 50(a) motion.

8

### 3.   The Jury's Verdict is Supported by Substantial Evidence

Plaintiff contends that he is entitled to judgment as a matter of law because there is no evidence of an argument or the racking of a gun prior to confronting the officers, Plaintiff never pointed a weapon in the officers' direction, the officers never identified themselves before firing their weapon, the when the officers fired their weapons, Plaintiff was running away with his back turned to them.  Based on these facts, Plaintiff maintains the only conclusion a reasonable jury could reach is that the officers' firing their weapons at Plaintiff constituted excessive force.

In addition to the *Graham* factors, the Ninth Circuit has noted other factors that are relevant to the *Graham* analysis such as whether officers were aware the suspect is an emotionally distraught individual, *Deorle,* 272 F.3d at 1282*,* whether innocent bystanders may be injured in addition to the targets of force, *Boyd*, 374 F.3d at 779, and whether there are available alternative methods of capturing a suspect, *Smith*, 394 F.3d 689, 703 (9th Cir. 2005).   Nonetheless, these factors are not simply additional items to be considered.  Under *Graham*, the question is whether an officer's actions were reasonable, which is not capable of "precise definition or mechanical application."  *Graham*, 490 U.S. at 396.  This requires balancing *all* relevant factors in concert, and not merely considering single factors in a vacuum.

Viewing the facts in the light most favorable to Defendants, and disregarding all evidence favorable to Plaintiff the jury was not required to believe, the Court finds there is sufficient evidence for a reasonable jury to conclude that Defendants' conduct was objectively reasonable in light of the facts and circumstances confronting them.

### a.   Circumstances Prior to Encountering Plaintiff[1]

There is no dispute there was a party at the Residence at the time of the incident, and that the Merced Police Department 911 dispatcher received a call reporting that someone wearing a black hoodie at the Residence had displayed a weapon.  The dispatcher advised Defendants to respond to a call at the Residence:

---

[1] The factual summary is not intended to be an exhaustive recitation of all trial testimony, but is rather selected portions of relevant testimony.

> . . . going to be for a 417 . . . advises that they are at a party at that location and an AMA with a black hooded sweatshirt pulled out a firearm . . . advised that there's a black firearm and advised that the male pulled it out . . . responsible was still on scene.

(Doc. 175, Exh. B, Dispatch Audio, Trial Exh. J-2, 4:00-4:34.)  Chavez asked for a description, and the dispatcher repeated it was an "AMA, black hooded sweatshirt."  (Doc. 175, Exh. B, Dispatch Audio, Trial Exh. J-2, 4:00-4:34.)[2]  The officers were advised there was no report of a threat with the weapon that had been exhibited when dispatch re-contacted the reporting party. (Doc. 175, Exh. B, Dispatch Audio, Trial Exh. J-2, 7:45-8:31.)  The dispatcher's reference to "a 417" is to California Penal Code Section 417, which makes it an offense, in relevant part, for a person in the presence of another to draw or exhibit a weapon in a rude, angry, or threatening manner.

Chavez testified he understood a 417 to involve a weapon being brandished, potentially in a threatening manner and therefore he felt taking extra precautions on arrival at the Residence was necessary.  (Doc. 177-2, Chavez Tr. Test., 97:3-22.)  Chavez indicated the extra precaution was necessary to prevent an ambush in an area with which the officers were not that familiar.  (Doc. 177-2, Chavez Tr. Test., 97:23-98:2.)  Because this was a call involving a gun, Chavez' training dictated that he attempt to gather more information before actually approaching the Residence. (Doc. 177-2, Chavez Tr. Test., 98:24-99:16.)  Thus, he approached the Residence on foot after parking his patrol car on another street.

The neighborhood was dark, but there were porch lights and houselights.  (Doc. 177-2, Chavez Tr. Test., 28:19-29:9.)  As Officer Lodwick approached the Residence house, a motion detecting light came on, and both officers ultimately moved behind vehicles at the front of the Residence.  (Doc. 177-2, Chavez Tr. Test., 29:13-15.)  Chavez testified he heard arguing coming from the back yard of the Residence, but at the time could not determine where the voices were coming from.   (Doc. 177-2, Chavez Tr. Test., 30:16-31:2.)   On cross examination, Chavez acknowledged he did not know that what he heard was an argument, but he assumed it to be an argument:

---

[2] This portion of the audio-tape was played for the jury during the course of Officer Chavez' examination.  (*See* Doc. 177-2, Chavez Trial Test., 16:15-17:4.)

Q.  And you assumed it was based on the fact that you just heard loud talking, right?

A.  Not loud talking.  It was more like a loud argument, like I said.

Q.  You were assuming they were arguing, you don't know if they were arguing, that's what that [prior] testimony says, isn't it?

A.  Yeah, I assumed.

(Doc. 177-2, Exhibit B, Chavez Trial Test., 33:17-23.)

From the cover of the cars at the Residence, Chavez also testified he heard the racking of a gun, a sound with which he was familiar and that he had heard "hundreds of times," and considered it a distinct noise that can be loud.  He testified that when he heard the gun racking, Lodwick asked him, "did you hear that?" which was in reference to the gun racking sound.  (Doc. 177-2, Chavez Tr. Test., 38:21-40:2.)

The video of the incident was played during Chavez' cross-examination, and he was asked to listen to the recording.  (Doc. 175, Ex. A, Incident Video, 23:03.)  Upon viewing and listening to the video, Chavez testified it appeared to record background noise such as music playing and people conversing, but the sound of the gun-racking was not captured on the video recording.  (Doc. 177-2, Chavez Tr. Test., 40:16-42:12.)  Chavez testified hearing the gun racking changed everything, although the argument he heard indicated to him that people may already be agitated.  (Doc. 177-2, Chavez Tr. Test., 99:20-100:8.)  Chavez testified that when he heard the gun racking, his sense of danger "went higher" because "somebody within close proximity ha[d] a firearm and they just either chambered a round or emptied it."  (Doc. 177-2, Chavez Tr. Test., 101:11-23.)  At that point, Chavez stated he believed that there was a weapon in a position to be fired; he did not assume the weapon was being emptied because the sound could mean either the gun was emptied or being loaded.  (Doc. 177-2, Chavez Tr. Test., 103:7-15.)  Chavez explained he was trained to assume a firearm is a deadly weapon until learning otherwise, and in this case Chavez inferred the sound of the gun racking to mean Chavez was dealing with someone who had a loaded deadly weapon available to him.  (Doc. 177-2, Chavez Tr. Test., 104:3-19.)

Lodwick testified as he approached the Residence upon arrival, he was illuminated by a motion sensor on a garage, at which point he moved to the northeast corner of the Residence's garage to get out of the light, and he heard what he presumed to be an argument.  (Doc. 177-3,

Lodwick Tr. Test., 7:5-8; 68:18-69:16.)   He also recalled hearing music, but "mainly just the argument" which included a person saying something to the effect of "fuck you nigger" in a "fairly loud voice." (Doc. 177-3, Lodwick Tr. Test., 7:17-8:2.)   He went back behind a car after he heard the argument so that he could relay the information to Chavez.   (Doc. 177-3, Lodwick Tr. Test., 16:15-24.)   At some point after this, although Lodwick could not recall the sequence, he heard the racking of a gun which was loud enough to be heard over the other sounds.   (Doc. 177-3, Lodwick Tr. Test., 8:18-10:10; 70:7-12.)   Immediately after hearing the gun racking, he asked Chavez something to the effect of, "did you hear that?"   (Doc. 177-3, Lodwick Tr. Test., 70:13-22.)   The sound of the gun racking appeared to come from the other side of the fence—i.e., in the Residence's backyard.   (Doc. 177-3, Lodwick Tr. Test., 11:3-8.)   Lodwick could not estimate the distance behind the fence where the racking occurred. (Doc. 177-3, Lodwick Tr. Test., 14:11-20.)

### b.   Circumstances Surrounding Encounter with Plaintiff

After hearing the racking sound, Chavez saw Plaintiff come through the gate between the front and back yard of the Residence, walking along the sidewalk.  (Doc. 177-2, Chavez Tr. Test., 42:25-43:6.)  When questioned about Plaintiff not wearing a black hoodie as described in the 911 call, Chavez testified it did not matter that the person coming through the gate did not perfectly fit the description because of the circumstances:   "We weigh everything into the circumstances. Basic totality of circumstances.   The call at the house, the call of a man with a firearm then [Plaintiff's] coming out.   Prior to him coming out, we heard a gun slide." (Doc. 177-2, Chavez Tr. Test., 105:8-11.)

Chavez testified he did not know whether Plaintiff had a gun at this point, nor could Chavez see whether the person coming through the gate was younger or older, male or female. (Doc. 177-2, Chavez Tr. Test., 43:3-24.)  When Plaintiff came through the gate, Chavez testified he did not have time to identify himself as a police officer because everything happened so fast. (Doc. 177-2, Chavez Tr. Test., 43:25-44:17.)  Chavez testified he believed Plaintiff was going to engage him, but he could not see anything in Plaintiff's hands at the moment he stepped through the gate.  (Doc. 177-2, Chavez Tr. Test., 46:3-22.)  Chavez testified as Plaintiff walked forward

1  from the backyard after passing through the gate, Chavez could see Plaintiff's right hand tucked

2  underneath his left hand. (Doc. 177-2, Chavez Tr. Test., 89:23-90:2.)

3      Chavez testified his training was that persons carrying guns most frequently carry them in

4  their waist area, and when Plaintiff walked out from the house with his hand pulling down on his

5  jacket, his other hand underneath his coat, that indicated to Chavez that Plaintiff might have a gun.

6  (Doc. 177-2, Chavez Tr. Test., 105:12-106:7.)

7      Chavez' gun was in the low-ready position as Plaintiff walked forward on the sidewalk

8  towards the officers. Chavez then raised his gun up and flipped the switch on his light, and

9  ordered Plaintiff to stop and raise his hands, or words to that effect. (Doc. 177-2, Chavez Tr.

10  Test., 90:3-15, 106:2-10.) Chavez moved his finger to the trigger of his gun after he activated his

11  light and saw Plaintiff with a gun. When Chavez saw the gun, he believed Plaintiff was going to

12  shoot Chavez or Lodwick, and fired his weapon to protect himself and Lodwick. (Doc. 177-2,

13  Chavez Tr. Test., 106:8-19.) Chavez testified his training at the POST academy did not require

14  him to wait until a suspect pointed a gun at him before he could fire upon that suspect, and that

15  anyone who has a gun exposed to the officer is a threat, even if running away, because the suspect

16  could shoot back as he is running away. (Doc. 177-2, Chavez Tr. Test., 107:18-108:7.)

17      Lodwick testified that when Plaintiff came out of the gate into the front yard, it was very

18  dark, but he could seek the outline of a person. (Doc. 177-3, Lodwick Tr. Test., 17:17-25.)

19  Lodwick could see Plaintiff's jacket and that Plaintiff was walking towards the street; when

20  Plaintiff reached the edge of the garage, Lodwick used his tactical light on his gun to illuminate

21  Plaintiff. (Doc. 177-3, Lodwick Tr. Test., 18:21-25.) Lodwick testified that while Plaintiff was

22  walking forward, it was possible Lodwick could have identified himself. (Doc. 177-3, Lodwick

23  Tr. Test., 19:17-25.) According to Lodwick, everything happened so quickly, he did not think of

24  yelling "police" but rather said something to the effect of "put your hands up." (Doc. 177-3,

25  Lodwick Tr. Test., 72:10-13.)

26      When Plaintiff was illuminated, Lodwick saw Plaintiff's hand in his waistband and his

27  right hand was underneath his jacket, but Lodwick could not see a gun. (Doc. 177-3, Lodwick Tr.

28  Test., 20:19-21:12.) As Plaintiff turned his body to face Lodwick after being illuminated, he

moved his right hand out from underneath his coat, which is when Lodwick saw Plaintiff's firearm.  (Doc. 177-3, Lodwick Tr. Test., 21:19-22:3.)  Lodwick testified Plaintiff had pointed the gun in Lodwick's direction as Plaintiff was turning, but Plaintiff did not raise the weapon and point it straight at Lodwick.  (Doc. 177-3, Lodwick Tr. Test., 23:8-11, 28:11-16.)  It was then that Lodwick proceeded to fire his weapon at Plaintiff.  (Doc. 177-3, Lodwick Tr. Test., 22:2-6.) Lodwick described the encounter in this manner:

> At that point, I had my tack light on him.  I yelled "Let me see your hands."  And he starts to make his turning movement to his left.  And as he's making that turning movement, his hand is coming up from his waistband.  And at that point I see what appears to be a gun to me.  And so I am now taking my finger off of high index and moving it down to the trigger and start the firing process.  And it happened—everything happened so quick, a fraction of a second.

(Doc. 177-3, Lodwick Tr. Test., 72:15-23.)

Lodwick was questioned about the discrepancy between Plaintiff's black-and-white jacket and the 911 caller's description of a person in a black hoodie.  Lodwick testified that discrepancy did not change the threat that Plaintiff posed:  "Because at that point, we had been dispatched to a call of brandishing a firearm.  Heard an argument.  Heard a racking of a gun.  After that, this subject appeared with his hand in his waistband."  (Doc. 177-3, Lodwick Tr. Test., 53:3-16.) Lodwick also testified that although there was no specific verbal threat reported by the 911 caller, he perceived the report of someone pulling out a weapon at the party and asking why people are there to be confrontational.  Lodwick was asked whether a gun was found near Plaintiff after he was shot, and Lodwick testified a gun was located inches from Plaintiff to his left.  (Doc. 54:22-55:11.)

Lodwick also testified about his training at the POST academy, stating that in his training he was taught that guns are most commonly recovered from suspects within the waistband of their pants.  (Doc. 177-3, Lodwick Trial Test., 65:3-9.)  Lodwick indicated he was trained to put attentional emphasis on a suspect's hands because they can reach for a weapon.  His training with MPD similarly instructed him to focus on a suspect's hands and waistband, and that suspects who have a gun in their hand are a threat not just to the officer but to everyone around.  (Doc. 177-3, Lodwick Tr. Test., 65:16-66:14.)

c.      **Plaintiff's Post-Incident Interview with Detective Deliman**

Detective Deliman ("Deliman") interviewed Plaintiff in the early morning hours on December 4, 2011, after the incident.  Deliman testified Plaintiff's interview took approximately two hours; during the first portion of the interview, Plaintiff denied he had possession of a gun during his encounter with Defendants and in the second portion, Plaintiff first stated another person at the party had a gun, and then admitted to having a gun himself, which he claimed was given to him by a friend.  (Doc. 177-5, Deliman Tr. Test., 26:15-22; 29:19-23.)  Deliman also testified that during the interview he questioned Plaintiff about whether Plaintiff pointed a gun at the officers, and Plaintiff said that he did point a gun, and then he was shot.  (Doc. 177-5, Deliman Tr. Test., 33:23-34:4.)  Deliman acknowledged on cross-examination, however, that Plaintiff had admitted to pointing a gun only after Deliman informed him that is what the video showed and that Plaintiff's statement about pointing the gun was equivocal:

> Q.  And isn't that true – isn't it true that he only admitted it after you said that you had seen him point the gun?
> A.  Yes.
> Q.  And didn't he say, "I didn't point the gun.  Did I?"
> A.  I think he did say that, yes.

(Doc. 177-5, Deliman Tr. Test., 42:16-25.)  On re-direct, Deliman was asked why he believed Plaintiff was acknowledging or admitting that he had pointed a gun at the officers, and Deliman testified as follows:

> A.  He said he wanted to talk about [the incident], but he didn't want to go down for it.  He didn't want to fall for it.
> Q.  Did he acknowledge in that statement to you that he was in possession of a gun that was pointed at officers?
> A.  Yes.
> Q.  And then did he admit that it was his fault?
> A.  Yes, he did.

(Doc. 177-5, Deliman Tr. Test., 49:13-50:1.)  Deliman testified that Plaintiff admitted a second time to pointing the gun when Deliman asked Plaintiff why he pointed the gun at the officers; Plaintiff responded that he panicked and did not know what to do.  (Doc. 177-5, Deliman Tr. Test., 50:2-19.)

1   Deliman also testified he believed the officers identified themselves to Plaintiff by wearing

2   their police uniforms:

3   > Q.  You believe [the officers] identified themselves before they fired?
>    A.  Sure.  Sure.  He saw them.
4   > Q.  And on what basis –
>    A.  Their mere presence –
5   > Q.  – what information did you have the officers identi[ed] themselves before they
>    fired?
6   > A.  Their mere presence in showing up in police uniforms would say that.  He
>    acknowledged they were wearing police uniforms.
7

8   (Doc. 177-5, Deliman Tr. Test., 43:17-24.)

9   ### d.  Relevant Expert Testimony[3]

10   #### (i)  Defense Expert Michael Schott

11   Michael Schott, a forensic image analyst, testified as a Defense expert.  (Doc. 177-6,

12   Shcott Tr. Test.)  Schott was retained to process the images recorded by Chavez' glasses video:

13   "Because the lighting level – see, we're pretty dark, difficult to see what's going on.  So to the

14   extent possible, to recover data so that it's possible to see a little bit more than you can by

15   watching it without processing was a primary objective."  (Doc. 177-6, Schott Tr. Test., 8:16-20.)

16   Schott also explained he was retained to address issues pertaining to Plaintiff's actions and

17   locations before and during the shooting.  (Doc. 177-6, Schott Tr. Test., 8:21-23.)  Based on his

18   analysis of the video, Schott testified as to Plaintiff's movements upon encountering Chavez and

19   Lodwick:

20   > Immediately on – or upon encountering Officers Chavez and Lodwick, [Plaintiff]
>    initially runs toward the rear of the residence.  After three strides, he reverses and
21   > turns back toward the front of the residence.  At about that time, the first shot is
>    fired.   [Plaintiff] turns again and resumes movement toward the rear of the
22   > residence.  And once again reverses and turns toward the front of the residence.
>    Within a fraction of a second, [Plaintiff] again reverses course and runs toward the
23   > gate.  While fleeing from the officers, [Plaintiff] twice turned back toward the front
>    of the residence and/or toward Officer Chavez and Lodwick.
24

25   (Doc. 177-6, Schott Tr. Test., 23:23-24:8.)  Schott also produced raw images from the video, but

26   the still frames from the video were "difficult to pick up detail because of motion blur.  We have

27

28   [3]  The summarized expert trial testimony is not meant to be an exhaustive or complete recitation of the experts'
testimony at trial, only a summary of relevant portions.

people – or a person in motion, there's low light and they didn't offer a lot of detail." (Doc. 177-6, Schott Tr. Test., 24:10-18.)  Schott had to process the images due to the lighting conditions of the video:

> Q.  I want to ask specifically you mentioned the lighting conditions.  Why did you apply this processing?
>
> A.  Well, some of the images were – when I watched the video initially without any changes, or even adjustments like you might do on TV.  Just watching it the way it arrived, some of the images looked at first glance as though they were just black.  And then if you look very close, you could see there might be detail.  But it was very difficult to see anything on some of them.

(Doc. 177-6, Schott Tr. Test., 26:15-23.)

### (ii)      Defense Expert Steve Papenfuhs

Steve Papenfuhs testified as a police practices expert for Defendants.  (Doc. 117-7, Papenfuhs Tr. Test.)  He indicated part of police officers' training deals with the concept of action and reaction timing, and that officers need to learn how to deal with a "reactionary gap."  (Doc. 177-7, Papenfuhs Tr. Test., 16:2-18:7.)  Papenfuhs was questioned how this type of police training is built into force option simulators and the handling of handguns in confrontations:

> A.  Well, one of the things we do right from the start, from an arrest and control perspective, those being the physical skills to engage with a subject, take him into custody, put some handcuffs on them, et cetera, is we establish what is known as a reactionary gap . . . and that's based on distance and placement.  And the idea being that if you're too close, no matter how good you are, if he wants to attack you and do some damage, he's going to be able to do that because we just don't have that time to react.

(Doc. 177-7, Papenfuhs Tr. Test., 18:11-21.)  Papenfuhs opined about the discrepancy between Defendants' testimony that they fired their weapons at Plaintiff as soon as they saw Plaintiff pull out a gun, and the video images showing that Plaintiff was turned away from them at the time shots were fired:

> Q.  When you looked at the video, did you perceive or did you see [Plaintiff] turn and move away from the officers?
> A.  I did.
> Q.  And can you give us an estimate, I mean, basically what you think or how many steps he might have taken?  Before there were muzzle flashes.
> A.  It would be hard for me to know for sure, but a couple.  A couple of steps probably.

17

Q.  Now, you did read in the – your read the officers' IA statements.  Am I correct?
A.  Yes.
Q.  Did the officers describe firing at him as he was – first firing at him as he was running away?
A.  No, that's not their description.
Q.  What did they describe?
A.  They described that they fired at the subject when he was turning in their direction and as he was pulling the firearm out.
Q.  Is that consistent with the video?
A.  No, it's not.
Q.  Can you explain why?
A.  Well, that would go to some of the action/reaction topics we were speaking about earlier, about when they formulated the intent to fire and then when they actually completed the trigger squeeze of the weapon.

(Doc. 177-7, Papenfuhs Tr. Test., 42:18-43:17.)

Pahenfuhs was asked whether an armed suspect is an imminent threat if he has a gun out by his side as he is running away, and Papenfuhs responded that such a person does represent an imminent threat.  (Doc. 177-7, Papenfuhs Tr. Test., 46:10-13.)  He also testified that officers are trained that if they wait until that moment when a firearm is pointed at them, because of the reaction time issue, they are in imminent danger of losing their lives.  (Doc. 177-7, Papenfuhs Tr. Test., 46:14-21.)

### e.    Analysis

As it is the most important and critical *Graham* factor, the Court first considers Plaintiff's argument there is insufficient evidence that Plaintiff presented an immediate threat when Defendants encountered him.  Plaintiff's central argument is that the incident video clearly contradicts Defendants' testimony that Plaintiff had a gun visible which he pulled out and pointed in Defendants' direction; rather, Plaintiff maintains the video unquestionably establishes Plaintiff was not an immediate threat at any time in his interaction with Defendants.  According to Plaintiff, the video clearly and unequivocally shows Plaintiff was turning his whole body and his arms away from Defendants, and at the time Defendants fired on him, Plaintiff had his back to Defendants.

Plaintiff's argument is premised on the Supreme Court's decision in *Scott v. Harris*, 550 U.S. 372, 378-80 (2007) holding that when video evidence "clearly contradicts" the testimony of a party so that no reasonable jury could believe it, a court should not credit that party's testimony in

considering the evidence.  In *Scott*, an officer (Scott) was involved in a high-speed pursuit of a suspect (Harris).  Scott terminated the chase by bumping Harris' vehicle, causing it to crash and rendering Harris a quadriplegic.  *Id.* at 375.  On summary judgment, Scott and Harris offered very different versions of the events.  Under Harris' version, his actions in handling his vehicle caused little if any actual threat to pedestrians or other motorists, the roads were mostly empty, and he was in control of his vehicle.[4]

A camera attached to Scott's car, however, captured the car chase on video: it showed Harris' vehicle racing down narrow, two-lane roads in the dead of night at speeds that were "shockingly fast"; swerving around more than a dozen other cars; crossing the double-yellow line; and forcing cars traveling in both directions to their respective shoulders to avoid being hit. Harris' vehicle ran multiple red lights and traveled for considerable time periods in the occasional center left-turn-only lane, chased by numerous police cars forced to engage in the same maneuvers to keep up the chase.  Instead of a cautious and controlled driver as Harris' described himself, the video "more closely resemeble[d] a Hollywood-style car chase of the most frightening sort, placing police officers and innocent bystanders alike at great risk of serious injury." *Id.* at 380. The Court concluded that Harris' version that he was *not* driving in a fashion as to endanger human life was so "utterly discredited" and "blatantly contradicted" by the video that no reasonable jury could believe him.  The Court held the facts should have been viewed in the light depicted by the videotape in considering qualified immunity. *Id.* at 380-81.

Plaintiff also relies on *Marvin v. City of Taylor*, 509 F.3d 234 (6th Cir. 2007) and its consideration of video evidence.  There, Marvin alleged that three police officers used excessive force when arresting him. Video documented Marvin's arrival at the jail from a camera at the back of a police car, but it did not "clearly" show the officer pushing Marvin onto the floor as he claimed.  *Id.* at 240.  The position of the camera was "from an offside angle" of the car such that the video neither "blatantly contradicted" Marvin's assertions nor supported them.  *Id.*  Two other events captured on video during Marvin's custody at the jail were credited by the court over

---

[4] It was this version of events that was credited by the district court in denying Scott's motion for qualified immunity, which was affirmed by the Eleventh Circuit on appeal.

1  Marvin's testimony about events because these video recordings clearly contradicted Marvin's
2  statements.  *Id.* at 241-42.

3      Plaintiff argues these cases highlight the importance of videotape evidence, which here
4  refutes Defendants' account of the facts.  Plaintiff also asserts the quality of the video and its
5  sound should be considered.  Plaintiff cites *Blankenhorn v. City of Orange*, 485 F.3d 463 (9th Cir.
6  2007) where video evidence was obstructed by a pole, resulting in the parties drawing very
7  different conclusions about what the video showed.  Plaintiff contends the video here is different
8  from *Blankenhorn*.  From the moment Plaintiff is illuminated on the video to the time Defendants
9  fired their weapons, the video records exactly what occurred: there was no sound of a firearm
10 being racked or of an argument, Plaintiff never pointed a gun in officers' direction any time before
11 they fired their weapons, nor is there an image that "could even be described as similar to a gun
12 being in the hand of the Plaintiff prior to the shooting by the officers."

13     Plaintiff's contention that the video here clearly and unequivocally showed the course of
14 events similar to that in *Scott* and the portions of the video credited in *Marvin* is unpersuasive.
15 Different from both those cases, the video here was recorded in low-light conditions, and although
16 the officer's gun-mounted flashlights gave some illumination, the video does not provide
17 unequivocal and clear images that allow for definitive conclusions regarding Plaintiff's exact
18 movements when confronted by Defendants.  In the portion of a video recording the court *refused*
19 to credit over the plaintiff's testimony in *Marvin*, the court noted the position of the camera did not
20 provide a clear view of the events such that it could not be used to clearly refute or clearly support
21 the plaintiff's testimony.  *Marvin*, 509 F.3d at 240.  In *Scott*, there were no visual impairments to
22 obscure the movement of Harris' vehicle, the video recorded events progressing over a much
23 longer period of time, and the nature of the conduct documented – the trajectory, speed, and
24 maneuvering of Harris' vehicle – was not subtle; it was obvious and objectively quantifiable.
25 Here, it is low-light conditions, speed of events, and subtleties of movements that preclude a clear
26 view of what occurred.

27     While Plaintiff argues the video *clearly* does not show him pointing a gun in Defendants'
28 direction before they fired on him, or any event similar to a gun being in Plaintiffs' hand prior to

the shooting, this is Plaintiff's interpretation of what can be seen on the video. Defendants' expert Schott presented images taken from the video, which were offered for the jury's consideration. Schott testified that in processing still images from the video, some images were so dark as "to nearly obscure any details which many be present . . . [b]efore processing, it was essentially a black screen." (Doc. Doc. 177, Downs Decl., Exh. F, 47:1-7.) Unlike *Harris* or the portions of the videos credited in *Marvin*, the Court cannot conclude no reasonable jury could view the video and credit Defendants' version of the events.

Plaintiff also argues the video shows he had his back turned to Defendants when they fired on him, and even assuming he had a weapon in his hand, Plaintiff did not present an immediate threat at any point. Plaintiff cites *Curnow v. Ridgecrest Police*, 952 F.2d 321, 324-25 (9th Cir. 1991) for the proposition that where a suspect neither points a gun at officers nor faces them, the use of deadly force to seize the suspect is unreasonable as a matter of law. In *Curnow*, the Ninth Circuit reviewed the district court's refusal to grant qualified immunity to the defendant officers at the summary judgment stage. In this posture, the testimony and evidence had to be construed in the plaintiff's (Curnow) favor. The plaintiff's ex-wife, who witnessed the events, provided a statement that when Curnow was confronted by the officers, he had no gun in his hand and officers shot him in the back; as Curnow ran out of the house, he grabbed his unloaded gun by the muzzle. *Id.* at 323. Crediting her statements, the court concluded no police officer could have reasonably believed the use of deadly force was lawful because Curnow never pointed his weapon at the officers, was not facing them, apparently, when he was shot the first time, and the gun he grabbed as he fled was held only by its muzzle and not in a firing position.

Both the procedural posture and the creditable facts of this case are distinguishable from *Curnow*. Because Plaintiff is the moving party here, the Court must view all evidence in the light most favorable to Defendants, resolving all doubts in Defendants' favor as the non-moving parties. As the video does not clearly contradict or refute Defendants' version of events, the Court must credit Defendants' testimonies, interpret the video in the light most favorable to Defendants, and draw all reasonable interferences in Defendants' favor. Viewing the circumstances under that lens, there is evidence Plaintiff pulled the weapon from his waistband, pointed it in Defendants'

direction, and then turned to run away from Defendants with the weapon in his hand. Additionally, Chavez was asked to testify about what "pointing" a weapon in his direction meant to him, and Chavez identified on the video where it shows the "pointing motion" Chavez described in his testimony, which was more information to assist the jury in assessing and interpreting the video as well as the credibility of Defendants testimony.  (Doc. 177-2, Chavez Tr. Test., 59:3-61:2.)  Given the dark conditions in which they confronted Plaintiff, the fast pace at which events unfolded, and evidence Plaintiff had a gun which he pointed in Defendants' direction, the factual circumstances are far different from the facts credited in *Curnow*.  It was not unreasonable for the jury to conclude Plaintiff presented an immediate threat under the evidence presented.

Moreover, although the video shows Defendants did not actually fire their weapons until Plaintiff had turned away from them, Papenfuhs explained Defendants experienced a reaction delay from the time the threat from Plaintiff was perceived until the time Defendants actually fired their weapons.  (Doc. 177-7, Papenfuhs Tr. Test., 43:4-17.)  In this manner, Papenfuhs offered an opinion about the discrepancy between Defendants' testimony that they fired the moment they perceived Plaintiff had a gun pointed in their direction and the video showing they did not fire their weapons until Plaintiff had turned his body away from Defendants.  Papenfuhs also opined that a suspect running away with a weapon under the circumstances presented in this case was still to be considered an immediate threat.  (Doc. 177-7, Papenfuhs Tr. Test., 46:10-13 ("Q.  And in your training of officers, is someone an imminent threat and a lethal threat if they have a gun out by their side as they're running away?  A.  Yes, they are.").)

Plaintiff contends there is overwhelming evidence showing Defendants could not have heard the racking of a gun just prior to encountering Plaintiff.  Even though Defendants testified they heard a gun being racked just prior to encountering Plaintiff and that they had heard an argument outside the house which lent to the officers' heightened sense of danger, the incident video did not record the sound of an argument or a gun racking, only music and talking.  Plaintiff argues that because other noises such as talking or music coming from the Residence were recorded, but no argument or gun racking was recorded, the video clearly and blatantly contradicts Defendants' testimony of what they heard.

1   There was no evidence offered regarding the quality of the microphone on the glasses

2   camera or that it was capable of detecting and recording all sounds perceived by the human ear.

3   Plaintiff's argument regarding the lack of sounds of an argument or a gun racking on the video is

4   only inferential.  This argument, however, is not evidence the audio device necessarily would have

5   recorded the racking of a gun or an argument in the vicinity where Defendants' believe they heard

6   those sounds.  The jury was entitled to consider evaluate Defendants' testimony in light of what is

7   heard on the video.  Although the inferences arising from the lack of argument or a gun racking

8   sound on the video weighs against Defendants' testimony, it was not unreasonable for a jury to

9   conclude that Defendants personally perceived sounds that were not reflected by the video camera.

10   Beyond the potential conflict between the video's audio recording and Defendants'

11   testimony, there is other circumstantial evidence supporting an inference that a gun could have

12   been racked consistent with Defendants' testimony.  The video records Lodwick asking Chavez,

13   "Did you hear that?" just before Plaintiff came through the gate, which Defendants testified was in

14   reference to the racking sound they had just heard.  (Doc. 177-2, Chavez Tr. Test., 38:21-40:2;

15   Doc. 177-3, Lodwick Tr. Test., 70:13-22.)   Plaintiff testified he had a gun in his possession 10 to

16   15 minutes before the shooting, and that he was mostly standing outside during that time.  (Doc.

17   177-3, Xiong Tr. Test., 6:11-25, 16:21-23.)   Thus, there was evidence a gun was outside the

18   Residence and could have been racked at the time Defendants claim they heard the sound.  It is

19   undisputed a gun was found near Plaintiff when he fell to the ground after the shooting.  There

20   was no evidence the gun found near Plaintiff was unable to be racked or that no one else heard the

21   racking of a gun.  In sum, there was evidence from which a reasonable jury could conclude

22   Defendants heard a racking of a gun, despite that the sound was not recorded on the video.

23   Plaintiff also contends there is insufficient evidence from which a reasonable jury could

24   conclude Defendants heard an argument prior to encountering Plaintiff.  No argument is heard on

25   the videotape of the event, and Chavez admitted he only "assumed" the loud talking he heard was

26   an argument.  Plaintiff maintains the evidence establishes only that Defendants relied on loud

27   talking, and without understanding any of the substance of the conversation or the location of the

28

23

1    discussion, it adds nothing to the totality of the circumstances that would allow a reasonable

2    officer to believe that a deadly threat was imminent.

3        Defendants testified they heard loud talking they assumed to be an argument.  (Doc. 177-2,

4    Chavez Tr. Test., 30:16-34:6; Doc. 117-3, Lodwick Tr. Test., 7:9-13, 53:13-16.)   Although the

5    video recorded the sound of voices and talking, it was for the jury to decide whether it had

6    captured the sounds of an argument as Defendants testified they heard, or what affect the absence

7    of an argument on the video had on the weight of Defendants' testimony.  And, as noted above,

8    there is no evidence showing the camera microphone was capable of capturing every sound

9    Defendants heard.  The jury was not required to believe Defendants did not and could not have

10   heard an argument, although its absence on the video casts doubt on Defendants' testimony in this

11   regard.

12       There is no dispute that Defendants did not issue a verbal warning to Plaintiff before firing

13   on him.  Failure to give a warning is a factor in considering the reasonableness of police use of

14   force.  *Deorle v. Rutherford*, 272 F.3d 1272, 1284 (9th Cir. 2001).  The Ninth Circuit has held that

15   a warning is not required when it is not "feasible." *Garner*, 471 U.S. at 11-12 ("deadly force may

16   be used if necessary . . . if, where feasible, some warning has been given").  "Verbal warnings are

17   not feasible when lives are in immediate danger and seconds matter." *Estate of Martinez v. City of

18   Federal Way*, 105 F. App'x 897, 899 (9th Cir. 2004) (unpublished).  On the other hand, where a

19   suspect does not pose an immediate threat to the lives of officers or others, a warning is considered

20   feasible, and the failure to do so weighs in favor of finding a constitutional violation. *See Deorle*,

21   272 F.3d at 1284; *Mattos v. Agarano*, 661 F.3d 433 (9th Cir. 2011).

22       Here, the fast pace at which events unfolded and the mere seconds that elapsed from the

23   time Defendants encountered Plaintiff and perceived the threat – the gun in Plaintiff's hand

24   pointed in their direction – was evidence it was not practicable to give a warning before deploying

25   force.  As Defendants note, the jury was specifically instructed that the failure to warn was a factor

26   in assessing the reasonableness of Defendants' use of force against Plaintiff.  (Doc. 150, 32:25-26,

27   Instruction No. 30.)  Although Plaintiff argues Defendants' failure to warn is additional evidence

28   showing Defendants' use of force was unreasonable as a matter of law, it is only one factor the

jury was entitled to consider in making its assessment.   Given that events unfolded in only seconds, there was evidence from which a jury could conclude a warning was not feasible under the circumstances.

To the extent Plaintiff contends Defendants did not sufficiently consider alternative measures before resorting to lethal force, the Ninth Circuit has held "the appropriate inquiry is whether the officers acted reasonably, not whether they had less intrusive alternatives available to them . . . . Requiring officers to find and choose the least intrusive alternative would require them to exercise superhuman judgment." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994).  The jury was instructed to consider whether there were alternative means of subduing Plaintiff as well as the time and any changing circumstances during which the officers had to determine the type and amount of force that appeared to be necessary.  (Doc. 150, 32:19-20, 22, Jury Instruction No. 30.) Again, considering the speed at which events occurred in Defendants' confrontation with Plaintiff, the jury could reasonably conclude the failure to consider an alternative manner of subduing Plaintiff was reasonable under the circumstances.  *Graham*, 490 U.S. at 396-97 (determining reasonableness must allow "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.").

Finally, Plaintiff contends Defendants failure to identify themselves as police officers weighs against the reasonableness of their use of force.  As Defendants note, Plaintiff cites no cause authority for the proposition that Defendants are required to identify themselves during the course of an arrest or seizure.  Moreover, the short time-frame in which officers had to identify themselves bears on the Defendants' reasonableness in failing to indicate to Plaintiff they were the police.

In sum, although Plaintiff presents a credible argument that a reasonable jury might have reached a different verdict, he has not demonstrated "that the jury [here] has reached a seriously erroneous result" given the evidence presented at trial.  *Carrethers v. Bay Area Transit*, No. 09-1101, 2012 WL 1004847, at *2 (N.D. Cal. Mar. 26, 2012).  "Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different

1 inferences or conclusions or because judges feel that other results are more reasonable." *Tennant*

2 *v. Peoria & Pekin Union Ry.*, 321 U.S. 29, 35 (1944).  Although the trial evidence was conflicting,

3 viewing it all in the light most favorable to Defendants – as the Court must – shows that a

4 reasonable jury could conclude that Defendants' use of force was reasonable.  *See Santos v.* Gates,

5 287 F.3d 846, 853 (9th Cir. 2002) ("Because [the excessive force inquiry] nearly always requires a

6 jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held

7 on many occasions that summary judgment or judgment as a matter of law in excessive force cases

8 should be granted sparingly.").  For the reasons described above, Plaintiff's post-verdict motion for

9 judgment as a matter of law is DENIED.

10 **B.     Plaintiff's Motion For A New Trial Based on the Weight of the Evidence is DENIED**

11          **1.     Clear Weight of the Evidence Does Not Warrant A New Trial**

12          Plaintiff asks the Court to grant a new trial under Rule 59(a) asserting the jury's verdict is

13 against the clear weight of the evidence.  Considering the entirety of the testimony and evidence,

14 the Court concludes this case is one which another reasonable jury may have decided differently

15 from this jury or from the Court sitting as a trier of fact in a bench trial; however, the verdict is not

16 against the great weight of the evidence nor can the Court conclude "the jury has reached a

17 seriously erroneous result." *EEOC v. Pape Lift, Inc.*, 115 F.3d 676, 680 (9th Cir. 1997).

18          As discussed above, the video does not present clear and unequivocal documentation of

19 Plaintiff's encounter with Defendants, nor does it clearly refute Defendants' testimony about the

20 events and circumstances they faced in confronting Plaintiff.  This issue was discussed at some

21 length in the order on Defendants' motion for summary judgment:

22          Finally, Plaintiffs argue the video of the incident contradicts the officers' statements
          that Kong pointed the gun in their direction. [Footnote omitted]  Interpreting the
23          video in the light most favorable to Plaintiffs and drawing all inference in Plaintiffs'
          favor, the video can be interpreted to contradict the officers' testimony.  *Blakenhorn*
24          *v. City of Orange*, 485 F.3d 463, 468 n.1 (9th Cir. 2007).  Although the officers
          testified they heard a racking of a gun just before Kong came through the backyard
25          gate, no racking sound is audible on the video.  At the moment Kong is illuminated
          in the video, he appears to be facing the officers with his hands down by his waist.
26          The video is susceptible to Plaintiffs' contention that Kong's gun was never
          revealed, nor did he remove it from his waistband or point it in the officers'
27          direction.  Defendants argue the video did not necessarily capture everything

28

                                              26

1
2
3
4
5

Chavez and Lodwick saw or heard and cannot therefore dispute the officers' testimony about what they perceived. While it is possible the video did not capture everything the officers testified they heard or saw, the jury must evaluate whether the events as portrayed in the video more accurately reflect what happened or whether the officers' testimony more accurately reflects the events – this is a factual issue for the jury, not one for the court to decide as a matter of law. *See Castro v. Cnty. of L.A.*, 785 F.3d 336, 346 (9th Cir. 2015) (where video footage neither confirmed [n]or refuted testimony, the jury could review the footage and the testimony in context to perform a full assessment of each witness's credibility).[5]

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21

The factual situation here is analogous to *Castro*, 797 F.3d at 666.  In *Castro*, an inmate (Castro) alleged deliberate indifference with respect to an officer's (Solomon) failure to respond when Castro pounded on the door of his cell after another inmate (Gonzalez) was placed in his cell.  Video footage at trial showed that Castro pounded on the door for a full minute after Gonzalez entered the cell in an effort to attract an officer's attention.  *Id.* at 661.  Although Solomon was near the door and within hearing distance, he testified he did not hear the pounding. Solomon argued the video footage of the event showed that he "did not appear to hear any banging on the door by plaintiff," ostensibly because it did not show him reacting to the pounding noise. *Id.* at 666.  Three other witnesses, however, including two jail employees, testified that one could hear simple talking from inside the sobering cell, such that pounding would have been easy to hear from where Solomon was standing.  *Id.*  Solomon asserted the court was free to "disregard inferences in favor of the prevailing party where they are belied by a video account in the record," and cited *Scott*, 550 U.S. at 380-81.  The court reasoned however, that the video footage neither confirmed nor refuted Solomon's account.  The jury had the opportunity to review both the footage and the testimony in context, and to perform a full assessment of each witness' credibility.

22
23
24
25
26

Here, due to the lack of lighting and the speed at which events occurred, the video does not clearly confirm or refute Defendants' account of events and, like *Castro*, can be reasonably interpreted to support the jury's verdict.  The video does not clearly negate Defendants' testimony that Plaintiff pulled a gun out of his waistband and pointed it in the officers' direction.  The low-lighting of the video renders it difficult to see whether there is an object in Plaintiff's hand or

27
28

[5] Following the Court's order on Defendants' motion for summary judgment, *Castro v. Cnty. of L.A.*, 785 F.3d 336 (9th Cir. 2015) was withdrawn and superseded in 797 F.3d 654 (9th Cir. 2015).  However, the Ninth Circuit's analysis of the video evidence was unchanged in the superseding opinion.  *Castro*, 797 F.3d at 666.

1   Plaintiff's exact movements with his hands.  For this reason, and those reasons discussed above in

2   considering the sufficiency of the evidence, the Court cannot conclude the video clearly and

3   unequivocally impeaches Defendants' version of events.

4        As discussed in *Carrethers*, 2012 WL 10048747, in cases of conflicting witness testimony,

5   courts have granted new trials when there is objective evidence that completely refutes a witness

6   such that the court is justified in disregarding that witness's testimony.  The *Carrethers* court cited

7   *Ruffin v. Fuller*, 125 F. Supp. 2d 105, 109-10 (S.D.N.Y 2000) where a new trial was granted to a

8   plaintiff in an excessive force case where medical evidence conclusively refuted the police

9   officers' claims as to how the plaintiff was injured.  In another case, the First Circuit affirmed a

10  district court's grant of a new trial where the only eyewitnesses supporting the plaintiff's testimony

11  were not in a physical position to see what they claimed to have seen.  *Jennings v. Jones*, 587 F.3d

12  430, 443 (1st Cir. 2009).  The *Jennings* court reasoned that the case was not one involving

13  questions only of witness demeanor but of clear objective evidence disproving witnesses'

14  statements.

15       This case is distinguishable from *Ruffin* and *Jennings* because it involves competing

16  testimony from Defendants and Plaintiff, as well as competing experts' opinions regarding the

17  nature of the threat Defendants faced.  For example, although Defendants claimed they began

18  firing as soon as they saw the gun in Plaintiff's hand, the video shows they did not fire until

19  Plaintiff had turned and taken a step or two away from Defendants.  Papenfuhs offered testimony

20  that there is a delay in officers' reaction time between perceiving an event and reacting to it.   As a

21  result, officers are trained how to manage "lag time, your being behind the curve, [so that] the

22  action of the bad guy can be managed."  (Doc. 177-7, Papenfuhs Tr. Test.,16:14-19:2.)   Thus,

23  although the officers perceived they fired as soon as they saw the gun, according to expert

24  testimony, the delayed response time led them to fire their weapons when Plaintiff was turning

25  away from them rather than at the very moment they perceived Plaintiff's gun.

26        Q.  Did the officers describe firing at him as he was – first firing at him as he was
           running away?
27        A.  No, that's not their description.
          Q.  What did they describe?
28

28

1    A.  They described that they fired at the subject when he was turning in their
direction and as he was pulling the firearm out.
2    Q.  Is that consistent with the video?
A.  No, it's not.
3    Q.  Can you explain why?
A.  Well, that would go to some of the action/reaction topics we were speaking
4    about earlier, about when they formulate the intent to fire and then when they
actually completed the trigger squeeze of the weapon.
5

6    (Doc. 177-7, Papenfuhs Trial Test., 43:4-17.)

7         As noted above, both Chavez and Lodwick testified they heard an argument and a gun

8    racking sound just prior to encountering Plaintiff.  On the one hand, the video does not capture any

9    sound of a gun racking or an argument but did capture the sound of talking and music.  It is a

10   reasonable inference that if an argument or gun racking had occurred, it would have been reflected

11   by the audio content on the video.  On the other hand, there was no evidence the microphone on

12   Chavez' glasses definitively would have detected every sound the officers claimed to have heard.

13   The video also records Lodwick asking Chavez, "Did you hear that?" right before Plaintiff came

14   through the gate, which is the type of contemporaneous statement that has inherent reliability.

15   Both officers testified the noise Lodwick was asking about was the gun-racking sound.  Although

16   the jury could have discredited Defendants' testimony about the argument or the gun racking based

17   on the video that did not capture these sounds, under the evidence presented the jury was not

18   *required* to do so.

19        Defendants testified they did not have time to warn Plaintiff they would shoot if he did not

20   show his hands.  Plaintiff notes they had time to say something to the extent of "stop" or "put your

21   hands up," thus there was time to give a warning.  However, the video shows that events unfolded

22   in only seconds from the time Plaintiff was illuminated and Defendants claim to have seen a gun

23   pointed in their direction to the time Plaintiff started to run and Defendants discharged their

24   weapons. The jury was instructed to consider the lack of warning as a factor in deciding the

25   reasonableness of Defendants' conduct.  In light of the video and Defendants' testimony, the jury

26   was not required to find that a warning was feasible or that Defendants' conduct was objectively

27   unreasonable.

28

1    In sum, the jury considered all the evidence discussed above, including the videotape, and

2    concluded Plaintiff had not established by a preponderance of the evidence that the force used by

3    Defendants was unreasonable under the circumstances.  Given the Court's rejection of Plaintiff's

4    argument that the video clearly impeaches and contravenes Defendants' testimony, a conclusion

5    that the clear weight of the evidence indicates the force used was unreasonable would be

6    substituting the Court's judgment for that of the jury, which it must not do.  *Wallace v. City of*

7    *S.D.*, 479 F.3d 616, 630 (9th Cir. 2007) (district court may not grant a new trial "simply because it

8    would have arrived at a different verdict").  In a case such as this, where there is conflicting

9    testimony and video evidence that does not clearly refute or support testimony offered by the

10   parties, the Court cannot re-interpret and apply the evidence to conclude the jury verdict

11   contravenes the clear weight of the evidence.  As such, a new trial is not warranted under the clear

12   weight of the evidence.

13        **2.      Defendants' Expert's Violation of A Motion in Limine Ruling Does Not**

14                **Require a New Trial**

15   Plaintiff asserts a new trial is necessary because Defendants' expert Papenfuhs violated the

16   Court's Motion in Limine order relating to the mention of gangs.  Although the Court immediately

17   provided a limiting instruction, Plaintiff maintains the issue was brought in front of the jury and

18   could not be undone.  Defendants argue the single mention of "gang language" is minimal and not

19   sufficiently prejudicial to warrant reversal of the jury's verdict.  *United States v. Wallace*, 848 F.2d

20   1464, 1475 (9th Cir. 1988).

21   After conducting a hearing on the parties' motions in limine on August 28, 2015, the Court

22   granted Plaintiff's motions in limine numbers 7 and 8 to exclude evidence, testimony, reference or

23   any argument which characterizes the party at the subject location as a "gang party" or persons in

24   attendance as "gang members," or that regards Kong's alleged gang affiliations.  (Doc. 101, p. 2,

25   ¶¶ 7-8.)

26

27

28

At trial, Papenfuhs gave the following testimony:

> Q.  Okay.  On arrival at the scene of a call of a man with a gun, what's the next factor you would consider as part of the totality of the circumstances to raise the level of alertness, awareness and/or danger that these officers confronted that night?
> A.  We're speaking to this event?
> Q.  This event.
> A.  Okay.  What next occurs to me is the fact that is when the officers got to their observation positions, their final positions of observation, they – well, Officer Lodwick actually, before getting to his final position, he was up – reported at the corner of the garage.  And at that position, and Officer Chavez at the back of a truck, both reported that they heard several subjects arguing.  There was [a] report that it was gang language involved in that –
> Mr. Berki:  Objection, Your Honor.  We're going to ask – Your Honor, we need to have a side bar, please.

(Doc. 177-7, Papenfuhs Tr. Test., 23:6-22.)

Out of the presence of the jury, Plaintiff's counsel argued, in part, as follows:

> You notified Mr. Papenfuhs before he got up on the stand that we are not to bring up any of these issues, including gang tattoos . . . And the fact that this has now come up in front of the jury and the fact that this jury now has some belief in their mind that there was allegedly some gang discussion going on taints the jury because, Your Honor, I can cite to the Court – and I will in a brief if necessary – tens of examples of gang and gang language and tattoos and those things being determined by both the Ninth Circuit and numerous district courts as being just completely inflammatory.  People hate it.  They don't like it.  They don't like gangs.  They don't like any of this stuff . . . The jury has now been tainted.  They now understand or have some belief that there may be a gang situation involved.  We believe that those are grounds for a mistrial based on the fact that the jury has been provided this information and a curative instruction would only exacerbate this situation because it would only identify further that there was this particular gang discussion and that he wasn't supposed to talk about it.  So it makes it out like we're trying to hide it from them.  And so we're asking at this time for a mistrial . . . .

(Doc. 177-7, 27:18-28-25.)

The Court denied the motion for a mistrial, and proposed a curative instruction, inviting counsel's input on the language of the instruction.  After discussing the language and timing of the curative instruction, the jury was brought back into court and given the following instruction:

> Ladies and gentlemen, Mr. Papenfuhs has testified that the argument the officers heard involved gang language.  The witness is mistaken and that portion of Mr. Papenfuhs' testimony is stricken.  There is no evidence to support his testimony regarding his characterization of what the officers heard and you may not consider it.  Thank you.

31

(Doc. 177, 38:3-9.)

"There is a strong presumption that the curative instructions given by the district court were followed by the jury."  *Doe v. Glanzer*, 232 F.3d 1258, 1270 (9th Cir. 2000) (citing *United States v. Pavon*, 561 F.2d 799, 803 (9th Cir. 1977)).  Although "some occurrences at trial may be too clearly prejudicial for such a curative instruction to mitigate their effect," *Donnelly v. DeChristoforo*, 416 U.S. 637, 644 (1974), the presumption that a jury will comply with a curative instruction is rebutted only in the "exceptional" case, *see United States v. Escalante*, 637 F.2d 1197, 1203 (9th Cir. 1980), where "there is an 'overwhelming probability' that the jury will be unable to follow the court's instructions . . . , and a strong likelihood that the effect of the evidence should be 'devastating' to [the moving party] . . . ."  *Greer v. Miller*, 483 U.S. 756, 767 (1987) n.8 (quoting *Richardson v. Marsh*, 481 U.S. 200, 208 (1987) and *Bruton v. United States*, 391 U.S. 123, 136 (1986)).

Here, the word "gang" was referenced by Papenfuhs only once, it was objected to before more testimony given, and the court immediately issued a curative instruction, striking the response and instructing the jury to disregard the statement.  Although gang evidence is potentially prejudicial, a single, fleeting reference to "gang" language was not incurably prejudicial.  The jury is presumed to have followed the Court's instructions.   Juries often hear unsolicited and inadmissible comments that they are instructed to disregard.  For trials to proceed without constant mistrial, it is fundamental that the prejudicial effect of this evidence may be corrected by judicial admonishment.  There is nothing in the record that rebuts the presumption the jury followed the instruction.  For these reasons, Plaintiff's motion for a new trial for Papenfuhs' reference to "gang" language is denied.

### 3.    Admission of Post-Incident Statements Does Not Require New Trial

Plaintiff raises this issue for the first time in his reply brief.  Plaintiff was interviewed while in custody following the incident, and he made numerous conflicting statements.  Plaintiff argues that by allowing Defendants to "repeatedly play" the interview video of Plaintiff making inconsistent statements, Defendants were allowed "to twist the case from one in which the focus should have been what the officers saw, to one focused on what the Plaintiff said hours later, after

1    hours of questioning, and while the Defendants had viewed the [incident] video already."   By

2    allowing Defendants to "shift the focus," the Court allowed unduly irrelevant and prejudicial

3    information in from the of the jury and confused the issue as to what the officers knew when they

4    seized Plaintiff to what Plaintiff may have later admitted in his post-incident interview.   This

5    caused jury confusion.

6        Reply briefs should be limited to matters raised in the opposition papers.   It is improper for

7    the moving party to introduce new facts or different legal arguments in the reply brief than

8    presented in the moving papers.   *See Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 894-95

9    (1990) (court has discretion to disregard late-filed factual matters); *Zamani v. Carnes*, 491 F.3d

10   990, 997 (9th Cir. 2007) ("district court need not consider arguments raised for the first time in a

11   reply brief"); *Ojo v. Farmers Grp., Inc.*, 565 F.3d 1175, 1186 n.13 (9th Cir. 2009); *Clark v. Cty. of

12   Tulare*, 755 F. Supp. 2d 1075, 1990 (E.D. Cal. 2010) (declining to consider immunity issue on

13   summary judgment when issue was raised improperly for the first time in reply papers).   This

14   issue was not properly briefed in Plaintiff's motion, and is not properly before the Court.

15       Moreover, the statements admitted from Plaintiff's post-incident interview were highly

16   relevant in that they corroborated Defendants' testimony that Plaintiff had a gun, pulled it out, and

17   pointed it in their direction.   This is directly relevant and probative to the totality of the

18   circumstances Defendants confronted when they encountered Plaintiff, and there is no reason to

19   believe Plaintiff's post-interview statements rendered the jury emotionally incapable of engaging

20   in rational thought.   Fed. R. Evid. 403, Adv. Comm. Note ("'Unfair prejudice' . . . means an undue

21   tendency to suggest decision on an improper basis, commonly, though not necessarily, an

22   emotional one.").   Although the statements are prejudicial to Plaintiff in that they bolster

23   Defendants' testimony about the circumstances surrounding their use of force, they are not unduly

24   or unfairly prejudicial under the balancing test of Rule 403.

25

26

27

28

1

## V.    CONCLUSION

2        For the reasons set forth above, IT IS HEREBY ORDERED that Plaintiff's renewed

3   motion for judgment as a matter of law and motion for a new trial is DENIED.

4

IT IS SO ORDERED.

5

6   Dated:   **January 28, 2016**                              **/s/ Sheila K. Oberto**
                                                        UNITED STATES MAGISTRATE JUDGE
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28